FILED

2017 JUL 21  PM 1:12

CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF.
LOS ANGELES

BY_____

Wayne Spindler
P.O. Box 16501
Encino, CA. 91416-6501
(213) 381-1403—phone
(213) 381-5542-fax

*In propia persona*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Wayne Spindler,** | **Case No.: 2:17-cv-00250-JLS-E** |
| **Plaintiff,** | Complaint Filed: January 11, 2017 |
| | **DEMAND FOR JURY TRIAL** |
| **vs.** | {Honorable Josephine L. Staton} |
| **City of Los Angeles; Herman J.** | **PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS OPPOSITION TO DEFENDANTS' MOTION TO DISMISS UNDER F.R.C.P. 12 (b)(6)AND MOTION TO STRIKE UNDER F.R.C.P. 12 (f).** |
| **Wesson Jr.; Hugo S. Rossitter; Eric** | |
| **Reade; Nelly Nava-Mercado;** | |
| **and Does 1 to 10,** | Due Date: July 24, 2017 |
| | Hon. Charles F. Eick |
| **Defendants.** | [filed concurrently with Plaintiff's Declaration;(proposed) Order; Plaintiff's Memorandum of Points and Authorities in Opposition; and Statement of Genuine Disputes.] |

- 1 -

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS OPPOSITION TO DEFENDANTS' MOTION TO DISMISS UNDER F.R.C.P. 12 (b)(6)AND MOTION TO STRIKE UNDER F.R.C.P. 12 (f).**

## I.        DOCUMENTS SUBJECT TO JUDICIAL NOTICE

Pursuant to Rule 201 of the Federal Rules of Evidence, Plaintiff request that judicial notice of the following documents, attached hereto:

- **EXHIBIT A** is a public record and a reproduction of the Ralph M. Brown Act.

- **EXHIBIT B:** is a Court record: Brief of Plaintiff on T.R.O. Appeal. Case # B276413, 2nd Dist. CA. Ct. of Appeal.

- **EXHIBIT C:** is a Court record: Transcript of a Superior Court action, Case No: BS162858 *City of Los Angeles v. Michael Hunt*

- **EXHIBIT D:** is a public record an article of the Los Angeles Times dated June 12, 2014 by David Zahniser-Contact Reporter and available at www.latimes.com/local/cityhall describing attorney Stephen F. Rohde's (who is the author of Defendant's exhibit A in their judicial notice packet) successful litigation against the Defendant City of Los Angeles for issues relating to alleged violations of public meeting laws that are similar to this suit and that Defendants are aware of.

- **EXHIBIT E:** is a public record L.A. Daily News article

- 2 -

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS OPPOSITION TO DEFENDANTS' MOTION TO DISMISS UNDER F.R.C.P. 12 (b)(6)AND MOTION TO STRIKE UNDER F.R.C.P. 12 (f).**

regarding another Rossitter filed T.R.O. against a public speaker.

- **EXHIBIT F:** is a public record, Case No BS162097 entitled **Office of the City Attorney v. Spindler** order of May 19, 2016 granting Defendants' attorney a restraining order for a claimed employee of theirs, a "Herman J. Wesson."

- **EXHIBIT G:** A declaration of "Herman J. Wesson, Jr." filed pursuant to case No. BS162097 signed under penalty of perjury that among other things shows **he does not work for nor is he an employee of** the Office of the City Attorney.

- **EXHIBIT H:** L.A. Times article, a public record dated March 29, 2017 showing Defendants' Attorneys filed a criminal charge against the Plaintiff

- **EXHIBIT I:** An article, a public record available on news blog L.A. City Watch Los Angeles dated April 3, 2017 showing incidents involving Plaintiff and the Defendant City of Los Angeles and Defendants' Attorney.

- **EXHIBIT J:** Public record as of April 2017 of Case No. 7VW01632 *People v. Spindler*, the Docket of the criminal matter.

- 3 -

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS OPPOSITION TO DEFENDANTS' MOTION TO DISMISS UNDER F.R.C.P. 12 (b)(6)AND MOTION TO STRIKE UNDER F.R.C.P. 12 (f).**

- **EXHIBIT K:** Is a public record and case regarding the the City losing a case attempting to restrict free speech at meetings, *Dowd v. City of Los Angeles.*

- **EXHIBIT L:** *Hunt v. City of Los Angeles* CV-12-7261 another case of the City losing attempts to restrict free speech at public meetings.

- **EXHIBIT M:** Meeting agenda for May 11, 2016 incident

- **EXHIBIT N:** Case filing B276413 Extension of time

- **EXHIBIT O:** Daily News article July 11, 2017

- **EXHIBIT P:** L.A. Times article July 17, 2017

## II.        JUDICIAL NOTICE IS PROPER

Rule 201 of the Federal Rules of Evidence permits judicial notice of a fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned."

Exhibits A to P are proper subjects of judicial notice because a court may properly take judicial notice of "court filings and other matters of public record." Federal Rules of Evidence 201(b); *Reyn's Pasta Bella, LLC v. Vista USA, Inc.*

- 4 -

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS OPPOSITION TO DEFENDANTS' MOTION TO DISMISS UNDER F.R.C.P. 12 (b)(6)AND MOTION TO STRIKE UNDER F.R.C.P. 12 (f).**

442 F.3d 741 (9th Cir. 2006.)

All records for which the Plaintiff requests judicial notice have a direct relation to matters at issue in this case, insofar as Plaintiff's allegations of violations and as applied violations to Rules of Decorum at public meetings and repeated violations of First Amendment and open meeting violations ongoing since last being noticed and litigated, and thus shifting the burden of proof to the Defendants in their continuous policy of civil rights violations enlisted by Plaintiff such as per *Monell* claims, including "as-applied" challenges to Civil Code of Procedure §527.8 and P.C. §422.

Defendants cite these rules of Decorum and reference the litigation of Michael Hunt and Stephen Rohde such that its authenticity by Defendants is not questioned *Branch v. Tunnell* 14 F.3d 449 (9th Cir. 1994.) ("[A] document 'outside' the complaint if the complaint specifically refers to the document and if its authenticity is not questioned.")

Further, the Defendants without question have admitted to the prior litigation that alleged violations of civil rights such as this current suit that ultimately resulted in those Plaintiffs prevailing either via settlement or nominally with the attorney's fees awarded in those cases in the six figure level.

- 5 -

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS OPPOSITION TO DEFENDANTS' MOTION TO DISMISS UNDER F.R.C.P. 12 (b)(6)AND MOTION TO STRIKE UNDER F.R.C.P. 12 (f).**

Defendants' Attorney is also a party to current litigation against the Plaintiff over a restraining order involving a non-existent employee of the City Attorney that the City Attorney knows and knew full well never has nor works for **them.** Exhibit F. Exhibit G is the declaration of the so-called employee: The person referred to falsely as the City Attorney's employee is none other than the L.A. City Council President, Herman Jason Wesson, Jr., who under oath states clearly he is not employed by the City Attorney's office.

The Defendants' attorneys, the City Attorney of Los Angeles, garnered and received information from Plaintiff regarding Plaintiff's guns, one of these guns was a pre-banned AK-47 similar type gun. The Defendant City on May 20, 2016 could not locate in their computer a registration for this 1989 purchased weapon. The Plaintiff produced the receipt for the 1989 purchase of the gun. The filing of the sham Restraining Order and Plaintiff complying with the Judge's Order  May 20, 2016 was the basis for the information to file the criminal complaint on April 4, 2017, because the T.R.O. gained by Defendants' Attorney forced the Plaintiff under threat of arrest to turn in all guns in his possession within 24 hours of being served with the T.R.O. and hearing date on it.[1]

---

[1] Since the last filing, the case resulted in a sham "infraction disturbing the

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS OPPOSITION TO DEFENDANTS' MOTION TO DISMISS UNDER F.R.C.P. 12 (b)(6)AND MOTION TO STRIKE UNDER F.R.C.P. 12 (f).**

### III.    CONCLUSION

For the reasons stated above, Plaintiff respectfully requests that the Court take Judicial notice of each of the above listed documents and transcripts.

Dated this 20 Day of July 2017

_____

Wayne Spindler
*In propia persona*

peace" no contest plea. The gun charge was a sham and filed to harass and gain an advantage in these civil rights cases, unethically. *See* CAL. Ethics Rule 5-100.

– 7 –

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS OPPOSITION TO DEFENDANTS' MOTION TO DISMISS UNDER F.R.C.P. 12 (b)(6)AND MOTION TO STRIKE UNDER F.R.C.P. 12 (f).**

# EXHIBIT A

8

APPENDIX B

## THE RALPH M. BROWN ACT

### CONTENTS

§ 54950.        Policy declaration
§ 54950.5.      Title
§ 54951.        Definition of local agency
§ 54952.        Definition of legislative body
§ 54952.1.      Definition of member of a legislative body
§ 54952.2.      Definition of meeting
§ 54952.6.      Definition of action taken
§ 54952.7.      Copies of Act; Distribution
§ 54953.        Open meetings required; Teleconferencing; Secret ballots
§ 54953.1.      Grand jury testimony by members
§ 54953.3.      Conditions to attendance at meetings
§ 54953.2.      Meeting; Disability rights
§ 54953.5.      Recording meetings
§ 54953.6.      Broadcasting meetings
§ 54953.7.      Greater access to meetings permitted
§ 54954.        Notice of regular meetings; Boundary restrictions for all meetings
§ 54954.1.      Agenda information provided by mail; Fee
§ 54954.2.      Agenda requirements; Regular meetings
§ 54954.3.      Public's right to testify at meetings
§ 54954.4.      Reimbursement of costs
§ 54954.5.      Safe harbor agenda for closed sessions
§ 54954.6.      New taxes and/or assessments; Procedural requirements
§ 54955.        Adjournment
§ 54955.1.      Continuance
§ 54956.        Special meetings
§ 54956.5.      Emergency meetings
§ 54956.6.      Fees
§ 54956.7.      Closed session; License application of rehabilitated criminal
§ 54956.8.      Closed session; Real Property negotiations
§ 54956.86.     Closed session; Health claims
§ 54956.87.     Record exempt; Closed session; County health plan
§ 54956.9.      Closed session; Pending litigation
§ 54956.95.     Closed session; Insurance liability
§ 54957.        Closed session; Personnel and threat to public security
§ 54957.1.      Report at conclusion of closed session
§ 54957.2.      Minutes of closed session
§ 54957.5.      Agendas and other materials; Public records

Exhibit A

9

§ 54957.6.    Closed session; Labor negotiations
§ 54957.7.    Announcement prior to closed sessions
§ 54957.8.    Closed session; Multijurisdictional drug enforcement agency
§ 54957.9.    Disruption of meeting
§ 54957.10.   Closed session; Deferred Compensation Plan; Early withdrawal
§ 54958.      Act supercedes conflicting laws
§ 54959.      Violation of Act; Criminal penalty
§ 54960.      Violation of Act; Civil remedies
§ 54960.1.    Violation of Act; Actions declared null and void
§ 54960.5.    Costs and attorney fees
§ 54961.      Discrimination; Disabled access; Fees for attendance;
              Disclosure of victims
§ 54962.      Closed session; Express authorization required
§ 54963.      Closed session; Disclosure of confidential information

## THE RALPH M. BROWN ACT

**54950.      Policy declaration**

In enacting this chapter, the Legislature finds and declares that the public commissions, boards and councils and the other public agencies in this State exist to aid in the conduct of the people's business. It is the intent of the law that their actions be taken openly and that their deliberations be conducted openly.

The people of this State do not yield their sovereignty to the agencies which serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments they have created.

**54950.5.    Title**

This chapter shall be known as the Ralph M. Brown Act.

**54951.      Definition of local agency**

As used in this chapter, "local agency" means a county, city, whether general law or chartered, city and county, town, school district, municipal corporation, district, political subdivision, or any board, commission or agency thereof, or other local public agency.

51

10

**54952.**     **Definition of legislative body**

As used in this chapter, "legislative body" means:

(a)     The governing body of a local agency or any other local body created by state or federal statute.

(b)     A commission, committee, board, or other body of a local agency, whether permanent or temporary, decisionmaking or advisory, created by charter, ordinance, resolution, or formal action of a legislative body.  However, advisory committees, composed solely of the members of the legislative body that are less than a quorum of the legislative body are not legislative bodies, except that standing committees of a legislative body, irrespective of their composition, which have a continuing subject matter jurisdiction, or a meeting schedule fixed by charter, ordinance, resolution, or formal action of a legislative body are legislative bodies for purposes of this chapter.

(c)     (1)     A board, commission, committee, or other multimember body that governs a private corporation, limited liability company, or other entity that either:

(A)     Is created by the elected legislative body in order to exercise authority that may lawfully be delegated by the elected governing body to a private corporation, limited liability company, or other entity.

(B)     Receives funds from a local agency and the membership of whose governing body includes a member of the legislative body of the local agency appointed to that governing body as a full voting member by the legislative body of the local agency.

(2)     Notwithstanding subparagraph (B) of paragraph (1), no board, commission, committee, or other multimember body that governs a private corporation, limited liability company, or other entity that receives funds from a local agency and, as of February 9, 1996, has a member of the legislative body of the local agency as a full voting member of the governing body of that private corporation, limited liability company, or other entity shall be relieved from the public meeting requirements of this chapter by virtue of a change in status of the full voting member to a nonvoting member.

(d)     The lessee of any hospital the whole or part of which is first leased pursuant to subdivision (p) of Section 32121 of the Health and Safety Code after January 1, 1994, where the lessee exercises any material authority of a legislative body of a local agency delegated to it by that legislative body whether the lessee is organized and operated by the local agency or by a delegated authority.

**54952.1.**     **Definition of member of a legislative body**

Any person elected to serve as a member of a legislative body who has not yet assumed the duties of office shall conform his or her conduct to the requirements of this chapter and shall be treated for purposes of enforcement of this chapter as if he or she has already assumed office.

**54952.2.**     **Definition of meeting**

(a)     As used in this chapter, "meeting" includes any congregation of a majority of the members of a legislative body at the same time and place to hear, discuss, or deliberate upon any item that is within the subject matter jurisdiction of the legislative body or the local agency to which it pertains.

(b)     Except as authorized pursuant to Section 54953, any use of direct communication, personal intermediaries, or technological devices that is employed by a majority of the members of the legislative body to develop a collective concurrence as to action to be taken on an item by the members of the legislative body is prohibited.

(c)     Nothing in this section shall impose the requirements of this chapter upon any of the following:

(1)     Individual contacts or conversations between a member of a legislative body and any other person.

(2)     The attendance of a majority of the members of a legislative body at a conference or similar gathering open to the public that involves a discussion of issues of general interest to the public or to public agencies of the type represented by the legislative body, provided that a majority of the members do not discuss among themselves, other than as part of the scheduled program, business of a specified nature that is within the subject matter jurisdiction of the local agency. Nothing in this paragraph is intended to allow members of the public free admission to a conference or similar gathering at which the organizers have required other participants or registrants to pay fees or charges as a condition of attendance.

(3)     The attendance of a majority of the members of a legislative body at an open and publicized meeting organized to address a topic of local community concern by a person or organization other than the local agency, provided that a majority of the members do not discuss among themselves, other than as part of the scheduled program, business of a specific nature that is within the subject matter jurisdiction of the legislative body of the local agency.

(4)     The attendance of a majority of the members of a legislative body at an open and noticed meeting of another body of the local agency, or at an open and noticed meeting of a legislative body of another local agency, provided that a majority of the members do not discuss among

12

themselves, other than as part of the scheduled meeting, business of a specific nature that is within the subject matter jurisdiction of the legislative body of the local agency.

(5)   The attendance of a majority of the members of a legislative body at a purely social or ceremonial occasion, provided that a majority of the members do not discuss among themselves business of a specific nature that is within the subject matter jurisdiction of the legislative body of the local agency.

(6)   The attendance of a majority of the members of a legislative body at an open and noticed meeting of a standing committee of that body, provided that the members of the legislative body who are not members of the standing committee attend only as observers.

54952.6.      Definition of action taken

As used in this chapter, "action taken" means a collective decision made by a majority of the members of a legislative body, a collective commitment or promise by a majority of the members of a legislative body to make a positive or a negative decision, or an actual vote by a majority of the members of a legislative body when sitting as a body or entity, upon a motion, proposal, resolution, order or ordinance.

54952.7.      Copies of Act; Distribution

A legislative body of a local agency may require that a copy of this chapter be given to each member of the legislative body and any person elected to serve as a member of the legislative body who has not assumed the duties of office. An elected legislative body of a local agency may require that a copy of this chapter be given to each member of each legislative body all or a majority of whose members are appointed by or under the authority of the elected legislative body.

54953.      Open meetings required; Teleconferencing; Secret ballots

(a)   All meetings of the legislative body of a local agency shall be open and public, and all persons shall be permitted to attend any meeting of the legislative body of a local agency, except as otherwise provided in this chapter.

(b)   (1)   Notwithstanding any other provision of law, the legislative body of a local agency may use teleconferencing for the benefit of the public and the legislative body of a local agency in connection with any meeting or proceeding authorized by law. The teleconferenced meeting or proceeding shall comply with all requirements of this chapter and all otherwise applicable provisions of law relating to a specific type of meeting or proceeding.

(2)   Teleconferencing, as authorized by this section, may be used for all purposes in connection with any meeting within the subject matter jurisdiction of the legislative body. All votes taken during a teleconferenced meeting shall be by rollcall.

13

(3)    If the legislative body of a local agency elects to use teleconferencing, it shall post agendas at all teleconference locations and conduct teleconference meetings in a manner that protects the statutory and constitutional rights of the parties or the public appearing before the legislative body of a local agency. Each teleconference location shall be identified in the notice and agenda of the meeting or proceeding, and each teleconference location shall be accessible to the public. During the teleconference, at least a quorum of the members of the legislative body shall participate from locations within the boundaries of the territory over which the local agency exercises jurisdiction. The agenda shall provide an opportunity for members of the public to address the legislative body directly pursuant to Section 54954.3 at each teleconference location.

(4)    For the purposes of this section, "teleconference" means a meeting of a legislative body, the members of which are in different locations, connected by electronic means, through either audio or video, or both. Nothing in this section shall prohibit a local agency from providing the public with additional teleconference locations.

(c)    No legislative body shall take action by secret ballot, whether preliminary or final.

## 54953.2.    Meeting; Disability rights

All meetings of a legislative body of a local agency that are open and public shall meet the protections and prohibitions contained in Section 202 of the Americans with Disabilities Act of 1990 (42 U.S.C. Sec. 12132), and the federal rules and regulations adopted in implementation thereof.

## 54953.1.    Grand jury testimony by members

The provisions of this chapter shall not be construed to prohibit the members of the legislative body of a local agency from giving testimony in private before a grand jury, either as individuals or as a body.

## 54953.3.    Conditions to attendance at meetings

A member of the public shall not be required, as a condition to attendance at a meeting of a legislative body of a local agency, to register his or her name, to provide other information, to complete a questionnaire, or otherwise to fulfill any condition precedent to his or her attendance.

If an attendance list, register, questionnaire, or other similar document is posted at or near the entrance to the room where the meeting is to be held, or is circulated to the persons present during the meeting, it shall state clearly that the signing, registering, or completion of the document is voluntary, and that all persons may attend the meeting regardless of whether a person signs, registers, or completes the document.

14

**54953.5.**     **Recording meetings**

(a)     Any person attending an open and public meeting of a legislative body of a local agency shall have the right to record the proceedings with an audio or video tape recorder or a still or motion picture camera in the absence of a reasonable finding by the legislative body of the local agency that the recording cannot continue without noise, illumination, or obstruction of view that constitutes, or would constitute, a persistent disruption of the proceedings.

(b)     Any tape or film record of an open and public meeting made for whatever purpose by or at the direction of the local agency shall be subject to inspection pursuant to the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1), but, notwithstanding Section 34090, may be erased or destroyed 30 days after the taping or recording. Any inspection of a video or tape recording shall be provided without charge on a video or tape player made available by the local agency.

**54953.6.**     **Broadcasting meetings**

No legislative body of a local agency shall prohibit or otherwise restrict the broadcast of its open and public meetings in the absence of a reasonable finding that the broadcast cannot be accomplished without noise, illumination, or obstruction of view that would constitute a persistent disruption of the proceedings.

**54953.7.**     **Greater access to meetings permitted**

Notwithstanding any other provision of law, legislative bodies of local agencies may impose requirements upon themselves which allow greater access to their meetings than prescribed by the minimal standards set forth in this chapter. In addition thereto, an elected legislative body of a local agency may impose such requirements on those appointed legislative bodies of the local agency of which all or a majority of the members are appointed by or under the authority of the elected legislative body.

**54954.**     **Notice of regular meetings; Boundary restrictions for all meetings**

(a)     Each legislative body of a local agency, except for advisory committees or standing committees, shall provide, by ordinance, resolution, bylaws, or by whatever other rule is required for the conduct of business by that body, the time and place for holding regular meetings. Meetings of advisory committees or standing committees, for which an agenda is posted at least 72 hours in advance of the meeting pursuant to subdivision (a) of Section 54954.2, shall be considered for purposes of this chapter as regular meetings of the legislative body.

(b)     Regular and special meetings of the legislative body shall be held within the boundaries of the territory over which the local agency exercises jurisdiction, except to do any of the following:

15

(1)     Comply with state or federal law or court order, or attend a judicial or administrative proceeding to which the local agency is a party.

(2)     Inspect real or personal property which cannot be conveniently brought within the boundaries of the territory over which the local agency exercises jurisdiction provided that the topic of the meeting is limited to items directly related to the real or personal property.

(3)     Participate in meetings or discussions of multiagency significance that are outside the boundaries of a local agency's jurisdiction.  However, any meeting or discussion held pursuant to this subdivision shall take place within the jurisdiction of one of the participating local agencies and be noticed by all participating agencies as provided for in this chapter.

(4)     Meet in the closest meeting facility if the local agency has no meeting facility within the boundaries of the territory over which the local agency exercises jurisdiction, or at the principal office of the local agency if that office is located outside the territory over which the agency exercises jurisdiction.

(5)     Meet outside their immediate jurisdiction with elected or appointed officials of the United States or the State of California when a local meeting would be impractical, solely to discuss a legislative or regulatory issue affecting the local agency and over which the federal or state officials have jurisdiction.

(6)     Meet outside their immediate jurisdiction if the meeting takes place in or nearby a facility owned by the agency, provided that the topic of the meeting is limited to items directly related to the facility.

(7)     Visit the office of the local agency's legal counsel for a closed session on pending litigation held pursuant to Section 54956.9, when to do so would reduce legal fees or costs.

(c)     Meetings of the governing board of a school district shall be held within the district except under the circumstances enumerated in subdivision (b), or to do any of the following:

(1)     Attend a conference on nonadversarial collective bargaining techniques.

(2)     Interview members of the public residing in another district with reference to the trustees' potential employment of the superintendent of that district.

(3)     Interview a potential employee from another district.

(d)     Meetings of a joint powers authority shall occur within the territory of at least one of its member agencies, or as provided in subdivision (b).  However, a joint powers authority which has members throughout the state may meet at any facility in the state which complies with the requirements of Section 54961.

(e)    If, by reason of fire, flood, earthquake, or other emergency, it shall be unsafe to meet in the place designated, the meetings shall be held for the duration of the emergency at the place designated by the presiding officer of the legislative body or his or her designee in a notice to the local media that have requested notice pursuant to Section 54956, by the most rapid means of communication available at the time.

## 54954.1.    Agenda information provided by mail; Fee

Any person may request that a copy of the agenda, or a copy of all the documents constituting the agenda packet, of any meeting of a legislative body be mailed to that person. If requested, the agenda and documents in the agenda packet shall be made available in appropriate alternative formats to persons with a disability, as required by Section 202 of the Americans with Disabilities Act of 1990 (42 U.S.C. Sec. 12132), and the federal rules and regulations adopted in implementation thereof. Upon receipt of the written request, the legislative body or its designee shall cause the requested materials to be mailed at the time the agenda is posted pursuant to Section 54954.2 and 54956 or upon distribution to all, or a majority of all, of the members of a legislative body, whichever occurs first. Any request for mailed copies of agendas or agenda packets shall be valid for the calendar year in which it is filed, and must be renewed following January 1 of each year. The legislative body may establish a fee for mailing the agenda or agenda packet, which fee shall not exceed the cost of providing the service. Failure of the requesting person to receive the agenda or agenda packet pursuant to this section shall not constitute grounds for invalidation of the actions of the legislative body taken at the meeting for which the agenda or agenda packet was not received.

## 54954.2.    Agenda requirements; Regular meetings

(a)    At least 72 hours before a regular meeting, the legislative body of the local agency, or its designee, shall post an agenda containing a brief general description of each item of business to be transacted or discussed at the meeting, including items to be discussed in closed session. A brief general description of an item generally need not exceed 20 words. The agenda shall specify the time and location of the regular meeting and shall be posted in a location that is freely accessible to members of the public. If requested, the agenda shall be made available in appropriate alternative formats to persons with a disability, as required by Section 202 of the Americans with Disabilities Act of 1990 (42 U.S.C. Sec. 12132), and the federal rules and regulations adopted in implementation thereof. The agenda shall include information regarding how, to whom, and when a request for disability-related modification or accommodation, including auxiliary aids or services may be made by a person with a disability who requires a modification or accommodation in order to participate in the public meeting.

No action or discussion shall be undertaken on any item not appearing on the posted agenda, except that members of a legislative body or its staff may briefly respond to statements made or questions posed by persons exercising their public testimony rights under Section 54954.3. In addition, on their own initiative or in response to questions posed by the public, a member of a legislative body or its staff may ask a question for clarification, make a brief announcement, or make a brief report on

his or her own activities. Furthermore, a member of a legislative body, or the body itself, subject to rules or procedures of the legislative body, may provide a reference to staff or other resources for factual information, request staff to report back to the body at a subsequent meeting concerning any matter, or take action to direct staff to place a matter of business on a future agenda.

(b)    Notwithstanding subdivision (a), the legislative body may take action on items of business not appearing on the posted agenda under any of the conditions stated below. Prior to discussing any item pursuant to this subdivision, the legislative body shall publicly identify the item.

(1)    Upon a determination by a majority vote of the legislative body that an emergency situation exists, as defined in Section 54956.5.

(2)    Upon a determination by a two-thirds vote of the members of the legislative body present at the meeting, or, if less than two-thirds of the members are present, a unanimous vote of those members present, that there is a need to take immediate action and that the need for action came to the attention of the local agency subsequent to the agenda being posted as specified in subdivision (a).

(3)    The item was posted pursuant to subdivision (a) for a prior meeting of the legislative body occurring not more than five calendar days prior to the date action is taken on the item, and at the prior meeting the item was continued to the meeting at which action is being taken.

**54954.3.    Public's right to testify at meetings**

(a)    Every agenda for regular meetings shall provide an opportunity for members of the public to directly address the legislative body on any item of interest to the public, before or during the legislative body's consideration of the item, that is within the subject matter jurisdiction of the legislative body, provided that no action shall be taken on any item not appearing on the agenda unless the action is otherwise authorized by subdivision (b) of Section 54954.2. However, the agenda need not provide an opportunity for members of the public to address the legislative body on any item that has already been considered by a committee, composed exclusively of members of the legislative body, at a public meeting wherein all interested members of the public were afforded the opportunity to address the committee on the item, before or during the committee's consideration of the item, unless the item has been substantially changed since the committee heard the item, as determined by the legislative body. Every notice for a special meeting shall provide an opportunity for members of the public to directly address the legislative body concerning any item that has been described in the notice for the meeting before or during consideration of that item.

(b)    The legislative body of a local agency may adopt reasonable regulations to ensure that the intent of subdivision (a) is carried out, including, but not limited to, regulations limiting the total amount of time allocated for public testimony on particular issues and for each individual speaker.

(c)     The legislative body of a local agency shall not prohibit public criticism of the policies, procedures, programs, or services of the agency, or of the acts or omissions of the legislative body. Nothing in this subdivision shall confer any privilege or protection for expression beyond that otherwise provided by law.

**54954.4.     Reimbursement of costs**

(a)     The Legislature hereby finds and declares that Section 12 of Chapter 641 of the Statutes of 1986, authorizing reimbursement to local agencies and school districts for costs mandated by the state pursuant to that act, shall be interpreted strictly.  The intent of the Legislature is to provide reimbursement for only those costs which are clearly and unequivocally incurred as the direct and necessary result of compliance with Chapter 641 of the Statutes of 1986.

(b)     In this regard, the Legislature directs all state employees and officials involved in reviewing or authorizing claims for reimbursement, or otherwise participating in the reimbursement process, to rigorously review each claim and authorize only those claims, or parts thereof, which represent costs which are clearly and unequivocally incurred as the direct and necessary result of compliance with Chapter 641 of the Statutes of 1986 and for which complete documentation exists. For purposes of Section 54954.2, costs eligible for reimbursement shall only include the actual cost to post a single agenda for any one meeting.

(c)     The Legislature hereby finds and declares that complete, faithful, and uninterrupted compliance with the Ralph M. Brown Act (Chapter 9 (commencing with Section 54950) of Part 1 of Division 2 of Title 5 of the Government Code) is a matter of overriding public importance. Unless specifically stated, no future Budget Act, or related budget enactments, shall, in any manner, be interpreted to suspend, eliminate, or otherwise modify the legal obligation and duty of local agencies to fully comply with Chapter 641 of the Statutes of 1986 in a complete, faithful, and uninterrupted manner.

**54954.5.     Safe harbor agenda for closed sessions**

For purposes of describing closed session items pursuant to Section 54954.2, the agenda may describe closed sessions as provided below. No legislative body or elected official shall be in violation of Section 54954.2 or 54956 if the closed session items were described in substantial compliance with this section. Substantial compliance is satisfied by including the information provided below, irrespective of its format.

(a)     With respect to a closed session held pursuant to Section 54956.7:

LICENSE/PERMIT DETERMINATION

Applicant(s): (Specify number of applicants)

60

19

(b)    With respect to every item of business to be discussed in closed session pursuant to Section 54956.8:

## CONFERENCE WITH REAL PROPERTY NEGOTIATORS

Property: (Specify street address, or if no street address, the parcel number or other unique reference, of the real property under negotiation)

Agency negotiator: (Specify names of negotiators attending the closed session) (If circumstances necessitate the absence of a specified negotiator, an agent or designee may participate in place of the absent negotiator so long as the name of the agent or designee is announced at an open session held prior to the closed session.)

Negotiating parties: (Specify name of party (not agent))

Under negotiation: (Specify whether instruction to negotiator will concern price, terms of payment, or both)

(c)    With respect to every item of business to be discussed in closed session pursuant to Section 54956.9:

## CONFERENCE WITH LEGAL COUNSEL--EXISTING LITIGATION
(Subdivision (a) of Section 54956.9)

Name of case: (Specify by reference to claimant's name, names of parties, case or claim numbers)

or

Case name unspecified: (Specify whether disclosure would jeopardize service of process or existing settlement negotiations)

## CONFERENCE WITH LEGAL COUNSEL--ANTICIPATED LITIGATION

Significant exposure to litigation pursuant to subdivision (b) of Section 54956.9: (Specify number of potential cases)

(In addition to the information noticed above, the agency may be required to provide additional information on the agenda or in an oral statement prior to the closed session pursuant to subparagraphs (B) to (E), inclusive, of paragraph (3) of subdivision (b) of Section 54956.9.)

61

Initiation of litigation pursuant to subdivision (c) of Section 54956.9: (Specify number of potential cases)

(d)    With respect to every item of business to be discussed in closed session pursuant to Section 54956.95:

LIABILITY CLAIMS

Claimant: (Specify name unless unspecified pursuant to Section 54961)

Agency claimed against: (Specify name)

(e)    With respect to every item of business to be discussed in closed session pursuant to Section 54957:

THREAT TO PUBLIC SERVICES OR FACILITIES

Consultation with: (Specify name of law enforcement agency and title of officer, or name of applicable agency representative and title)

PUBLIC EMPLOYEE APPOINTMENT

Title: (Specify description of position to be filled)

PUBLIC EMPLOYMENT

Title: (Specify description of position to be filled)

PUBLIC EMPLOYEE PERFORMANCE EVALUATION

Title: (Specify position title of employee being reviewed)

PUBLIC EMPLOYEE DISCIPLINE/DISMISSAL/RELEASE

(No additional information is required in connection with a closed session to consider discipline, dismissal, or release of a public employee. Discipline includes potential reduction of compensation.)

(f)    With respect to every item of business to be discussed in closed session pursuant to Section 54957.6:

CONFERENCE WITH LABOR NEGOTIATORS

Agency designated representatives:  (Specify names of designated representatives attending the closed session) (If circumstances necessitate the absence of a specified designated representative, an agent or designee may participate in place of the absent representative so long as the name of the agent or designee is announced at an open session held prior to the closed session.)

Employee organization: (Specify name of organization representing employee or employees in question)

or

Unrepresented employee: (Specify position title of unrepresented employee who is the subject of the negotiations)

(g)    With respect to closed sessions called pursuant to Section 54957.8:

CASE REVIEW/PLANNING

(No additional information is required in connection with a closed session to consider case review or planning.)

(h)    With respect to every item of business to be discussed in closed session pursuant to Sections 1461, 32106, and 32155 of the Health and Safety Code or Sections 37606 and 37624.3 of the Government Code:

REPORT INVOLVING TRADE SECRET

Discussion will concern: (Specify whether discussion will concern proposed new service, program, or facility)

Estimated date of public disclosure: (Specify month and year)

HEARINGS

Subject matter: (Specify whether testimony/deliberation will concern staff privileges, report of medical audit committee, or report of quality assurance committee)

(i)    With respect to every item of business to be discussed in closed session pursuant to Section 54956.86:

63

22

CHARGE OR COMPLAINT INVOLVING INFORMATION PROTECTED BY FEDERAL LAW

(No additional information is required in connection with a closed session to discuss a charge or complaint pursuant to Section 54956.86.)

54954.6.      New taxes and/or assessments; Procedural requirements

(a)   (1)   Before adopting any new or increased general tax or any new or increased assessment, the legislative body of a local agency shall conduct at least one public meeting at which local officials shall allow public testimony regarding the proposed new or increased general tax or new or increased assessment in addition to the noticed public hearing at which the legislative body proposes to enact or increase the general tax or assessment.

For purposes of this section, the term "new or increased assessment" does not include any of the following:

(A)   A fee that does not exceed the reasonable cost of providing the services, facilities, or regulatory activity for which the fee is charged.

(B)   A service charge, rate, or charge, unless a special district's principal act requires the service charge, rate, or charge to conform to the requirements of this section.

(C)   An ongoing annual assessment if it is imposed at the same or lower amount as any previous year.

(D)   An assessment that does not exceed an assessment formula or range of assessments previously specified in the notice given to the public pursuant to subparagraph (G) of paragraph (2) of subdivision (c) and that was previously adopted by the agency or approved by the voters in the area where the assessment is imposed.

(E)   Standby or immediate availability charges.

(2)   The legislative body shall provide at least 45 days' public notice of the public hearing at which the legislative body proposes to enact or increase the general tax or assessment. The legislative body shall provide notice for the public meeting at the same time and in the same document as the notice for the public hearing, but the meeting shall occur prior to the hearing.

(b)   (1)   The joint notice of both the public meeting and the public hearing required by subdivision (a) with respect to a proposal for a new or increased general tax shall be accomplished by placing a display advertisement of at least one-eighth page in a newspaper of general circulation for three weeks pursuant to Section 6063 and by a first-class mailing to those interested parties who have filed a written request with the local agency for mailed notice of public meetings or hearings on new

23

or increased general taxes. The public meeting pursuant to subdivision (a) shall take place no earlier than 10 days after the first publication of the joint notice pursuant to this subdivision. The public hearing shall take place no earlier than seven days after the public meeting pursuant to this subdivision. Notwithstanding paragraph (2) of subdivision (a), the joint notice need not include notice of the public meeting after the meeting has taken place. The public hearing pursuant to subdivision (a) shall take place no earlier than 45 days after the first publication of the joint notice pursuant to this subdivision. Any written request for mailed notices shall be effective for one year from the date on which it is filed unless a renewal request is filed. Renewal requests for mailed notices shall be filed on or before April 1 of each year. The legislative body may establish a reasonable annual charge for sending notices based on the estimated cost of providing the service.

     (2)    The notice required by paragraph (1) of this subdivision shall include, but not be limited to, the following:

     (A)    The amount or rate of the tax. If the tax is proposed to be increased from any previous year, the joint notice shall separately state both the existing tax rate and the proposed tax rate increase.

     (B)    The activity to be taxed.

     (C)    The estimated amount of revenue to be raised by the tax annually.

     (D)    The method and frequency for collecting the tax.

     (E)    The dates, times, and locations of the public meeting and hearing described in subdivision (a).

     (F)    The phone number and address of an individual, office, or organization that interested persons may contact to receive additional information about the tax.

     (c)    (1)    The joint notice of both the public meeting and the public hearing required by subdivision (a) with respect to a proposal for a new or increased assessment on real property shall be accomplished through a mailing, postage prepaid, in the United States mail and shall be deemed given when so deposited. The public meeting pursuant to subdivision (a) shall take place no earlier than 10 days after the joint mailing pursuant to this subdivision. The public hearing shall take place no earlier than seven days after the public meeting pursuant to this subdivision. The envelope or the cover of the mailing shall include the name of the local agency and the return address of the sender. This mailed notice shall be in at least 10-point type and shall be given to all property owners proposed to be subject to the new or increased assessment by a mailing by name to those persons whose names and addresses appear on the last equalized county assessment roll or the State Board of Equalization assessment roll, as the case may be.

Q4

(2)    The joint notice required by paragraph (1) of this subdivision shall include, but not be limited to, the following:

(A)    The estimated amount of the assessment per parcel.  If the assessment is proposed to be increased from any previous year, the joint notice shall separately state both the amount of the existing assessment and the proposed assessment increase.

(B)    A general description of the purpose or improvements that the assessment will fund.

(C)    The address to which property owners may mail a protest against the assessment.

(D)    The phone number and address of an individual, office, or organization that interested persons may contact to receive additional information about the assessment.

(E)    A statement that a majority protest will cause the assessment to be abandoned if the assessment act used to levy the assessment so provides.  Notice shall also state the percentage of protests required to trigger an election, if applicable.

(F)    The dates, times, and locations of the public meeting and hearing described in subdivision (a).

(G)    A proposed assessment formula or range as described in subparagraph (D) of paragraph (1) of subdivision (a) if applicable and that is noticed pursuant to this section.

(3)    Notwithstanding paragraph (1), in the case of an assessment that is proposed exclusively for operation and maintenance expenses imposed throughout the entire local agency, or exclusively for operation and maintenance assessments proposed to be levied on 50,000 parcels or more, notice may be provided pursuant to this subdivision or pursuant to paragraph (1) of subdivision (b) and shall include the estimated amount of the assessment of various types, amounts, or uses of property and the information required by subparagraphs (B) to (G), inclusive, of paragraph (2) of subdivision (c).

(4)    Notwithstanding paragraph (1), in the case of an assessment proposed to be levied pursuant to Part 2 (commencing with Section 22500) of Division 2 of the Streets and Highways Code by a regional park district, regional park and open-space district, or regional open-space district formed pursuant to Article 3 (commencing with Section 5500) of Chapter 3 of Division 5 of, or pursuant to Division 26 (commencing with Section 35100) of, the Public Resources Code, notice may be provided pursuant to paragraph (1) of subdivision (b).

66

25

(d)     The notice requirements imposed by this section shall be construed as additional to, and not to supersede, existing provisions of law, and shall be applied concurrently with the existing provisions so as to not delay or prolong the governmental decisionmaking process.

(e)     This section shall not apply to any new or increased general tax or any new or increased assessment that requires an election of either of the following:

(1)     The property owners subject to the assessment.

(2)     The voters within the local agency imposing the tax or assessment.

(f)     Nothing in this section shall prohibit a local agency from holding a consolidated meeting or hearing at which the legislative body discusses multiple tax or assessment proposals.

(g)     The local agency may recover the reasonable costs of public meetings, public hearings, and notice required by this section from the proceeds of the tax or assessment.  The costs recovered for these purposes, whether recovered pursuant to this subdivision or any other provision of law, shall not exceed the reasonable costs of the public meetings, public hearings, and notice.

(h)     Any new or increased assessment that is subject to the notice and hearing provisions of Article XIIIC or XIIID of the California Constitution is not subject to the notice and hearing requirements of this section.

**54955.     Adjournment**

The legislative body of a local agency may adjourn any regular, adjourned regular, special or adjourned special meeting to a time and place specified in the order of adjournment.  Less than a quorum may so adjourn from time to time.  If all members are absent from any regular or adjourned regular meeting the clerk or secretary of the legislative body may declare the meeting adjourned to a stated time and place and he shall cause a written notice of the adjournment to be given in the same manner as provided in Section 54956 for special meetings, unless such notice is waived as provided for special meetings.  A copy of the order or notice of adjournment shall be conspicuously posted on or near the door of the place where the regular, adjourned regular, special or adjourned special meeting was held within 24 hours after the time of the adjournment.  When a regular or adjourned regular meeting is adjourned as provided in this section, the resulting adjourned regular meeting is a regular meeting for all purposes.  When an order of adjournment of any meeting fails to state the hour at which the adjourned meeting is to be held, it shall be held at the hour specified for regular meetings by ordinance, resolution, bylaw, or other rule.

**54955.1.     Continuance**

Any hearing being held, or noticed or ordered to be held, by a legislative body of a local agency at any meeting may by order or notice of continuance be continued or recontinued to any subsequent

67

meeting of the legislative body in the same manner and to the same extent set forth in Section 54955 for the adjournment of meetings; provided, that if the hearing is continued to a time less than 24 hours after the time specified in the order or notice of hearing, a copy of the order or notice of continuance of hearing shall be posted immediately following the meeting at which the order or declaration of continuance was adopted or made.

**54956.**        **Special meetings**

A special meeting may be called at any time by the presiding officer of the legislative body of a local agency, or by a majority of the members of the legislative body, by delivering written notice to each member of the legislative body and to each local newspaper of general circulation and radio or television station requesting notice in writing.  The notice shall be delivered personally or by any other means and shall be received at least 24 hours before the time of the meeting as specified in the notice.  The call and notice shall specify the time and place of the special meeting and the business to be transacted or discussed.  No other business shall be considered at these meetings by the legislative body.  The written notice may be dispensed with as to any member who at or prior to the time the meeting convenes files with the clerk or secretary of the legislative body a written waiver of notice.  The waiver may be given by telegram.  The written notice may also be dispensed with as to any member who is actually present at the meeting at the time it convenes.

The call and notice shall be posted at least 24 hours prior to the special meeting in a location that is freely accessible to members of the public.

**54956.5.**     **Emergency meetings**

(a)        For purposes of this section, "emergency situation" means both of the following:

(1)        An emergency, which shall be defined as a work stoppage, crippling activity, or other activity that severely impairs public health, safety, or both, as determined by a majority of the members of the legislative body.

(2)        A dire emergency, which shall be defined as a crippling disaster, mass destruction, terrorist act, or threatened terrorist activity that poses peril so immediate and significant that requiring a legislative body to provide one-hour notice before holding an emergency meeting under this section may endanger the public health, safety, or both, as determined by a majority of the members of the legislative body.

(b)     (1)        Subject to paragraph (2), in the case of an emergency situation involving matters upon which prompt action is necessary due to the disruption or threatened disruption of public facilities, a legislative body may hold an emergency meeting without complying with either the 24-hour notice requirement or the 24-hour posting requirement of Section 54956 or both of the notice and posting requirements.

68

27

(2)     Each local newspaper of general circulation and radio or television station that has requested notice of special meetings pursuant to Section 54956 shall be notified by the presiding officer of the legislative body, or designee thereof, one hour prior to the emergency meeting, or, in the case of a dire emergency, at or near the time that the presiding officer or designee notifies the members of the legislative body of the emergency meeting. This notice shall be given by telephone and all telephone numbers provided in the most recent request of a newspaper or station for notification of special meetings shall be exhausted. In the event that telephone services are not functioning, the notice requirements of this section shall be deemed waived, and the legislative body, or designee of the legislative body, shall notify those newspapers, radio stations, or television stations of the fact of the holding of the emergency meeting, the purpose of the meeting, and any action taken at the meeting as soon after the meeting as possible.

(c)     During a meeting held pursuant to this section, the legislative body may meet in closed session pursuant to Section 54957 if agreed to by a two-thirds vote of the members of the legislative body present, or, if less than two-thirds of the members are present, by a unanimous vote of the members present.

(d)     All special meeting requirements, as prescribed in Section 54956 shall be applicable to a meeting called pursuant to this section, with the exception of the 24-hour notice requirement.

(e)     The minutes of a meeting called pursuant to this section, a list of persons who the presiding officer of the legislative body, or designee of the legislative body, notified or attempted to notify, a copy of the rollcall vote, and any actions taken at the meeting shall be posted for a minimum of 10 days in a public place as soon after the meeting as possible.

54956.6.     Fees          $ 6,000 Bond Fee For Wayne?

No fees may be charged by the legislative body of a local agency for carrying out any provision of this chapter, except as specifically authorized by this chapter.

54956.7.     Closed session; License application of rehabilitated criminal

Whenever a legislative body of a local agency determines that it is necessary to discuss and determine whether an applicant for a license or license renewal, who has a criminal record, is sufficiently rehabilitated to obtain the license, the legislative body may hold a closed session with the applicant and the applicant's attorney, if any, for the purpose of holding the discussion and making the determination. If the legislative body determines, as a result of the closed session, that the issuance or renewal of the license should be denied, the applicant shall be offered the opportunity to withdraw the application. If the applicant withdraws the application, no record shall be kept of the discussions or decisions made at the closed session and all matters relating to the closed session shall be confidential. If the applicant does not withdraw the application, the legislative body shall take action at the public meeting during which the closed session is held or at its next public meeting denying the application for the license but all matters relating to the closed session are confidential and shall not

28

be disclosed without the consent of the applicant, except in an action by an applicant who has been denied a license challenging the denial of the license.

**54956.8.        Closed session; Real property negotiations**

Notwithstanding any other provision of this chapter, a legislative body of a local agency may hold a closed session with its negotiator prior to the purchase, sale, exchange, or lease of real property by or for the local agency to grant authority to its negotiator regarding the price and terms of payment for the purchase, sale, exchange, or lease.

However, prior to the closed session, the legislative body of the local agency shall hold an open and public session in which it identifies its negotiators, the real property or real properties which the negotiations may concern, and the person or persons with whom its negotiators may negotiate.

For purposes of this section, negotiators may be members of the legislative body of the local agency.

For purposes of this section, "lease" includes renewal or renegotiation of a lease.

Nothing in this section shall preclude a local agency from holding a closed session for discussions regarding eminent domain proceedings pursuant to Section 54956.9.

**54956.86.        Closed session; Health claims**

Notwithstanding any other provision of this chapter, a legislative body of a local agency which provides services pursuant to Section 14087.3 of the Welfare and Institutions Code may hold a closed session to hear a charge or complaint from a member enrolled in its health plan if the member does not wish to have his or her name, medical status, or other information that is protected by federal law publicly disclosed. Prior to holding a closed session pursuant to this section, the legislative body shall inform the member, in writing, of his or her right to have the charge or complaint heard in an open session rather than a closed session.

**54956.87.        Record exempt; Closed session; County health plan**

(a)        Notwithstanding any other provision of this chapter, the records of a health plan that is licensed pursuant to the Knox-Keene Health Care Service Plan Act of 1975 (Chapter 2.2 (commencing with Section 1340) of Division 2 of the Health and Safety Code) and that is governed by a county board of supervisors, whether paper records, records maintained in the management information system, or records in any other form, that relate to provider rate or payment determinations, allocation or distribution methodologies for provider payments, formulae or calculations for these payments, and contract negotiations with providers of health care for alternative rates are exempt from disclosure for a period of three years after the contract is fully executed. The transmission of the records, or the information contained therein in an alternative form, to the board

70

of supervisors shall not constitute a waiver of exemption from disclosure, and the records and information once transmitted to the board of supervisors shall be subject to this same exemption.

(b)     Notwithstanding any other provision of law, the governing board of a health plan that is licensed pursuant to the Knox-Keene Health Care Service Plan Act of 1975 (Chapter 2.2 (commencing with Section 1340) of Division 2 of the Health and Safety Code) and that is governed by a county board of supervisors may order that a meeting held solely for the purpose of discussion or taking action on health plan trade secrets, as defined in subdivision (c) of Section 32106 of the Health and Safety Code, shall be held in closed session.  The requirements of making a public report of action taken in closed session, and the vote or abstention of every member present, may be limited to a brief general description without the information constituting the trade secret.

(c)     The governing board may delete the portion or portions containing trade secrets from any documents that were finally approved in the closed session held pursuant to subdivision (b) that are provided to persons who have made the timely or standing request.

(d)     Nothing in this section shall be construed as preventing the governing board from meeting in closed session as otherwise provided by law.

(e)     The provisions of this section shall not prevent access to any records by the Joint Legislative Audit Committee in the exercise of its powers pursuant to Article 1 (commencing with Section 10500) of Chapter 4 of Part 2 of Division 2 of Title 2.  The provisions of this section also shall not prevent access to any records by the Department of Corporations in the exercise of its powers pursuant to Article 1 (commencing with Section 1340) of Chapter 2.2 of Division 2 of the Health and Safety Code.

## 54956.9.     Closed session; Pending litigation

Nothing in this chapter shall be construed to prevent a legislative body of a local agency, based on advice of its legal counsel, from holding a closed session to confer with, or receive advice from, its legal counsel regarding pending litigation when discussion in open session concerning those matters would prejudice the position of the local agency in the litigation.

For purposes of this chapter, all expressions of the lawyer-client privilege other than those provided in this section are hereby abrogated.  This section is the exclusive expression of the lawyer-client privilege for purposes of conducting closed-session meetings pursuant to this chapter.

For purposes of this section, "litigation" includes any adjudicatory proceeding, including eminent domain, before a court, administrative body exercising its adjudicatory authority, hearing officer, or arbitrator.

For purposes of this section, litigation shall be considered pending when any of the following circumstances exist:

(a)     Litigation, to which the local agency is a party, has been initiated formally.

(b)     (1)     A point has been reached where, in the opinion of the legislative body of the local agency on the advice of its legal counsel, based on existing facts and circumstances, there is a significant exposure to litigation against the local agency.

(2)     Based on existing facts and circumstances, the legislative body of the local agency is meeting only to decide whether a closed session is authorized pursuant to paragraph (1) of this subdivision.

(3)     For purposes of paragraphs (1) and (2), "existing facts and circumstances" shall consist only of one of the following:

(A)     Facts and circumstances that might result in litigation against the local agency but which the local agency believes are not yet known to a potential plaintiff or plaintiffs, which facts and circumstances need not be disclosed.

(B)     Facts and circumstances, including, but not limited to, an accident, disaster, incident, or transactional occurrence that might result in litigation against the agency and that are known to a potential plaintiff or plaintiffs, which facts or circumstances shall be publicly stated on the agenda or announced.

(C)     The receipt of a claim pursuant to the Tort Claims Act or some other written communication from a potential plaintiff threatening litigation, which claim or communication shall be available for public inspection pursuant to Section 54957.5.

(D)     A statement made by a person in an open and public meeting threatening litigation on a specific matter within the responsibility of the legislative body.

(E)     A statement threatening litigation made by a person outside an open and public meeting on a specific matter within the responsibility of the legislative body so long as the official or employee of the local agency receiving knowledge of the threat makes a contemporaneous or other record of the statement prior to the meeting, which record shall be available for public inspection pursuant to Section 54957.5. The records so created need not identify the alleged victim of unlawful or tortious sexual conduct or anyone making the threat on their behalf, or identify a public employee who is the alleged perpetrator of any unlawful or tortious conduct upon which a threat of litigation is based, unless the identity of the person has been publicly disclosed.

(F)     Nothing in this section shall require disclosure of written communications that are privileged and not subject to disclosure pursuant to the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1).

72

3/

(c)     Based on existing facts and circumstances, the legislative body of the local agency has decided to initiate or is deciding whether to initiate litigation.

Prior to holding a closed session pursuant to this section, the legislative body of the local agency shall state on the agenda or publicly announce the subdivision of this section that authorizes the closed session. If the session is closed pursuant to subdivision (a), the body shall state the title of or otherwise specifically identify the litigation to be discussed, unless the body states that to do so would jeopardize the agency's ability to effectuate service of process upon one or more unserved parties, or that to do so would jeopardize its ability to conclude existing settlement negotiations to its advantage.

A local agency shall be considered to be a "party" or to have a "significant exposure to litigation" if an officer or employee of the local agency is a party or has significant exposure to litigation concerning prior or prospective activities or alleged activities during the course and scope of that office or employment, including litigation in which it is an issue whether an activity is outside the course and scope of the office or employment.

## § 54956.95.    Closed session; Insurance liability

(a)     Nothing in this chapter shall be construed to prevent a joint powers agency formed pursuant to Article 1 (commencing with Section 6500) of Chapter 5 of Division 7 of Title 1, for purposes of insurance pooling, or a local agency member of the joint powers agency, from holding a closed session to discuss a claim for the payment of tort liability losses, public liability losses, or workers' compensation liability incurred by the joint powers agency or a local agency member of the joint powers agency.

(b)     Nothing in this chapter shall be construed to prevent the Local Agency Self-Insurance Authority formed pursuant to Chapter 5.5 (commencing with Section 6599.01) of Division 7 of Title 1, or a local agency member of the authority, from holding a closed session to discuss a claim for the payment of tort liability losses, public liability losses, or workers' compensation liability incurred by the authority or a local agency member of the authority.

(c)     Nothing in this section shall be construed to affect Section 54956.9 with respect to any other local agency.

## 54957.    Closed session; Personnel and threat to public security

(a)     Nothing contained in this chapter shall be construed to prevent the legislative body of a local agency from holding closed sessions with the Attorney General, district attorney, agency counsel, sheriff, or chief of police, or their respective deputies, or a security consultant or a security

32

operations manager, on matters posing a threat to the security of public buildings, a threat to the security of essential public services, including water, drinking water, wastewater treatment, natural gas service, and electric service, or a threat to the public's right of access to public services or public facilities.

(b) (1) Subject to paragraph (2), nothing contained in this chapter shall be construed to prevent the legislative body of a local agency from holding closed sessions during a regular or special meeting to consider the appointment, employment, evaluation of performance, discipline, or dismissal of a public employee or to hear complaints or charges brought against the employee by another person or employee unless the employee requests a public session.

(2) As a condition to holding a closed session on specific complaints or charges brought against an employee by another person or employee, the employee shall be given written notice of his or her right to have the complaints or charges heard in an open session rather than a closed session, which notice shall be delivered to the employee personally or by mail at least 24 hours before the time for holding the session. If notice is not given, any disciplinary or other action taken by the legislative body against the employee based on the specific complaints or charges in the closed session shall be null and void.

(3) The legislative body also may exclude from the public or closed meeting, during the examination of a witness, any or all other witnesses in the matter being investigated by the legislative body.

(4) For the purposes of this subdivision, the term "employee" shall include an officer or an independent contractor who functions as an officer or an employee but shall not include any elected official, member of a legislative body or other independent contractors. Nothing in this subdivision shall limit local officials' ability to hold closed session meetings pursuant to Sections 1461, 32106, and 32155 of the Health and Safety Code or Sections 37606 and 37624.3 of the Government Code. Closed sessions held pursuant to this subdivision shall not include discussion or action on proposed compensation except for a reduction of compensation that results from the imposition of discipline.

## § 54957.1.   Report at conclusion of closed session

(a) The legislative body of any local agency shall publicly report any action taken in closed session and the vote or abstention of every member present thereon, as follows:

(1) Approval of an agreement concluding real estate negotiations pursuant to Section 54956.8 shall be reported after the agreement is final, as specified below:

(A) If its own approval renders the agreement final, the body shall report that approval and the substance of the agreement in open session at the public meeting during which the closed session is held.

74

33

(B)    If final approval rests with the other party to the negotiations, the local agency shall disclose the fact of that approval and the substance of the agreement upon inquiry by any person, as soon as the other party or its agent has informed the local agency of its approval.

(2)    Approval given to its legal counsel to defend, or seek or refrain from seeking appellate review or relief, or to enter as an amicus curiae in any form of litigation as the result of a consultation under Section 54956.9 shall be reported in open session at the public meeting during which the closed session is held.  The report shall identify, if known, the adverse party or parties and the substance of the litigation.  In the case of approval given to initiate or intervene in an action, the announcement need not identify the action, the defendants, or other particulars, but shall specify that the direction to initiate or intervene in an action has been given and that the action, the defendants, and the other particulars shall, once formally commenced, be disclosed to any person upon inquiry, unless to do so would jeopardize the agency's ability to effectuate service of process on one or more unserved parties, or that to do so would jeopardize its ability to conclude existing settlement negotiations to its advantage.

(3)    Approval given to its legal counsel of a settlement of pending litigation, as defined in Section 54956.9, at any stage prior to or during a judicial or quasi-judicial proceeding shall be reported after the settlement is final, as specified below:

(A)    If the legislative body accepts a settlement offer signed by the opposing party, the body shall report its acceptance and identify the substance of the agreement in open session at the public meeting during which the closed session is held.

(B)    If final approval rests with some other party to the litigation or with the court, then as soon as the settlement becomes final, and upon inquiry by any person, the local agency shall disclose the fact of that approval, and identify the substance of the agreement.

(4)    Disposition reached as to claims discussed in closed session pursuant to Section 54956.95 shall be reported as soon as reached in a manner that identifies the name of the claimant, the name of the local agency claimed against, the substance of the claim, and any monetary amount approved for payment and agreed upon by the claimant.

(5)    Action taken to appoint, employ, dismiss, accept the resignation of, or otherwise affect the employment status of a public employee in closed session pursuant to Section 54957 shall be reported at the public meeting during which the closed session is held.  Any report required by this paragraph shall identify the title of the position.  The general requirement of this paragraph notwithstanding, the report of a dismissal or of the nonrenewal of an employment contract shall be deferred until the first public meeting following the exhaustion of administrative remedies, if any.

34

(6)     Approval of an agreement concluding labor negotiations with represented employees pursuant to Section 54957.6 shall be reported after the agreement is final and has been accepted or ratified by the other party.  The report shall identify the item approved and the other party or parties to the negotiation.

(b)     Reports that are required to be made pursuant to this section may be made orally or in writing.  The legislative body shall provide to any person who has submitted a written request to the legislative body within 24 hours of the posting of the agenda, or to any person who has made a standing request for all documentation as part of a request for notice of meetings pursuant to Section 54954.1 or 54956, if the requester is present at the time the closed session ends, copies of any contracts, settlement agreements, or other documents that were finally approved or adopted in the closed session.  If the action taken results in one or more substantive amendments to the related documents requiring retyping, the documents need not be released until the retyping is completed during normal business hours, provided that the presiding officer of the legislative body or his or her designee orally summarizes the substance of the amendments for the benefit of the document requester or any other person present and requesting the information.

(c)     The documentation referred to in paragraph (b) shall be available to any person on the next business day following the meeting in which the action referred to is taken or, in the case of substantial amendments, when any necessary retyping is complete.

(d)     Nothing in this section shall be construed to require that the legislative body approve actions not otherwise subject to legislative body approval.

(e)     No action for injury to a reputational, liberty, or other personal interest may be commenced by or on behalf of any employee or former employee with respect to whom a disclosure is made by a legislative body in an effort to comply with this section.

## 54957.2.   Minutes of closed session

(a)     The legislative body of a local agency may, by ordinance or resolution, designate a clerk or other officer or employee of the local agency who shall then attend each closed session of the legislative body and keep and enter in a minute book a record of topics discussed and decisions made at the meeting.  The minute book made pursuant to this section is not a public record subject to inspection pursuant to the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1), and shall be kept confidential.  The minute book shall be available only to members of the legislative body or, if a violation of this chapter is alleged to have occurred at a closed session, to a court of general jurisdiction wherein the local agency lies.  Such minute book may, but need not, consist of a recording of the closed session.

(b)     An elected legislative body of a local agency may require that each legislative body all or a majority of whose members are appointed by or under the authority of the elected legislative body keep a minute book as prescribed under subdivision (a).

76

35

**54957.5.**      **Agendas and other materials; Public records**

(a)      Notwithstanding Section 6255 or any other provisions of law, agendas of public meetings and any other writings, when distributed to all, or a majority of all, of the members of a legislative body of a local agency by any person in connection with a matter subject to discussion or consideration at a public meeting of the body, are disclosable public records under the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1), and shall be made available upon request without delay. However, this section shall not include any writing exempt from public disclosure under Section 6253.5, 6254, 6254.7, or 6254.22.

(b)      Writings that are public records under subdivision (a) and that are distributed during a public meeting shall be made available for public inspection at the meeting if prepared by the local agency or a member of its legislative body, or after the meeting if prepared by some other person. These writings shall be made available in appropriate alternative formats upon request by a person with a disability, as required by Section 202 of the Americans with Disabilities Act of 1990 (42 U.S.C. Sec. 12132), and the federal rules and regulations adopted in implementation thereof.

(c)      Nothing in this chapter shall be construed to prevent the legislative body of a local agency from charging a fee or deposit for a copy of a public record pursuant to Section 6253, except that no surcharge shall be imposed on persons with disabilities in violation of Section 202 of the Americans with Disabilities Act of 1990 (42 U.S.C. Sec. 12132), and the federal rules and regulations adopted in implementation thereof.

(d)      This section shall not be construed to limit or delay the public's right to inspect or obtain a copy of any record required to be disclosed under the requirements of the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1). Nothing in this chapter shall be construed to require a legislative body of a local agency to place any paid advertisement or any other paid notice in any publication.

**54957.6.**      **Closed session; Labor negotiations**

(a)      Notwithstanding any other provision of law, a legislative body of a local agency may hold closed sessions with the local agency's designated representatives regarding the salaries, salary schedules, or compensation paid in the form of fringe benefits of its represented and unrepresented employees, and, for represented employees, any other matter within the statutorily provided scope of representation.

However, prior to the closed session, the legislative body of the local agency shall hold an open and public session in which it identifies its designated representatives.

Closed sessions of a legislative body of a local agency, as permitted in this section, shall be for the purpose of reviewing its position and instructing the local agency's designated representatives.

77

36

Closed sessions, as permitted in this section, may take place prior to and during consultations and discussions with representatives of employee organizations and unrepresented employees.

Closed sessions with the local agency's designated representative regarding the salaries, salary schedules, or compensation paid in the form of fringe benefits may include discussion of an agency's available funds and funding priorities, but only insofar as these discussions relate to providing instructions to the local agency's designated representative.

Closed sessions held pursuant to this section shall not include final action on the proposed compensation of one or more unrepresented employees.

For the purposes enumerated in this section, a legislative body of a local agency may also meet with a state conciliator who has intervened in the proceedings.

(b)    For the purposes of this section, the term "employee" shall include an officer or an independent contractor who functions as an officer or an employee, but shall not include any elected official, member of a legislative body, or other independent contractors.

**54957.7.    Announcement prior to closed sessions**

(a)    Prior to holding any closed session, the legislative body of the local agency shall disclose, in an open meeting, the item or items to be discussed in the closed session. The disclosure may take the form of a reference to the item or items as they are listed by number or letter on the agenda. In the closed session, the legislative body may consider only those matters covered in its statement. Nothing in this section shall require or authorize a disclosure of information prohibited by state or federal law.

(b)    After any closed session, the legislative body shall reconvene into open session prior to adjournment and shall make any disclosures required by Section 54957.1 of action taken in the closed session.

(c)    The announcements required to be made in open session pursuant to this section may be made at the location announced in the agenda for the closed session, as long as the public is allowed to be present at that location for the purpose of hearing the announcements.

**54957.8.    Closed session; Multijurisdictional drug enforcement agency**

Nothing contained in this chapter shall be construed to prevent the legislative body of a multijurisdictional drug law enforcement agency, or an advisory body of a multijurisdictional drug law enforcement agency, from holding closed sessions to discuss the case records of any ongoing criminal

78

37

investigation of the multijurisdictional drug law enforcement agency or of any party to the joint powers agreement, to hear testimony from persons involved in the investigation, and to discuss courses of action in particular cases.

"Multijurisdictional drug law enforcement agency," for purposes of this section, means a joint powers entity formed pursuant to Article 1 (commencing with Section 6500) of Chapter 5 of Division 7 of Title 1, which provides drug law enforcement services for the parties to the joint powers agreement.

The Legislature finds and declares that this section is within the public interest, in that its provisions are necessary to prevent the impairment of ongoing law enforcement investigations, to protect witnesses and informants, and to permit the discussion of effective courses of action in particular cases.

## 54957.9.    Disruption of meeting

In the event that any meeting is willfully interrupted by a group or groups of persons so as to render the orderly conduct of such meeting unfeasible and order cannot be restored by the removal of individuals who are willfully interrupting the meeting, the members of the legislative body conducting the meeting may order the meeting room cleared and continue in session. Only matters appearing on the agenda may be considered in such a session. Representatives of the press or other news media, except those participating in the disturbance, shall be allowed to attend any session held pursuant to this section. Nothing in this section shall prohibit the legislative body from establishing a procedure for readmitting an individual or individuals not responsible for willfully disturbing the orderly conduct of the meeting.

## 54957.10.    Closed session; Deferred Compensation Plan; Early withdrawal

Notwithstanding any other provision of law, a legislative body of a local agency may hold closed sessions to discuss a local agency employee's application for early withdrawal of funds in a deferred compensation plan when the application is based on financial hardship arising from an unforeseeable emergency due to illness, accident, casualty, or other extraordinary event, as specified in the deferred compensation plan.

## 54958.    Act supercedes conflicting laws

The provisions of this chapter shall apply to the legislative body of every local agency notwithstanding the conflicting provisions of any other state law.

## 54959.    Violation of Act; Criminal penalty

Each member of a legislative body who attends a meeting of that legislative body where action is taken in violation of any provision of this chapter, and where the member intends to deprive the

38

public of information to which the member knows or has reason to know the public is entitled under this chapter, is guilty of a misdemeanor.

## 54960.        Violation of Act; Civil remedies

(a)        The district attorney or any interested person may commence an action by mandamus, injunction or declaratory relief for the purpose of stopping or preventing violations or threatened violations of this chapter by members of the legislative body of a local agency or to determine the applicability of this chapter to actions or threatened future action of the legislative body, or to determine whether any rule or action by the legislative body to penalize or otherwise discourage the expression of one or more of its members is valid or invalid under the laws of this state or of the United States, or to compel the legislative body to tape record its closed sessions as hereinafter provided.

(b)        The court in its discretion may, upon a judgment of a violation of Section 54956.7, 54956.8, 54956.9, 54956.95, 54957, or 54957.6, order the legislative body to tape record its closed sessions and preserve the tape recordings for the period and under the terms of security and confidentiality the court deems appropriate.

(c)        (1)        Each recording so kept shall be immediately labeled with the date of the closed session recorded and the title of the clerk or other officer who shall be custodian of the recording.

(2)        The tapes shall be subject to the following discovery procedures:

(A)        In any case in which discovery or disclosure of the tape is sought by either the district attorney or the plaintiff in a civil action pursuant to Section 54959, 54960, or 54960.1 alleging that a violation of this chapter has occurred in a closed session which has been recorded pursuant to this section, the party seeking discovery or disclosure shall file a written notice of motion with the appropriate court with notice to the governmental agency which has custody and control of the tape recording.  The notice shall be given pursuant to subdivision (b) of Section 1005 of the Code of Civil Procedure.

(B)        The notice shall include, in addition to the items required by Section 1010 of the Code of Civil Procedure, all of the following:

(i)        Identification of the proceeding in which discovery or disclosure is sought, the party seeking discovery or disclosure, the date and time of the meeting recorded, and the governmental agency which has custody and control of the recording.

(ii)        An affidavit which contains specific facts indicating that a violation of the act occurred in the closed session.

39

(3)     If the court, following a review of the motion, finds that there is good cause to believe that a violation has occurred, the court may review, in camera, the recording of that portion of the closed session alleged to have violated the act.

(4)     If, following the in camera review, the court concludes that disclosure of a portion of the recording would be likely to materially assist in the resolution of the litigation alleging violation of this chapter, the court shall, in its discretion, make a certified transcript of the portion of the recording a public exhibit in the proceeding. '

(5)     Nothing in this section shall permit discovery of communications which are protected by the attorney-client privilege.

**54960.1.     Violation of Act; Actions declared null and void**

(a)     The district attorney or any interested person may commence an action by mandamus or injunction for the purpose of obtaining a judicial determination that an action taken by a legislative body of a local agency in violation of Section 54953, 54954.2, 54954.5, 54954.6, 54956, or 54956.5 is null and void under this section. Nothing in this chapter shall be construed to prevent a legislative body from curing or correcting an action challenged pursuant to this section.

(b)     Prior to any action being commenced pursuant to subdivision (a), the district attorney or interested person shall make a demand of the legislative body to cure or correct the action alleged to have been taken in violation of Section 54953, 54954.2, 54954.5, 54954.6, 54956, or 54956.5. The demand shall be in writing and clearly describe the challenged action of the legislative body and nature of the alleged violation.

(c)     (1)     The written demand shall be made within 90 days from the date the action was taken unless the action was taken in an open session but in violation of Section 54954.2, in which case the written demand shall be made within 30 days from the date the action was taken.

(2)     Within 30 days of receipt of the demand, the legislative body shall cure or correct the challenged action and inform the demanding party in writing of its actions to cure or correct or inform the demanding party in writing of its decision not to cure or correct the challenged action.

(3)     If the legislative body takes no action within the 30-day period, the inaction shall be deemed a decision not to cure or correct the challenged action, and the 15-day period to commence the action described in subdivision (a) shall commence to run the day after the 30-day period to cure or correct expires.

(4)     Within 15 days of receipt of the written notice of the legislative body's decision to cure or correct, or not to cure or correct, or within 15 days of the expiration of the 30-day period to cure or correct, whichever is earlier, the demanding party shall be required to commence the action pursuant to subdivision (a) or thereafter be barred from commencing the action.

81

(d)     An action taken that is alleged to have been taken in violation of Section 54953, 54954.2, 54954.5, 54954.6, 54956, or 54956.5 shall not be determined to be null and void if any of the following conditions exist:

(1)     The action taken was in substantial compliance with Sections 54953, 54954.2, 54954.5, 54954.6, 54956, and 54956.5.

(2)     The action taken was in connection with the sale or issuance of notes, bonds, or other evidences of indebtedness or any contract, instrument, or agreement thereto.

(3)     The action taken gave rise to a contractual obligation, including a contract let by competitive bid other than compensation for services in the form of salary or fees for professional services, upon which a party has, in good faith and without notice of a challenge to the validity of the action, detrimentally relied.

(4)     The action taken was in connection with the collection of any tax.

(5)     Any person, city, city and county, county, district, or any agency or subdivision of the state alleging noncompliance with subdivision (a) of Section 54954.2, Section 54956, or Section 54956.5, because of any defect, error, irregularity, or omission in the notice given pursuant to those provisions, had actual notice of the item of business at least 72 hours prior to the meeting at which the action was taken, if the meeting was noticed pursuant to Section 54954.2, or 24 hours prior to the meeting at which the action was taken if the meeting was noticed pursuant to Section 54956, or prior to the meeting at which the action was taken if the meeting is held pursuant to Section 54956.5.

(e)     During any action seeking a judicial determination pursuant to subdivision (a) if the court determines, pursuant to a showing by the legislative body that an action alleged to have been taken in violation of Section 54953, 54954.2, 54954.5, 54954.6, 54956, or 54956.5 has been cured or corrected by a subsequent action of the legislative body, the action filed pursuant to subdivision (a) shall be dismissed with prejudice.

(f)     The fact that a legislative body takes a subsequent action to cure or correct an action taken pursuant to this section shall not be construed or admissible as evidence of a violation of this chapter.

**54960.5.     Costs and attorney fees**

A court may award court costs and reasonable attorney fees to the plaintiff in an action brought pursuant to Section 54960 or 54960.1 where it is found that a legislative body of the local agency has violated this chapter.  The costs and fees shall be paid by the local agency and shall not become a personal liability of any public officer or employee of the local agency.

41

A court may award court costs and reasonable attorney fees to a defendant in any action brought pursuant to Section 54960 or 54960.1 where the defendant has prevailed in a final determination of such action and the court finds that the action was clearly frivolous and totally lacking in merit.

**54961.     Discrimination; Disabled access; Fees for attendance; Disclosure of victims**

(a)     No legislative body of a local agency shall conduct any meeting in any facility that prohibits the admittance of any person, or persons, on the basis of race, religious creed, color, national origin, ancestry, or sex, or which is inaccessible to disabled persons, or where members of the public may not be present without making a payment or purchase.  This section shall apply to every local agency as defined in Section 54951.

(b)     No notice, agenda, announcement, or report required under this chapter need identify any victim or alleged victim of tortious sexual conduct or child abuse unless the identity of the person has been publicly disclosed.

**54962.     Closed session; Express authorization required**

Except as expressly authorized by this chapter, or by Sections 1461, 1462, 32106, and 32155 of the Health and Safety Code or Sections 37606 and 37624.3 of the Government Code as they apply to hospitals, or by any provision of the Education Code pertaining to school districts and community college districts, no closed session may be held by any legislative body of any local agency.

**54963.     Closed session; Disclosure of confidential information**

(a)     A person may not disclose confidential information that has been acquired by being present in a closed session authorized by Section 54956.7, 54956.8, 54956.86, 54956.87, 54956.9, 54957, 54957.6, 54957.8, or 54957.10 to a person not entitled to receive it, unless the legislative body authorizes disclosure of that confidential information.

(b)     For purposes of this section, "confidential information" means a communication made in a closed session that is specifically related to the basis for the legislative body of a local agency to meet lawfully in closed session under this chapter.

(c)     Violation of this section may be addressed by the use of such remedies as are currently available by law, including, but not limited to:

(1)     Injunctive relief to prevent the disclosure of confidential information prohibited by this section.

(2)     Disciplinary action against an employee who has willfully disclosed confidential information in violation of this section.

42

(3)    Referral of a member of a legislative body who has willfully disclosed confidential information in violation of this section to the grandjury.

(d)    Disciplinary action pursuant to paragraph (2) of subdivision (c) shall require that the employee in question has either received training as to the requirements of this section or otherwise has been given notice of the requirements of this section.

(e)    A local agency may not take any action authorized by subdivision (c) against a person, nor shall it be deemed a violation of this section, for doing any of the following:

(1)    Making a confidential inquiry or complaint to a district attorney or grand jury concerning a perceived violation of law, including disclosing facts to a district attorney or grand jury that are necessary to establish the illegality of an action taken by a legislative body of a local agency or the potential illegality of an action that has been the subject of deliberation at a closed session if that action were to be taken by a legislative body of a local agency.

(2)    Expressing an opinion concerning the propriety or legality of actions taken by a legislative body of a local agency in closed session, including disclosure of the nature and extent of the illegal or potentially illegal action.

(3)    Disclosing information acquired by being present in a closed session under this chapter that is not confidential information.

(f)    Nothing in this section shall be construed to prohibit disclosures under the whistleblower statutes contained in Section 1102.5 of the Labor Code or Article 4.5 (commencing with Section 53296) of Chapter 2 of this code.

84

# EXHIBIT B

44

2d Civil No.

# B276413

IN THE

# Court of Appeal

### STATE OF CALIFORNIA
### SECOND APPELLATE DISTRICT
### DIVISION THREE

OFFICE OF THE CITY ATTORNEY

*Plaintiff and Respondent,*

*vs.*

WAYNE SPINDLER

*Defendant and Appellant.*

APPEAL FROM THE SUPERIOR COURT,

COUNTY OF LOS ANGELES

CASE NO. BS162097

## APPELLANT'S OPENING BRIEF

**Wayne Spindler,** *in pro per*

P.O. Box 16501

Enci no, CA. 91416-6501

(213) 381-1403

Exhibit B                                      45

2017 JUL 14  PM 12: 51

TO BE FILED IN THE COURT OF APPEAL | **APP-008**

| COURT OF APPEAL     SECOND **APPELLATE DISTRICT, DIVISION** 3 | COURT OF APPEAL CASE NUMBER: B276413 |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY:          STATE BAR NO.:

NAME:  Wayne Spindler

FIRM NAME:

STREET ADDRESS:  Post Office Box 16501

CITY:  Encino                                                STATE:  CA.      ZIP CODE:  91416-6501

TELEPHONE NO.:  (213) 381-1403                    FAX NO.:  (213) 381-5542

E-MAIL ADDRESS:  inslos@aol.com

ATTORNEY FOR (name):    in pro per

| SUPERIOR COURT CASE NUMBER: BS162097 |
|---|

APPELLANT/   Wayne Spindler
PETITIONER:

RESPONDENT/          Office of the City Attorney
REAL PARTY IN INTEREST:

### CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

(Check one):   [X] INITIAL CERTIFICATE   [ ] SUPPLEMENTAL CERTIFICATE

**Notice:  Please read rules 8.208 and 8.488 before completing this form. You may use this form for the initial certificate in an appeal when you file your brief or a prebriefing motion, application, or opposition to such a motion or application in the Court of Appeal, and when you file a petition for an extraordinary writ. You may also use this form as a supplemental certificate when you learn of changed or additional information that must be disclosed.**

1.  This form is being submitted on behalf of the following party (name):  Wayne Spindler, Appellant and Defendant.

2.  a.  [ ]  There are no interested entities or persons that must be listed in this certificate under rule 8.208.

    b.  [X]  Interested entities or persons required to be listed under rule 8.208 are as follows:

| Full name of interested entity or person | Nature of interest (Explain): |
|---|---|
| (1)  Herman Jason Wesson Jr. | "employee" of L.A. City Attorney's Office, aka Herb Wesson |
| (2)  Office of the City Attorney | Petitioner and Appellee |
| (3)  Wayne Spindler | Respondent and Appellant |
| (4)  Hon. Carol Boas Goodson | Trial Judge who issued the 3 year injunction |
| (5)  Hon. Xavier Becerra | State of CA. Attorney General, case involves subst. Const. rights |

[ ]  Continued on attachment 2.

The undersigned certifies that the above-listed persons or entities (corporations, partnerships, firms, or any other association, but not including government entities or their agencies) have either (1) an ownership interest of 10 percent or more in the party if it is an entity; or (2) a financial or other interest in the outcome of the proceeding that the justices should consider in determining whether to disqualify themselves, as defined in rule 8.208(e)(2).

Date:  July 14, 2017

Wayne Spindler, in pro per
_____
(TYPE OR PRINT NAME)

►                    _____
(SIGNATURE OF APPELLANT OR ATTORNEY)

Form Approved for Optional Use
Judicial Council of California
APP-008 [Rev. January 1, 2017]

**CERTIFICATE OF INTERESTED ENTITIES OR PERSONS**

Page 1 of 1

Cal. Rules of Court, rules 8.208, 8.488
www.courts.ca.gov

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES...............................................ii


I.INTRODUCTION AND STATEMENT OF THE CASE...........1

II. STANDARD OF REVIEW..............................................10

III.  ISSUES PRESENTED ON APPEAL..............................12

IV.  STATEMENT OF FACTS............................................12

V.  ARGUMENT.............................................................17

   1. The Office of the City Attorney cannot file the petition as it is not the employer of the intended protected person...................17

   2.  The absence of the City of Los Angeles as a party to the case voids *ab initio* the petition as an *ultra vires* action..............20

   3.  SPINDLER'S speaker had served a "legitimate purpose" and thus requires the petition be dismissed for lack of a credible threat of violence..................................................................21

   4.  No threat was "reasonably construed" to be carried out or have been carried out at the "workplace"...............................23


   5.  The testimony and declarations of WESSON and ROSSITTER fail to show by clear and convincing evidence a TRO and injunction for 3 years was warranted.............................24


VI.  CONCLUSION.............................................................29


CERTIFICATE OF COMPLIANCE....................................30

i.

47

# TABLE OF AUTHORITES

**Page**

## Cases

*Acosta v. City of Costa Mesa* (9th Cir. 2013)

　　718 F.3d 800.................................................................27

*Ali v. City of Los Angeles* (1999)

　　77 Cal. App. 4th 246....................................................19

*Apte v. Regents of University of California* (1988)

　　198 Cal.App.3d 1084, 1092 [244 Cal.Rptr. 312]..............10

*Baca v. Moreno Valley Unified School District* (1996)

　　936 F. Supp. 719..........................................................23

*City of Los Angeles v. Animal Defense League, et. al.* (2006)

　　135 Cal. App. 4th 1567a...........................20,21,22

*City of Los Angeles, Petitioner v. Michael Hunt, Respondent  (ex. rel. Councilman Mitch O'farrell(as petitioner)*

　　Case No. BS 16-2858 (July 8, 2016-Pet. Den'd)..............26

*Dowd, et. al. v. City of Los Angeles, a municipal corporation*
　(August 7, 2013)

　　Case No. CV-09-06731 DDP (SSx); U.S. Dist. LEXIS 111435*,

　　2013 WL 4039043.....................................................26

*Gonzales v. Superior Court* (Ct. App. 1986)

　　180 Cal. App. 3d 1116, 1122, 226 Cal. Rptr 164..............28

*Harris v. Alcoholic Beverage Control Appeals Board* (1964)

　　228 Cal. App. 2d. 1,5.................................................20

ii.

# TABLE OF AUTHORITES

**Page**

*Hoye v. City of Oakland* (9th Cir. 2011)

   653 F.3d 835…………………………..…………………….27

*Hunt v. City of Los Angeles* (Dec. 6, 2012)

     Case No. CV-12-7261 DSF (SHx)………...…………………….26

*Hunt v. City of Los Angeles* (9th Cir. 2011)

    638 F.3d at 703……………………………………………….26

*In re Ricky T* (2001)

   87 Cal. App. 4th 1132……………………………………….24

*Jessup Farms v. Baldwin* (1983)

   33 Cal. 3d. 639, 660……………………………………....11

*Kaiser Foundation Hospitals v. Wilson* (2011)

   201 Cal. App. 4th 550…………………………………..…….18

*Leventhal v. Vista Unified School District* (1997)

    973 F. Supp. 951…………………………………………..23

*Neighborhood Action Group v. County of Calavares* (1984)

   156 Cal. App. 3d. 1176, 1179……………………………....20

*Norse v. City of Santa Cruz* (9th Cir. 2010)

   629 F.3d 966…………………………………………....27

*Nygard, Inc. Uusi-Kerttlula* (2008)

   159 Cal. App. 4th 1027……………………………………….25

*People v. Martinez* (1997)

   53 Cal. App. 4th 1218……………………………………….24

iii.

# TABLE OF AUTHORITES

**Page**

*People of the State of California v. Spindler* (2017)

 Case No. 7 VW 01632 (July 7, 2017)……………………………..8.16

*Spindler v. City of Los Angeles* (filed July 29, 2016)(pending)

 Case 2:16-cv-05655 JLS (E) (U.S. Dist. Ct. Los Angeles)………26

*Spindler v. City of Los Angeles, Herman J. Wesson, Hugo S.*

*Rossitter, et. al* (Filed January 11, 2017)(pending)

 Case No. 2:17-cv-00250 JLS (E) (U. S. Dist. Ct. Los Angeles)....6,26

## California Statutes and Regulations

Civil Code of Procedure §425.16, subd. (e)(4)……………………..25

Civil Code of Procedure §527.6 subd. (b)………………………….28

Civil Code of Procedure §527.8………………………………….11

Civil Code of Procedure §527.8(a)……………...……………….11,18

Civil Code of Procedure §527.8j, subd.(b)(2)……………………..11

Government Code §54953.3……………………………………...21

Government Code §54954.3(a)…………………………………..21

Government Code §54954.3(c)………………………………....23

Penal Code §422……………………………...…………….....2,7

50

# TABLE OF AUTHORITES

**Page**

### Constitutional and Public Law Citations

California Const. article I, §2..................................................27

Los Angeles City Charter, Section 271......................................2,19

Measure RRR..................................................................1,6,25

Ralph M. Brown Act (Gov't Code §§54950-54963)................9,25

Rules of the Los Angeles City Council, Rule *7.......................21

U.S. Constitution, Amendment I...........................................15

v.

51

# I.

## INTRODUCTION AND STATEMENT OF THE CASE

This appeal comes before the Court because Respondent OFFICE OF THE CITY ATTORNEY (hereinafter CITY ATTORNEY) filed for and received a 3 year restraining order against Appellant WAYNE SPINDLER (hereinafter SPINDLER) because SPINDLER wrote on a speaker card handed in at a public meeting regarding the proposed City charter amendment, measure "RRR" which would have changed the L.A. Department of Water and Power (D.W.P.) board and also allowed annual transfers **approved by voters** of up to $220,000,000 per year **forever.** The City of Los Angeles needs that money and has been in litigation as it has been billing and receiving hundreds of millions of dollars a year from the D.W.P. in violation of the California Constitution. A vote in favor of the proposal would have been a possible legalization of this illicit practice. SPINDLER went many meetings about this measure RRR and vehemently spoke against it because the City's politicians buried the rate transfer legalization behind the other parts of the measure. SPINDLER kept asserting this was done to "trick" the voters to vote themselves a tax increase and spoke of the lawsuits saying the practice

52

of taking the hundreds of millions of dollars from D.W.P. was illegal.

The reception to SPINDLER's comments was gaining traction and soon many started to question it. This made the City Councilmembers who backed Measure RRR very irate. So, at one of those meetings on May 11, 2016 a speaker card with colorful offensive remarks was misused and mislabeled as a "threat" and SPINDLER was arrested two days later on May 13, 2016 literally on the steps of City Hall entering a public meeting with a felony "criminal threats" charge under P.C. §422.

Petitioner and Respondent OFFICE OF THE CITY ATTORNEY is the lawyer for the City of Los Angeles, a municipal corporation. The OFFICE OF THE CITY ATTORNEY is elected for 4 year terms Citywide. The City Attorney has the task of both being the lawyer and law firm exclusively to the client the City of Los Angeles and also a public prosecutor with jurisdiction over misdemeanor and infraction cases occurring within the boundaries of the City of Los Angeles. City Charter 271 states the CITY ATTORNEY is the **legal officer for the City.** Only the City Attorney is **authorized** to provide legal advice and the City Attorney's **only**

2

53

client is the municipal corporation, which means that the City
Attorney cannot provide outside legal services. The City Charter
also goes on to say that City Employees cannot provide legal
services to persons outside the municipal corporation.

At no time was the City of Los Angeles, a municipal
corporation named or placed as a party to this action.

On May 19, 2016 a full 8 days after the alleged "threat" was
made, the OFFICE OF THE CITY ATTORNEY by itself filed a
"Petition for Workplace Violence Restraining Orders (Workplace
Violence Prevention)" (Supl. A.R. 1-6) The OFFICE OF THE CITY
ATTORNEY falsely filed for a non-employee of theirs named
"Herman J. Wesson." (Supl. A.R. 1.) Mr. Wesson filed an affidavit
stating he is an "elected councilmember" and in no way could be an
employee of the OFFICE OF THE CITY ATTORNEY. (Supl. A.R.
7.) Mr. Wesson fails to identify himself: He goes by the name Herb
J. Wesson, Jr. and never uses the name "Herman J. Wesson."

Mr. Wesson goes on in his affidavit to proclaim a speaker card
handed to a sergeant-at-arms and then to the desk was "handed" to

3

54

him—insinuating that the speaker card was handed to him **directly** vs. handed in to the meeting committee in session. Mr. Wesson next states he "...took the depictions as a personal and direct threat to me." (Supp. A.R. 8.)  The Speaker card referred to was attached as an exhibit (Supp. A.R. 9-10.)

Deputy City Attorney Hugo Rossitter also submitted an affidavit (Supp. A.R. 11.) However, it was dated April 27, 2016 **a full 14 days before the alleged incident that allegedly occurred on May 11, 2016.** A Temporary Restraining Order (T.R.O.) was issued the same date May 19, 2016 with a hearing date for a full 3 year restraining order scheduled for June 10, 2016. (Supp. A.R. 12.)

The T.R.O. was worded with such things as it wasn't going to stop attendance at public meetings (Supp. A.R. 13.)

"7 (other) Nothing in this order shall be construed as prohibiting The Respondent from peacefully and in an orderly manner Presenting grievances or comments to the City Council or any City Agenda." (Supp. A.R. 13.)

Yet, the T.R.O. contained numerous restrictions like having to surrender all weapons **within 24 hours**. (Supp. A.R. 14.)

4

55

The T.R.O. was essentially a legal minefield for all concerned: It said stay away 10 yards from Wesson at public meetings, yet 100 yards away from his home. (Supp. A.R. 13,) The Order also barred SPINDLER from ever visiting the 10th District Counsel claiming that SPINDLER is not a "constituent!" (Supp. A.R. 13.) The order went on to stay away 2 yards from Wesson's Downtown district office and 10 yards away at public meetings. (A.R. 14.) Yet, what if Wesson's car drove up to City Hall and SPINDLER was on the sidewalk walking? Or what if Wesson walked in front of SPINDLER at a public meeting? This outrageous order was clearly crafted to be a trap to try to get SPINDLER in violation anyway possible.

Mr. Wesson and the OFFICE OF THE CITY ATTORNEY rode the T.R.O. out on a press junket. Now SPINDLER was then said to be a dangerous racist—which is exactly what the Petitioner sought out to do and designed this plan **weeks before the alleged incident.**

Mr. Wesson in fact threatened SPINDLER at the May 11, 2016 meeting. There was an audio recording of the meeting, but the Judge

5

56

never took it out of the holder (A.R. 26 A.[1]) Had the Judge played the recording, it is very clear Mr. Wesson was far from afraid of anything, he was really angry and ready to attack.  The polls had the measure RRR going to a narrow defeat, which it did. Mr. Wesson was having these meetings, at night and around the City to urge a yes vote on the Measure RRR scheme. At one point, at SPINDLER making public comment, at 1:11:00 to 1:13:00 mark on the audio that says that the City is fighting a big lawsuit and that the D.W.P. should be sold by the City to private investors. SPINDLER filled out and spoke twice: the first speaker card said "F-U-Herb" on the address line. (A.R. 33-right column, second speaker card.) **Nothing was said about this.** Then SPINDLER was called up to speak on the second card (A.R. 32) around 1:18:00 of the recording. SPINDLER speaks at 1:21:22 to the point till 1:22:31. The comment made was that the Measure RRR would fail and that the City was stealing the money and over $716,000,000 would be due back to the D.W.P. if the 3 years past of the annual transfers was voided by the Courts. This made WESSON

---

[1] The full recording of the audio-only of the May 11, 2016 meeting in question is available at the following public website: http://lacity.granicus.com/MediaPlayer.php?view_id=46&clip_id=15829.

6

irate. Then at 1:22:41-1:23:00 WESSON insulted SPINDLER that he was a fool and made no sense and wanted to know if anyone else had a speaker card. There was one more woman who opposed RRR. WESSON was calm at all times in his voice and demeanor. Then at the very end at 1:24:49 WESSON calls for the City Attorney and states he wanted to "Go on the record regarding to Mr. Spindler." and goes "on the record" "that this idiot" "called me the N-word" "not man enough to come up to my face and say that" and describes the card and says that SPINDLER needs to show respect then tosses SPINDLER out of the meeting. The audio is the key: it clearly shows WESSON was mad about the card mocking him and was not in any way "afraid" or otherwise. No police officer/seargeant-at-arms would sign a police report **on the scene.** Instead, the L.A.P.D. took a 'narrative' from WESSON and based on that filed an arrest warrant and arrested SPINDLER two days later at Downtown City Hall for P.C. §422 a "criminal threat."

"Its not good to be uncivil" the City Official said at 1:26:00 to the 1:27:00. Clearly, the City officials at that meeting **knew the card was offensive speech NOT A THREAT.** A public speaker said the SPINDLER card that was described was **offensive.** WESSON was

7

58

clearly calm and not in any way threatened by the speaker card, period. WESSON sounds in a good mood from 1:29:00 to the end of the meeting.

CITY ATTORNEY **itself** as "employer" to "Herman J. Wesson" filed and obtained a Temporary Restraining Order against SPINDLER on May 19, 2016. (A.R. 3-5.) That same NIGHT on May 19, 2016 at 5:29 pm the arresting officer of SPINDLER from the May 13, 2016 arrest, Detective III, Eric Reade serves the Civil T.R.O. on SPINDLER returned the proof of service the next day.

SPINDLER as a result had to turn in all his guns and ammunition within 24 hours to the L.A.P.D. for "storage" (A.R. 7-8.) The guns and ammo worth thousands of dollars are lost forever[2].

SPINDLER filed a lengthy response on May 25, 2016.  In it was alleged that the incident was a public meeting and the card was part of that as a free speech and symbolic speech. (A.R. 10-38.) It was also

---

[2] On July 7, 2017, the CITY forced an agreement to have all the weapons and ammo destroyed by the L.A.P.D. as part of a criminal case they filed in case 7 VW 01632 PEOPLE V. SPINDLER because of the T.R.O. being in force. The CITY dropped its gun charge to an infraction "disturbing the peace" alleged to have occurred on May 20, 2016 for SPINDLER complying with the Judge's TRO order.

8

59

alleged that WESSON was not an "employee" of the CITY ATTORNEY. The response also listed the Ralph M. Brown Act was the law allowing free speech at the public meeting in that it requires anonymity if speakers use a pseudonym which WESSON clearly violated in referring to SPINDLER vs. "Wayne from Encino." WESSON then held nationally and internationally broadcasted press conferences and everywhere SPINDLER was on T.V. and the radio and internet showing his picture and being a racist! (A.R. 16-18.) WESSON called on the State Bar to revoke SPINDLER'S law license and to beput up on federal and state hate crime and gun charges. SPINDLER was not only having to go into seclusion and barraged with death threats, he was now **disarmed completely.**

Despite all this evidence, the Judge issued a 3 year restraining order and it was amended (A.R. 39-44.) The CITY ATTORNEY never added the City of Los Angeles as a party to the case. They continued and to this day continue to not dismiss this void T.R.O. and never has received valid authorization from its client the City of Los Angeles to file such a workplace violence T.R.O.

9

60

WESSON, SPINDLER, and Mr. Rossitter from the CITY
ATTORNEY attended. The hearing was brief, and clearly SPINDLER
had no chance to defend himself—the Judge said it was hate speech
and that SPINDLER could go to all public meetings, but must stay
away from WESSON. What the Judge failed to rationalize was the
taking for 3 years of SPINDLER'S right to bear arms and the loss of
his guns. This issue should have been addressed especially given how
WESSON drummed up the fever pitch of bad publicity and death
threats that resulted against SPINDLER. The Judge also failed to rule
if SPINDLER was involved in a "protected activity" whereby
SPINDLER was engaged in giving opinion on matters of general
public interest.

## II.
## STANDARD OF REVIEW

The "…reviewing court is free to determine independently the
application of laws, regulations, or procedures." *Apte v. Regents of*
*University of California* (1988) 198 Cal.App.3d 1084, 1092 [244
Cal.Rptr. 312.]

The substantial evidence standard applies, in that the appellate

10

61

court finds any substantial evidence contradicted or not to support the decision below reviewing the evidence most favorable to the prevailing party (here the CITY ATTORNEY.) *Jessup Farms v. Baldwin* (1983) 33 Cal.3d. 639, 660.

The Office of the City Attorney obtained a 3 year work place violence restraining order against SPINDLER under Civil Code of Procedure §527.8 on behalf of WESSON **who is not an employee.**

Section §527.8(a) provides that in part "any **employer**, whose **Employee** has suffered…a credible threat of violence from any individual, that can reasonably be construed to be carried out or to have been carried out at the workplace, may seek a temporary restraining order and an injunction **on behalf of the employee.**"

A credible threat of violence is "a knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, **and that serves no legitimate purpose.** (§527.8j, subd. (b)(2).)

11

# III.
## ISSUES PRESENTED ON APPEAL

The issues on appeal are:

1) whether the Office of the City Attorney can file the petition when it is not the employer of the intended protected person.

2) whether the absence of the City of Los Angeles as a party to the case voids *ab initio* the petition as an *ultra vires* action.

3) whether SPINDLER's speaker had served a "legitimate purpose" and thus requires the petition be dismissed for lack of a credible threat of violence.

4) whether any threat was "reasonably construed" to be carried out or have been carried out at the "workplace."

5) whether the testimony and declarations of WESSON and ROSSITTER fail to show by clear and convincing evidence a TRO and injunction for 3 years was warranted.

# IV.
## STATEMENT OF FACTS

On May 11, 2016 the Herman J. Wesson (WESSON) called a special meeting of the Rules, Elections, Intergovernmental Relations, and Neighborhood Committee (A. R. 30.) SPINDLER attended the

12

63

meeting and spoke twice, handing into the seargent-at-arms two

separate speaker cards (A.R. 32; Suppl A.R. 9-10) and (A.R. 33.)

SPINDLER was called twice after the cards were called as speakers

and spoke for 1 minute each time. After SPINDLER spoke the second

time, WESSON stated he wanted SPINDLER to come up to his face

"like a man" and call him a "nigger." (A.R. 14.) He also called

SPINDLER an idiot (A.R. 14) (on C. D. at A.R. 26A.[3]) WESSON 8

days later on May 19, 2016 gave a sworn declaration claiming he took

the drawings on the card as a "threat" to him personally. Two days

after the meeting on May 13, 2016 SPINDLER had been arrested by

L.A.P.D. (this was 6 days before the WESSON declaration.) (A.R. 13)

Then WESSON held major press conferences showing SPINDLER in

a hood with a swastika falsely claiming that was a picture of

SPINDLER from the May 11th meeting "handing him the speaker card

(A.R. 16-18) and WESSON called for a "hate-speech probe." (A.R.

17.) WESSON publicly called for the D.A. to "fully" prosecute

SPINDLER and "revoke" his bar license. (A.R. 15)

---

[3] The Judge never removed the C.D. from the holder and reviewed it.

13

Back on April 27, 2016, a full 14 days before the May 11,
2016 meeting attorney Hugo Rossitter signed his affidavit (Supp. A.R.
11.) The Rossitter declaration falsely stated that "I am seeking a
restraining order on behalf of Herman J. Wesson Jr., the victim herein,
who has reported threats of violence and a course of conduct by the
Defendant which puts the victim in fear of his life and the lives and
safety of employees of the City of Los Angeles." (Supp A.R. 11.)Note
that Mr. Wesson never mentions any **threats of violence and a
course of conduct** in his declaration (Supp. A.R. 7-8.) There was no
police report at the scene of the May 11th Meeting nor a declaration
from any sergeant-at-arms who was present at the meeting. WESSON
as well failed to state he uses an A.K.A. "Herb" Wesson. It must be
noted the "employer" the City of Los Angeles did not submit an
affidavit on its behalf (e.g. human resources, City Controller, etc.)

On May 19, 2016 as stated earlier the T.R.O. was served by the
same arresting officer of SPINDLER on May 13th and SPINDLER
surrendered his guns and ammunition to L.A.P.D. the next day.

On June 10. 2016 a quick hearing was held. The Transcript
shows that SPINDLER was questioned first by the Judge (Trans.

14

65

At 1-2, Then WESSON was questioned, (Trans. At 2.) The Judge asked what the cartoon on the card had to do with the D.W.P. (Trans. at 3.) The Judge said:

"You can't send up a picture of a noose and a person about to be hung from it and a ku klux klan and saying "fuck you, Herb." (Trans. At 4. ll. 9-12.)

Mr. Rossitter next opined:

"But this, this card, this speaker card in and of itself was a unique piece of focus hate speech." (trans. at 5, ll. 10-12.)

The judge said next "It was clearly a hate message." (trans. at 5, line 13.)

Next the Judge said SPINDLER could go to Council meetings but must stay 10 yards away from those same meetings (trans. at 5 ll. 15-17.)

In December 2016 the D.A. announced it declined to file any criminal charges regarding the incident as it involved 1rst Amendment

15

free speech and assembly issues but said in the statement that
SPINDLER was reprehensible in his conduct.

On March 29, 2017, The CITY ATTORNEY announced that a
criminal complaint was filed against SPINDLER for possession of an
assault rifle which was obtained by **SPINDLER complying with the
Judge's May 19 2016 T.R.O. order.** The next day the L.A. Times
put that story in the print edition March 30, 2017. That same night,
after SPINDLER attended a public meeting featuring several State,
Federal, and local elected officials including Mr. Feuer, SPINDLER
was surrounded by 20 officers and ordered by gunpoint out of his
vehicle. The reason: it was claimed a radio call said SPINDLER had a
gun with him!

On April 4, 2017 the CITY ATTORNEY actually filed the
criminal complaint without running the gun's paperwork or serial
number. After numerous appearances in Van Nuys (Case No.
7 VW 01632) the Judge arrested SPINDLER and booked him in
Van Nuys Div. on the 1 count of assault weapon possession.

67

On July 7, 2017 the gun case fell apart. SPINDLER pled to 1

count of "disturbing the peace" as an infraction. The $895.00 fine was

"satisfied" because the Sheriff's Dept. shows SPINDLER was

arrested and released in 12 hours.[4]

On July 11, 2017 City New Service was quoted by the L.A.

Daily News that City Attorney's office stated Spindler "..pleaded

guilty to a misdemeanor..." This is falsely stating a crime was pled to

defaming the Appellant in this case in no less than 4 days after the

Case to settle as an infraction was taken in criminal court.[5]

## V.

## ARGUMENT

### 1) The Office of the City Attorney cannot file the petition as it is not the employer of the intended protected person.

The "employer" is the municipal corporation of Los Angeles. Both

WESSON and Mr. Hugo Rossitter are "employees" of the City of

---

[4] The issues in this appeal would have been litigated in the criminal case as it is clear the CITY ATTORNEY may have filed the criminal charge to gain an advantage in this case and the ancillary litigation against the City. The T.R.O, **IT FILED FALSELY for WESSON** was alleged a "ruse" and thus the gun turned in was excludable in a criminal case as evidence.

[5] www.dailynews.com/general-news/20170711/la-city-hall-critic-to-destroy-guns-pleads-guilty-to-disturbing-the-peace.

Los Angeles. (A.R. 27-29.) Wesson **is not employed by the Office of the City Attorney.** (Supp. A.R. 7 lines 3-4) "That I am the elected Councilmember for the Tenth District of the City Council of the City of Los Angeles ("City"), and have held my office since 2005."

The "employer" the City of Los Angeles never submitted on its behalf an affidavit to file a T.R.O. for workplace violence as the law mandates. C.C.P. § 527.8, subd. (e), *Kaiser Foundation Hospitals v. Wilson* (2011) 201 Cal. App. 4th 550.

> "Section 527.8(a) permits an employer to seek a "temporary restraining order and an injunction on behalf of [an] employee [who has suffered unlawful violence or a credible threat of violence carried out in the workplace]."Upon filing the of a petition for an injunction, the employer may obtain a temporary restraining order if the plaintiff "files an affidavit that, to the satisfaction of the court, shows reasonable proof the employee has suffered unlawful violence or a credible threat of violence by the defendant, and that great or irreparable harm would result to an employee." *Kaiser, id.*

69

There is no affidavit from the "employer." The City Attorney himself through Hugo Rossitter **falsely** stated **it, the "Office of the City Attorney"** was the employer! And the Office of the City Attorney is the elected "lawyer" **and counselor for the City of Los Angeles, the municipal corporation on all civil matters,** City Charter 271. (A.R. 28) "The City Attorney litigates all civil actions **on behalf of the City and represents the City, its boards and officers in all civil trials and legal proceedings, in both state and federal court."** Thus, the City Attorney and the Office of the City Attorney cannot be the employer of Herman J. Wesson Jr. aka Herb Wesson. The civil action here was never brought on behalf of the City of Los Angeles, a municipal corporation. The City Attorney's action is void and *ultra vires.* The case must be remanded and the restraining order immediately declared a nullity as it violates state law and is a fraud. **Further, the guns and other personal property obtained via the T.R.O. is an illegal "taking"** *e.g. Ali v. City of Los Angeles* (1999) 77 Cal. App. 4th 246. The City Attorney's Office has litigated this issue before and it has cost the City millions. They fully know and have been a party to numerous suits when they do something the municipal corporation is not allowed to do or **exceeds its authority to do.**

70

**2) The absence of the City of Los Angeles as a party to the case voids *ab initio* the petition as an *ultra vires* action.**

If an action taken by the City of Los Angeles is "null and void" any subsequent action thereto tha act is "null and void," *e.g. Neighborhood Action Group v. County of Calaveras* (1984) 156 Cal. App. 3d 1176, 1179 (finding that issuance of a conditional use permit is itself *ultra vires* because the general plan of the issuing entity was statutorily improper. Actions taken by the City that are in conflict with state statute or its own city charter are void, *Harris v. Alcoholic Beverage Control Appeals Board* (1964) 228 Cal. App. 2d 1,5 (Department of Alcoholic Beverage Control Board's denial of an alcoholic license is*ultra vires* because it is predicated on a Department rule that is a "nullity" because in conflict with state statute.)

The Office of the City Attorney in a civil case can only **act on behalf** of the City of Los Angeles. The CITY ATTORNEY is also not the employer. Thus the restraining order brought here is null and void.

The Los Angeles City Attorney as public prosecutor **cannot bring a workplace violence lawsuit in its own name,** *City of Los Angeles v. Animal Defense League, et. al.* (2006) 135 Cal. App.

71

4th.1567a.

The action must be brought in the name of the City of Los Angeles.

**3) SPINDLER's speaker had served a "legitimate purpose" and thus requires the petition be dismissed for lack of a credible threat of violence.**

If the writing in question (the speaker card) (Supp A.R. 9-1 0) **itself** had a "legitimate purpose" then the decision must be reversed. The judge never considered this. Mr. Wesson concedes the point: The speaker card was handed into a sergeant-at-arms (supp. A. R. 7, ll.11-14; 22-24) which was handed to the clerk, then to him **to speak at a meeting that gives members of the public the right to speak.** Gov't Code §54954.3(a); Council Rule *7. Therefore the card had a legitimate purpose. WESSON also illegally named SPINDLER by his real name and not his anonymous name, in violation of State law at the meeting.[6]

The injunction in this lawsuit must be brought if "it is reasonably likely such unlawful violence may occur in the future

---

[6] Gov't Code §54953.3

21

absent a restraining order. *City of Los Angeles v. Animal Defense League, supra.*

The clear language of the T.R.O. shows that SPINDLER in the injunction **would be allowed at all public meetings WESSON attends!** Also noteworthy is **written, oral, and telephonic contact with WESSON was specifically ALLOWED under the Judge's order!** (A.R. 40.) Thus if SPINDLER is allowed to attend all meetings and contact WESSON by writing, mail, email, or any means Then it means SPINDLER is not a "threat" to "hand" any threat to WESSON. If SPINDLER did commit a threat at a public meeting why would he be allowed to attend all meetings then?

As well, the TRO takes SPINDLER's right to bear arms away a full three years! There never was an issue in this lawsuit about any gun or weapon whatsoever. As well, the TRO prohibits SPINDLER to stay 100 yards away from WESSON's home, his district office on Vermont Ave., and his City Hall office on the 4th floor---yet there was nothing that occurred anywhere at those places. Thus, the T.R.O. is a **sham.** WESSON wanted the injunction to use as a publicity stunt to label SPINDLER a nut and as anyone in the average public knows if

22

73

someone has "a restraining order" against them that usually means they are "dangerous" or "nuts." There never was a need to gain a 3 year injunction in this case and it wasn't needed because SPINDLER could go right on attending meetings, except SPINDLER gets punished for public participation in the media, loses his gun rights for 3 years, and has the stigma of a restraining order against him. That is not what the Legislature intended for a Government employer to use to "protect" its employees when it amended the law allowing workplace violence restraint orders.

### 4) No threat was "reasonably construed" to be carried out or have been carried out at the "workplace."

"The legislative body of a local agency shall not prohibit public criticism of the policies, procedures, programs, or services of the agency, or of the acts or omissions of the legislative body." Gov't Code § 54954.3(c). Limiting the public ability to criticize the City or its employees is "viewpoint discrimination" and unconstitutional under both State and Federal law. *Leventhal v. Vista Unified School District* (1997) 973 F. Supp 951; *Baca v. Moreno Valley Unified School District* (1996) 936 F. Supp. 719. The judge stated SPINDLER

23

74

is to stay 10 yards away from public meetings (Trans. at 5.) The judge

violated the Constitution and State Law as her actions had to be

under"strict scrutiny" for this purpose. The Speaker card drawings and

message was **criticism** of City policy and city employees. It was part

of the speech of SPINDLER. It is non-commercial political speech

and fully protected. As such, the card is not a "threat" as the D.A. of

Los Angeles County opined. The card itself, standing alone, without

more cannot be an "imminent threat" or "course of conduct" to cause

the finding to be made for a T.R.O., *see In re Ricky T* (2001) 87

Cal.App.4th 1132 "threats are judged in their context; *People v.*

*Martinez* (1997) 53 Cal.App.4th 1218. Here the room was filled with

armed and trained L.A.P.D. sergeants-at-arms and no verbal or any

gesture of threat whatsoever was made by SPINDLER. In fact,

WESSON made a threat "if you were man enough you'd say it to my

face" (in reference to the speaker card cartoon saying "nigger.")

**5)  The testimony and declarations of WESSON and ROSSITTER**

**fail to show by clear and convincing evidence a TRO and**

**injunction for 3 years was warranted.**

WESSON failed to state his name "Herb" Wesson. He also

24

75

publicly has contradicted his affidavit, saying in fact he wasn't

"frightened" but really was "unbelievably angry." (A.R.16.)

Rossitter's affidavit, dated a full 2 weeks before the May 11 meeting

by the way said there was "threats" and a reported "course of

conduct" plural reported by WESSON. which is a lie and contradicts

WESSON's own affidavit and his own testimony at the hearing!

Given the inconsistencies of the CITY ATTORNEY and WESSON,

the case cannot be sustained by clear and convincing evidence.

    This isn't the first "rodeo" the City and the City Council have had

against the "notorious" "gadfly's." The current T.R.O. is anti-

SLAPP.[7] The D.W.P. measure RRR was clearly an "issue in which

the public is interested" and is of "public interest" *Nygard, Inc. v.*

*Uusi-Kerttlula* (2008) 159. Cal.App.4th 1027. Speaking at a Brown

Act sanctioned meeting is a public interest in and of itself and clearly

a "protected activity. In July 8, 2016 the same Judge as in this case

rejected the same kind of T.R.O. as SPINDLER'S by the same City

Attorney (who brought the case **in the name of the City of Los**

---

[7] C.C.P. §425.16, subd. (e)(4) Strategic Lawsuit Against Public
Participation

Angeles.)[8] Mr. Hunt is another frequent "critic" of City Hall and wears sometimes a hood and KKK style "garb" to symbolically show the City is against the interests of African Americans, of which Hunt is. The City has lost millions in legal fees and judgements against Hunt (CV-09-06731 DDP (SSx) *Dowd, et. al. v. City of Los Angeles, a municipal corporation* (Aug. 7, 2013) U.S. Dist. LEXIS 111435*; 2013 WL 4039043. The federal Court granted summary judgement that the rules of decorum *as applied* violated the first amendment, *Dowd* at *59.; *Hunt v. City of Los Angeles*  (Dec. 6, 2012) CV 12-7261 DSF (SHx); *Hunt v. City of L.A.* 638 F.3d at 703 (9th Cir. 2011.) Judicial Notice should be made as well to 2 lawsuits pending against the City for violations of SPINDLER's right to attend and speak at Brown Act Public Meetings:  *Spindler v. City of Los Angeles, et. al* 2:16-cv-05655-JLS-E (FILED July 29, 2016) violations of civil rights; *Spindler v. City of Los Angeles, Herman J. Wesson Jr., Hugo S. Rossitter, et.al.* 2:17-cv-00250-JLS-E (filed January 11, 2017.) Every day people are getting thrown out and sometimes arrested too for speaking at these city meetings. As such, the City is engaging in a

---

[8] Case no BS 16-2858 *City of Los Angeles, Petitioner  v. Michael Hunt, Respondent. (ex rel. City Councilman Mitch O'farrell (as Petitioner.) July 8, 2016.* Petition denied.

26

77

form of "as applied" discrimination. *Hoye v. City of Oakland* 653 F.3d 835 (9th Cir 2011.) "two types of as-applied challenges to rules of decorum: "paradigmatic type" vs. "selective enforcement vis a vis the Plaintiff..." *Norse v. City of Santa Cruz* 629 F.3d 966 (9th Cir. 2010), "actual disruption must be objective vs. discriminatory" *Acosta v. City of Costa Mesa* 718 F.3d 800 (9th Cir. 2013.) "A speaker may not be removed from a meeting solely because of the use of profanity unless the use of profanity actually disturbs or impedes the meeting."

In this instance, the speaker card was not seen and could not be seen to the audience in attendance. It becomes online available later on the City's website. Second, but for WESSON reading the card's artwork and visual details and then saying it was done by an "idiot" named Wayne Spindler (vs. the anonymous name given "Wayne from Encino") and saying if SPINDLER was "man enough" to "say that to my face" **there would have been no disruption of the meeting or pausing of the meeting whatsoever!** WESSON was the one who disturbed the meeting and thus illegally ejected SPINDLER from the room after his retaliation for SPINDLER's speaker card. The actions violated Cal. Const. art. I, §2 which provides greater protection to the expression of free speech than does the United States Constitution"

27

78

*Gonzales v. Superior Court* (Ct. App. 1986) 180 Cal. App. 3d 1116, 1122; 226 Cal. Rptr. 164. This T.R.O and 3 year injunction are furtherance of violation of SPINDLER's right to remain free of retaliation for the **content** of his speech and drawings on cards. Most glaringly showing what a fraud this lawsuit is: is (A.R. 40) on the form left **blank** under "Contact the person, either directly or indirectly , in **any** way, including, but not limited to, in person, by telephone, in writing, by public or private mail, by interoffice mail, by e-mail, by text message, by fax, or by other electronic means" And then (7 ) Other (*specify*): *May engage in public comment and attend city public meetings!*"

Thus, the attending of the public meeting and handing in a speaker card to speak with speech on the card that is critical of Gov't officials is a "Constitutionally Protected Activity" and cannot be enjoined as "a course of conduct" Ca. Civil Code §527.6 subd. (b).

79

# VI.

# CONCLUSION

Based upon the record in this case and the arguments made, it is hereby respectfully requested that the Court of Appeal grant this appeal and remand the case to the Superior Court ordering the injunction and T.R.O. be vacated *ab initio* May 19, 2016.

Dated: July 14, 2017                          Respectfully submitted,

                                              APPELLANT/DEFENDANT

                                              _____

                                              Wayne Spindler

                                              *In pro per*

80

## CERTIFICATE OF COMPLIANCE

Appellant/Defendant hereby certifies that pursuant to the California Rules of Court, the enclosed document has been produced using a 14-point type, including footnotes and contains 5,876 words. Appellant/Defendant relies on the word count of the computer program used to prepare this brief.


Dated: July 13, 2017                    APPELLANT/DEFENDANT

                                        _____

                                        Wayne Spindler

                                        *In pro per.*

# PROOF OF SERVICE BY MAIL

In Re: APPELLANT'S OPENING BRIEF: 2nd Civil No. B276413

CAPTION: OFFICE OF THE CITY ATTORNEY v. WAYNE SPINDLER

Filed: IN THE COURT OF APPEAL, Second Appellate District, Division 3

STATE OF CALIFORNIA        )

                        ) ss.

<u>COUNTY OF LOS ANGELES   </u>)

  I am a Lawful Permanent Resident of the United States and a resident or employed in the County of Los Angeles; I am over the age of eighteen years and not a party to the within action; my business address is: 856 South Hoover Street Los Angeles, CA. 90005-1201. On this date, I served the persons interested in said action by placing one copy of the above-entitled document in sealed envelopes with first class postage fully prepaid in the United States post office mailbox at Encino, California addressed as follows;

HUGO S. ROSSITTER

OFFICE OF THE CITY ATTORNEY

200 North Main Street, Room 800

Los Angeles, CA. 90012

(Attorney for Plaintiff and Respondent)

HERMAN J. WESSON,

AKA "HERB WESSON"

200 North Spring Street, Suite 430

Los Angeles, CA. 90012

(Fictitious "employee")

The Hon. Carol Boas Goodson

111 North Hill Street,

Courtroom "2C" Room 243

Los Angeles, CA. 90012

(Trial Court Judge)

Hon. Xavier Becerra

Attorney General of California

Public Integrity Unit

P.O. Box 944255

Sacramento, CA.  94244-2550

(Attorney General)

I certify (or declare) under penalty of perjury that the foregoing is true and correct.

Executed on July 14, 2017, at Encino, California.

_____        Mike Jacovic

*82*

# EXHIBIT C

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                FOR THE COUNTY OF LOS ANGELES

3

    DEPARTMENT 2C          HON. CAROL BOAS GOODSON, JUDGE
4

5   CITY OF LOS ANGELES,                    )
                                            )
6                          PETITIONER,      ) SUPERIOR COURT
                                            )
7               -VS-                        ) NO. BS162858
                                            )
8   MICHAEL HUNT,                           )
                                            )
9                          RESPONDENT.      )
    _____)

10

11            REPORTER'S TRANSCRIPT OF PROCEEDINGS

12                 FRIDAY, JULY 8, 2016

13   APPEARANCES:

14

    FOR THE PETITIONER:   MIKE FEUER, CITY ATTORNEY
15                         BY:  HUGO S. ROSSITTER, DEPUTY
                           CITY HALL EAST
16                         200 NORTH MAIN STREET
                           ROOM 800
17                         LOS ANGELES, CALIFORNIA  90012

18

19   FOR THE RESPONDENT:   MICHAEL HUNT
                           IN PROPRIA PERSONA
20

21

22

23

24

25

26

27   REPORTED BY:          PATRICIA ANN THAETE, CSR 8737
                           OFFICIAL REPORTER
28

EXHiBiT C                                                    87

1

```
1    CASE NUMBER              BS162858
2    CASE NAME:               CITY OF LOS ANGELES
3                             VS.
4                             MICHAEL HUNT
5    LOS ANGELES, CA          FRIDAY, JULY 8, 2016
6    DEPARTMENT 2C            HON. CAROL BOAS GOODSON,
7                             JUDGE
8    APPEARANCES:             (AS HERETOFORE NOTED.)
9    REPORTER:                PATRICIA ANN THAETE,
10                            CSR NO. 8737
11   TIME:                    A.M. SESSION
12
13        THE COURT:  SO WE WILL PROCEED WITH THE CASE
14   THAT REQUIRES PRIORITY.  CITY HALL VERSUS HUNT.
15        MR. ROSSITTER:  YES.
16        THE COURT:  THANK YOU.
17            AND IF YOU WILL STEP FORWARD,
18   MR. HUNT.  THANK YOU.
19            I ASSUME YOU'VE RECEIVED A COPY OF --
20        MR. ROSSITTER:  GOOD MORNING, YOUR HONOR.
21        THE RESPONDENT:  GOOD MORNING, YOUR HONOR.
22        THE COURT:  THIS IS YOUR ANSWER, CORRECT?
23        THE RESPONDENT:  CORRECT.
24        THE COURT:  GOOD.  BECAUSE IT WAS LONG AND
25   CLEAR, I WOULD HATE TO THINK THAT I -- ALTHOUGH
26   I'VE LEARNED SOMETHING, I WOULD HATE TO NOT THINK
27   THAT I'VE READ EVERYTHING IN IT.
28        THE RESPONDENT:  NO.  THE BRIEF IS VERY
```

85

2

1    GOOD.

2         THE COURT:  ALL RIGHT.  AND GOOD MORNING,

3    COUNCILMAN.

4         THE PETITIONER:  GOOD MORNING, YOUR HONOR.

5         THE COURT:  THANK YOU.  AND WOULD YOU

6    IDENTIFY YOURSELF FOR THE RECORD.

7         THE PETITIONER:  MITCH O'FARRELL.

8         THE COURT:  THANK YOU.

9         COUNCILMAN O'FARRELL, PLEASE TELL ME

10   WHY YOU FEEL YOU NEED A RESTRAINING ORDER AGAINST

11   MR. HUNT.

12        THE PETITIONER:  MR. HUNT FOLLOWED ME INTO

13   THE HALLWAY OUTSIDE COUNCIL CHAMBERS WHERE, YOU

14   KNOW, FIRST AMENDMENT IS ON FULL DISPLAY ALL THE

15   TIME, AND THEN CAME WITHIN INCHES OF ME

16   PHYSICALLY.  AND THERE WAS ENOUGH CONCERN --

17        THE COURT:  DID HE STRIKE YOU?

18        THE PETITIONER:  HE DID NOT STRIKE ME.

19        THE COURT:  DID HE ATTEMPT TO STRIKE YOU

20   ASIDE FROM BEING ANGRY?

21        THE PETITIONER:  HE WAS INVADING MY PERSONAL

22   SPACE WITHIN INCHES OF ME.

23        THE COURT:  ALL RIGHT.

24        THE PETITIONER:  AND PROCEEDED TO FOLLOW AND

25   HARANGUE AND ALL THE WAY UNTIL I JOINED THE

26   SECOND-GRADERS FOR THE HEADING OUT TO THE ROTUNDA

27   FOR THE PHOTO OPPORTUNITY.

28        THE COURT:  THE SECOND-GRADERS WERE THERE

86

3

```
 1    FOR A KIND OF SHOW AND TELL ABOUT WHAT THE SYSTEM
 2    IS ABOUT?
 3         THE PETITIONER:  YES.
 4         THE COURT:  ALL RIGHT.  AND DID ANYTHING
 5    ELSE HAPPEN?
 6         THE PETITIONER:  JUST CONSTANT PHYSICAL --
 7    OR CONSTANT PHYSICAL THREAT AND VERBAL ABUSE.
 8         THE COURT:  WELL, I NEED TO KNOW ASIDE FROM
 9    THE FACT THAT HE CAME VERY CLOSE TO YOU AND YOU
10    FEEL INVADED YOUR SPACE, WHAT ELSE HAS HE DONE
11    THAT WOULD BE A THREAT TO YOU?
12         THE PETITIONER:  THIS WAS SUCH A TURN OF
13    EVENTS TO WHAT NORMALLY HAPPENS IN COUNCIL
14    WHERE --
15         THE COURT:  WELL, I IMAGINE SO IN THE SENSE
16    THAT THEY'RE USUALLY PRETTY QUIET SESSIONS WITH
17    PRE-SUBMITTED QUESTIONS AND ANSWERS, HOWEVER, OR
18    IF NOT, THEY ARE -- THEY ARE -- IT'S OFTEN A
19    HEATED DEBATE WITH PEOPLE YELLING AND SCREAMING IF
20    THEY CARE A LOT ABOUT AN ISSUE.
21              HOWEVER, THE ONLY -- THE ONLY THING
22    YOU REALLY TOLD ME IS THAT HE FOLLOWED YOU
23    OUTSIDE WITH THE CHILDREN.
24              DID HE THREATEN THE CHILDREN?
25         THE PETITIONER:  I DID NOT OBSERVE A THREAT
26    TO THE CHILDREN.
27         THE COURT:  ALL RIGHT.
28         THE PETITIONER:  JUST TO MYSELF.
```

87

4

```
1          THE COURT:  AND THAT THREAT WAS THAT HE CAME
2    VERY CLOSE TO YOU?
3          THE PETITIONER:  AND I HAD GREAT CONCERN
4    THAT IT WAS GOING TO --
5          THE COURT:  TO ESCALATE?
6          THE PETITIONER:  YES.
7          THE COURT:  AND WHAT DID HE SAY WHEN HE WAS
8    SO CLOSE TO YOU?
9          THE PETITIONER:  COUNTLESS "F" BOMBS.
10         THE COURT:  SO HE CURSED YOU, SAID, "FUCK
11   YOU," THAT KIND OF THING?
12         THE PETITIONER:  YES.
13         THE COURT:  OKAY.  WELL, AS A COUNCILMAN,
14   I'M SURE YOU'VE HEARD THAT BEFORE.
15         THE PETITIONER:  OH, YEAH.
16         THE COURT:  AS A JUDGE I'VE HEARD THAT
17   BEFORE.
18         MR. ROSSITTER:  YOUR HONOR, IF I MIGHT SAY
19   SOMETHING?
20         THE COURT:  PLEASE DON'T TESTIFY FOR HIM.
21         MR. ROSSITTER:  I'M NOT GOING TO TESTIFY.
22   I'M AN ADVOCATE ONLY, YOUR HONOR.
23         THE COURT:  AND, YOU KNOW, YOU KNOW I
24   RESPECT YOU GREATLY BECAUSE YOU ARE HERE AT LEAST
25   ONCE A WEEK.
26         MR. ROSSITTER:  BUT THERE -- WE BELIEVE
27   THERE IS -- WHAT HAPPENS IN THE CITY COUNCIL
28   CHAMBER IS WHAT HAPPENED -- WHAT HAPPENS THERE
```

88

5

```
1    HAPPENS THERE AND IT IS -- IN MANY CASES IT IS FAR
2    LESS THAN QUESTION AND ANSWER AND CALM AND SO ON
3    AND SO FORTH.  IT'S VERY -- IT'S VERY ANIMATED.
4         THE COURT:  I UNDERSTAND THAT.
5         MR. ROSSITTER:  BUT THAT'S THE COUNCIL
6    CHAMBER.
7         THE COURT:  BUT WHEN HE FOLLOWED COUNCILMAN
8    OUTSIDE -- WAS IT OUTSIDE?
9         THE PETITIONER:  IT WAS OUTSIDE COUNCIL
10   CHAMBERS.
11        THE COURT:  SO IT WAS STILL IN THE CITY
12   HALL?
13        THE PETITIONER:  IT WAS IN THE BUILDING.
14        MR. ROSSITTER:  IN THE ROTUNDA, YOUR HONOR,
15   YES.
16        THE COURT:  WELL, IN THE ROTUNDA WE'RE STILL
17   TALKING ABOUT PUBLIC PROPERTY.  WE'RE STILL
18   TALKING ABOUT AN AREA WHERE THERE ARE GREAT
19   FREEDOMS OF SPEECH.
20             AND I'M GOING TO ASK YOU SOME
21   QUESTIONS.  YOU GAVE ME A --
22        THE RESPONDENT:  A HUNDRED PAGES.
23        THE COURT:  -- A VERY, VERY LONG --
24        THE RESPONDENT:  EXTENSIVE.
25        THE COURT:  -- ANSWER, SO I DO NOT NEED YOU
26   TO RESTATE ANYTHING IN THIS ANSWER.
27        THE RESPONDENT:  OH, OKAY.
28        THE COURT:  BUT BECAUSE I ASSURE YOU I HAVE
```

89

6

```
 1    READ IT.

 2          THE RESPONDENT:  OKAY.

 3          THE COURT:  BUT MY QUESTION TO YOU IS DO YOU

 4    HAVE ANY INTENT TO HARM THE COUNCILMAN?

 5          THE RESPONDENT:  NOT AT ALL AND IT WAS JUST

 6    BACK AND FORTH.  AND I HAVE TOLD HIM ACTUALLY THAT

 7    MY ATTORNEY STEPHEN ROHDE, WHO REPRESENTED ME IN

 8    THE LAST TWO CASES, AS YOU KNOW, I'M A NINTH

 9    CIRCUIT WINNER AND I WON CITY HALL BEFORE, THAT,

10    YOU KNOW, THIS IS JUST FREEDOM OF SPEECH AND

11    THAT'S IT.  IT WASN'T NO ATTEMPT TO THREATEN HIM

12    OR ANY KIND OF THING LIKE THAT.  IT WAS JUST

13    FREEDOM OF SPEECH.

14          THE COURT:  ALL RIGHT.  WELL, I DON'T THINK

15    THAT THE PEOPLE HAVE MET THEIR BURDEN HERE, BUT

16    I'M GOING TO SUGGEST THIS TO YOU, MR. HUNT --

17          THE RESPONDENT:  YES, MA'AM.

18          THE COURT:  -- WITHOUT INTERFERING WITH ALL

19    OF YOUR RIGHTS OF SPEECH --

20          THE RESPONDENT:  UH-HUH.

21          THE COURT:  -- THAT DOES NOT INCLUDE GETTING

22    SO CLOSE TO THE COUNCILMAN THAT IT CAUSES HIM

23    ALARM.

24          THE RESPONDENT:  OKAY.

25          THE COURT:  IN OTHER WORDS, YOU WOULDN'T

26    LIKE IT, I WOULDN'T LIKE IT, NOBODY LIKES SOMEBODY

27    IN THEIR FACE.

28          THE RESPONDENT:  YES, MA'AM.
```

90

7

1        THE COURT:  AND YOU DON'T EVEN LIKE YOUR
2   CHILDREN IN YOUR FACE, BUT -- AT LEAST I DON'T,
3   AND SO WHAT I AM GOING TO SAY IS THAT YOU CAN
4   CONTINUE TO GO TO THE COUNCIL MEETINGS, YOU CAN
5   CONTINUE TO PROTEST, BUT YOU'RE GOING TO BE RIGHT
6   BACK HERE AGAIN IF YOU GET VERY CLOSE TO THE
7   COUNCILMAN OR IF YOU FOLLOW HIM OUTSIDE OF
8   CITY HALL.
9        THE RESPONDENT:  I FOLLOWED THE CHILDREN.
10        THE COURT:  YOU ASSURE ME THAT WON'T HAPPEN?
11        THE RESPONDENT:  I ASSURE YOU.
12        THE COURT:  THANK YOU.  THIS IS DENIED.
13   THANK YOU.
14        THE RESPONDENT:  THANK YOU.
15        MR. ROSSITTER:  THANK YOU.
16        THE PETITIONER:  OKAY.
17        THE RESPONDENT:  PEACE AND BLESSINGS.  AND
18   THANK YOU FOR READING MY BRIEF.
19        THE COURT:  WELL, IT WAS INTERESTING.
20        THE RESPONDENT:  YEAH.  YES.
21
22        (PROCEEDINGS CONCLUDED)
23
24
25
26
27
28

91

1            SUPERIOR COURT FOR THE STATE OF CALIFORNIA

2               FOR THE COUNTY OF LOS ANGELES

3   DEPARTMENT 2C        HON. CAROL BOAS GOODSON, JUDGE

4

5   CITY OF LOS ANGELES,         )

6                      )
                 PETITIONER,  )  SUPERIOR COURT

7                      )
          -VS-       )  NO. BS162858

8                      )
   MICHAEL HUNT,           )

9                      )
               RESPONDENT.  )

10  --------------------------------------)

11

12       I, PATRICIA ANN THAETE, OFFICIAL REPORTER OF

13  THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, FOR

14  THE COUNTY OF LOS ANGELES, DO HEREBY CERTIFY THAT

15  THE FOREGOING PAGES, 1 THROUGH 7, COMPRISE A FULL,

16  TRUE, AND CORRECT TRANSCRIPT OF THE PROCEEDINGS HELD

17  IN THE ABOVE-ENTITLED MATTER, REPORTED BY ME ON

18  JULY 8, 2016, IN DEPARTMENT 2C.

19

20

21            DATED THIS 23RD DAY OF JANUARY, 2017.

22

23

24           _____
              PATRICIA A. THAETE, CSR NO. 8737

25                 OFFICIAL REPORTER

26

27

28

92

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | | |
|---|---|---|---|
| Date | 07-08-16 | | Dept: Dept. CE 2C [CE2C] |
| Honorable | Carol Boas Goodson | Judge | R. Alva by S. Charles | Deputy Clerk |
| Honorable | | Judge Pro Tem | R. Runako | Court Assistant |
| 17 | M. Lewis | Deputy Sheriff | Patricia Thaete, CSR #8737 | Reporter |

| 8:30 am | BS162858 | | |
|---|---|---|---|
| | City Of Los Angeles (X) VS. Michael Hunt (X) | Counsel For Petitioner: | Hugo Rossitter (X) |
| | | Counsel For Respondent: | In Pro Per (X) |

**Nature of Proceedings:** HEARING ON PETITION REQUESTING ORDERS PROHIBITING WORKPLACE VIOLENCE

The above entitled matter is called for hearing.

The Petitioner and Respondent are sworn.

The Employee, Councilman Mitch O'Farrell is sworn and testifies on his own behalf.

The Petition for Orders Prohibiting Workplace Violence is denied.

The Temporary Restraining Orders are dissolved.

Moplain.doc                    Page 1 of 1

| | |
|---|---|
| DEPT: | Dept. CE 2C [CE2C] |

| MINUTES ENTERED |
|---|
| 07-08-16 |
| COUNTY CLERK |

93

# EXHIBIT D

LOCAL / CITY HALL

# L.A. pays $215,000 to settle suit by man who wore KKK hood to meeting



Los Angeles Parks and Recreation Commissioner Barry Sanders at a 2011 meeting. Sanders presided over a hearing that same year where Michael Hunt wore a Ku Klux Klan hood and was kicked out. (Bob Chamberlin, Los Angeles Times)



By **David Zahniser** · **Contact Reporter**

JUNE 12, 2014, 8:27 PM

**L**os Angeles will pay $215,000 to end a free-speech lawsuit involving a man who was kicked out of a public meeting after showing up wearing a Ku Klux Klan hood.

Council members voted unanimously Wednesday to settle the lawsuit with Venice resident Michael Hunt, who said city leaders had violated his constitutional rights by ejecting him from a session of

exh.3.7 D

the Department of Recreation and Parks' Board of Commissioners in 2011. Hunt, who is black, attended the meeting while wearing both the KKK hood and a T-shirt that featured a profanity and a racial slur used to describe African Americans.

At the 2011 meeting, then-commission President Barry Sanders told Hunt his outfit violated the city's rules of decorum and said Hunt would be ejected if he did not remove the KKK headgear and "offensive signage." Hunt was later escorted out by officers and received a citation for disturbing a public assembly, according to his lawsuit.

The city declined to prosecute and the citation was dismissed. But Hunt, a vendor on the Venice Boardwalk, said he had been wrongfully arrested and accused the city of violating his rights to free speech, assembly and due process by preventing him from speaking at the meeting.

Attorney Stephen Rohde, who represented Hunt, said the settlement "means that the city is held accountable when it violates civil rights and 1st Amendment rights."

"These rules of decorum should not be used to silence people unless they engage in actual disruption of the meeting," he said. "And actual disruption doesn't mean upsetting people or offending people."

**"**

# These rules of decorum should not be used to silence people unless they engage in actual disruption of the meeting.

— Stephen Rohde, attorney

Councilman Bernard C. Parks described the payment as a "business decision," arguing that the city would have had to pay far more had the case gone to trial. A judge in a separate federal case recently found that Los Angeles violated the free speech rights of two other men who were repeatedly ejected from council meetings.

Although a jury awarded each man only $1 over that matter, the city still had to pay around $600,000 in legal fees for that case, Parks said. Rohde also was the plaintiffs' attorney in that lawsuit.

"This is one of those things where you hold your nose and vote," Parks said. "If this thing had gone to a trial and [Hunt] had gotten $1, the attorneys' fees would have been larger than what we paid to settle it."

The parks commission's rules of decorum prohibit audience members from engaging in "disorderly or

L.A. pays $215,000 to settle suit by man who wore KKK hood to meeting - LA Times                          7/1/16, 3:41 !

boisterous conduct," including threatening or abusive language, whistling, or stamping of feet.

Government agencies legally can use such rules to restrict disruptive speech, but the disruption has to be so great that the agency is incapable of conducting its public business, according to a report on Hunt's case sent to the council by City Atty. Mike Feuer.

Witnesses at the 2011 meeting did not think Hunt had been a disruption, Feuer's report said.

"Rather most of those in attendance felt that [Hunt's] garb was only mildly distracting and confusing, and that under the circumstances, he should have been allowed to stay," the report said.

Rohde said his client has worn the KKK hood and the T-shirt with the racial slur to various meetings to turn the tables on a city government he believes is "engaging in discrimination."

"He has co-opted these images and uses them to protest back against the city," he said.

The settlement is not Hunt's first victory over the city. He previously received a $264,286 jury award stemming from a 2009 lawsuit in which he challenged the city's vending restrictions on the Venice Boardwalk. The city also paid Hunt's attorney $340,000 in legal fees in that case.

Hunt alleged in his latest lawsuit that the city's handling of the 2011 meeting caused him to experience emotional distress, among other things. The city's lawyers, in turn, said Hunt "beseeched" the officers who escorted him from the room for 20 minutes to give him a citation.

Once he was outside the meeting room, Hunt removed his hood and thanked the security officers for providing him with a "big payday," according to the city's report on the case.

Rohde said his client made no such statement.

"I do think he told the authorities that this was a big mistake and he wanted to hold them accountable," Rohde said. "They may have heard it differently."

*david.zahniser@latimes.com*

**Follow @DavidZahniser** for news from Los Angeles City Hall

Copyright © 2016, Los Angeles Times

**This article is related to:** Trials and Arbitration, Justice System, Ku Klux Klan, Racism

97

# EXHIBIT E

**A3**

Volume 195, Issue 194

# LOCAL NEWS

dailynews.com

LOS ANGELES SUPERIOR COURT

# Judge denies restraining order

## Councilman Mitch O'Farrell made the request against a well-known City Hall critic, citing concern for safety

**By Dakota Smith**
*dakota.smith@langnews.com*
*@dakotacdsmith on Twitter*

A Los Angeles Superior Court judge has shot down Los Angeles City Councilman Mitch O'Farrell's bid for a restraining order against a well-known City Hall critic.

Judge Carol Goodson denied O'Farrell's request for an order protecting him against Michael Hunt at a Friday hearing.

The councilman alleged in court documents that Hunt harassed him on June 15 in City Hall's corridors, shouting in his face and threatening

him. Hunt, a regular at City Hall, denied physically threatening the councilman and accused O'Farrell of calling him a slur.

The councilman obtained a temporary restraining order against Hunt on June 21, but sought a more permanent order against the 53-year-old Palms resident.

Hunt said in an interview Monday that Goodson's ruling shows "justice works."

"It makes me feel really good," Hunt said.

Hunt, who is African-American, also won a $215,000 settlement from the city in 2016. He sued after being removed from a city hearing for

ORDER » PAGE 8



Los Angeles City Councilman Mitch O'Farrell made a bid for a restraining order against a well-known City Hall critic. Judge Carol Goodson denied O'Farrell's request for an order protecting him against Michael Hunt at a Friday hearing.

STAFF FILE PHOTO

LOS ANGELES

# Garcetti hopes to assist





TYING THE KNOT

EXHIBIT E                    100

8   OBITUARIES   LOS ANGELES DAILY NEWS • DAILYNEWS

## Television

| 07/12 | | 3 pm | 3:30 | 4 pm | 4:30 | 5 pm | 5:30 | 6 pm | 6:30 | 7 pm | 7:30 | 8 pm | 8:30 | 9 pm | 9:30 | 10 pm |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | KCBS CBS | Dr. Phil (N) | | Judge Judy | Judge Judy | CBS 2 News at 5:00 p.m. | | CBS 2 News at 6:00 p.m. | CBS Evening News | The Insider | Entertainment Tonight | NCIS DiNozzo is reunited with his ex-girlfriend in Sudan. | | Zoo The team infiltrates a black-tie event in Vancouver. (N) | | |
| 4 | KNBC NBC | Ellen Rob Lowe; Justin Bieber; Ed Sheeran; Jamie Lawson. | | NBC 4 News at 4 p.m. | | NBC 4 News Breaking news, weather, sports, and business. | | NBC 4 News at 6 | NBC Nightly News | Extra | Access Hollywood | America's Got Talent Ne-Yo joins the panel and controls the Golden Buzzer. (N) | | Zoo The team infiltrates a black-tie | | |
| 5 | KTLA CW | KTLA 5 News at 3 | | The Bill Cunningham Show | | Crime Watch Daily | | KTLA 5 News at 6 | KTLA 5 News | Two and a Half Men | Two and a Half Men | The Flash | | Containment (N) | | KTLA 5 News |
| 7 | KABC ABC | Eyewitness News 3 p.m. | | Eyewitness News 4 p.m. | | Eyewitness News 5 p.m. | | Eyewitness News Worldat 6 p.m. | ABC World News | Jeopardy! | Wheel of Fortune | Celebrity Family Feud | | The $100,000 Pyramid Sherri Shepherd plays Anthony Anderson. | | |
| 9 | KCAL IND | The People's Court | | Eyewitness News 4 | | The People's Court- | | Family Feud | Family Feud | 2 Broke Girls | 2 Broke Girls | KCAL 9 News at 8:00 p.m. | | KCAL 9 News at 9:00 | | |
| 11 | KTTV FOX | The Real Ways to indulge and feel luxurious at home. | | Fox 11 News | | MLB Pre-game Show (L) | | MLB Baseball All-Star Game American League vs. National League Site: Petco Park – San Diego, Calif. (L) | | | | | | Modern Family | Modern Family | FOX 11 10pm News |
| 13 | KCOP MNT | The Wendy Williams Show | | So-Me | The King of Queens | Anger Manage | Anger Manage | Met Your Mother | Big Bang Theory | Big Bang Theory | The Simpsons | TMZ Live! | | Hollywood Today Live | | |
| 28 | KCET IND | (2:30) Tommy Emmanuel | | France 24 News | DW News | BBC News America | Business Report | PBS World News | Newsline | Globe Trekker | | Connected (N) | Earth Focus | Artbound | | |
| 30 | KOCE PBS | Nature Cat | Odd Squad | Ready Jet Go! | Wild Kratts | Wild Kratts | The McLaughlin Group | News Providing in-depth analysis of current events. | | Parks Examines pre-Disneyland amusement parks of America. | | The White House: Inside Story Visit America's most iconic residence, the White House. (N) | | | | |

## Order

FROM PAGE 3

wearing a Ku Klux Klan robe.

O'Farrell's push for a restraining order comes amid heightened tensions between City Hall critics and the city's 15 council members.

Los Angeles City President Herb Wesson won a restraining order two months ago against Wayne Spindler after the Encino resident submitted a public speaking card directed at Wesson that contained the "N" word, a KKK-figure and a noose.

Spindler claims the drawing was a political commentary on Los Angeles Department of Water and Power ratepayers being "lynched."

## Renters

FROM PAGE 3

replaced with new condominium or rental buildings, housing advocates say.

Beverly Kenworthy, executive director of California Apartment Association, said the group supports educating the public about the RSO law. The group wasn't consulted for Garcetti's campaign, she said.

The "Home for Rent-ers" initiative is written by property owners and has a website.

## Fire

FROM PAGE 3

said. Towsley Canyon and Lyon Canyon would also remain closed, he said.

One home was damaged early Sunday after a fire ignited in the attic in the 25000 block of Dogwood Court in the Sagecrest

### METRO EXPO LINE



Metro employees participate in the dedication of the Expo Line Extension into Santa Monica.

STAFF FILE

## Ridership is up after extension finish

By City News Service

Average weekday ridership on the Metro Expo Line jumped about 58 percent in June, the first full month the line offered service to Santa Monica, compared to April, while Sunday ridership more than doubled, according to figures released Monday.

The Expo Line extension to Santa Monica opened on May 20.

According to figures released by Metro, average weekday ridership on the line in April — the last full month without Santa Monica service — was 29,047. Last month, average weekday ridership was 45,876. Sunday ridership jumped from an average of 15,965 in April to 35,995 in June, likely a sign that residents took advantage of the extension. Saturday ridership increased from an average of 21,945 in April to 34,844 in June.

The jump in business on the Expo Line helped propel an overall increase in ridership between April and June on Metro rail lines. Despite the increased popularity of the Expo Line, the Blue Line between downtown Los Angeles and Long Beach had ridership on the Blue Line

last month was 83,424, average was 52,095 on Saturdays and 40,167 on Sundays.

Overall ridership on the Metro system, including both rail and bus lines, was down in June compared to the previous month.

neighborhood, which was among those that had been temporarily evacuated the night before. But whether that fire was related to the larger blaze was still under investigation, Medina said.

One inmate firefighter and a firefighter from an unidentified agency sustained minor injuries Saturday and were taken to the hospital, Medina said. A third firefighter sus-

tained minor injuries Sunday. Most of the injuries were heat-related, officials said.

Firefighters have had to contend with steep terrain, high heat and low humidity in battling the blaze, including a red flag warning

Sunday and Monday.

The cause of the fire was still under investigation Monday, said L.A. County fire Capt. Tony Imbrenda.

Staff Writer Greg Wilcox contributed to this report.



OBITUARIES
FUNERAL ANNOUNCEMENT
...ating Lives & ...

Visit daily ...ream and sign the online ...
condol... ...ds and ...



DONATE
WheelsForWishes
Wheels For Wishes

Daily News   A

101

# EXHIBIT F

102

*Item #6  9/10/16 8:30A* (handwritten)

**WV-109**   **Notice of Court Hearing**

Clerk stamps date here when form is filed.

ENDORSED/FILED
Superior Court of California
County of Los Angeles

MAY 10 2016

Sherri R. Carter, Executive Officer/Clerk
By _____, Deputy
Verdanica Cabrera

## ① Petitioner (Employer)

a. Name: <u>Office of the City Attorney</u>

Lawyer for Petitioner *(if any for this case):*

Name: <u>Hugo S. Rossitter</u>        State Bar No.:<u>079335</u>

Firm Name: <u>Office of the City Attorney</u>

b. Address *(If you have a lawyer, give your lawyer's information.):*

Address: <u>200 N. Main Street</u>

City: <u>Los Angeles</u>        State: <u>CA</u>        Zip: <u>90012</u>

Telephone: <u>213-978-7153</u>        Fax:<u>213-978-8315</u>

E-Mail Address: <u>hugo.rossitter@lacity.org</u>

Fill in court name and street address:

Superior Court of California, County of
Los Angeles
111 N. Hill Street
Los Angeles, CA 90012

Fill in case number:

Case Number:
BS162997

## ② Employee in Need of Protection

Full Name:<u>Herman J. Wesson</u>

## ③ Respondent (Person From Whom Protection Is Sought)

Full Name:<u>Wayne Spindler</u>

*The court will complete the rest of this form.*

## ④ Notice of Hearing

**A court hearing is scheduled on the request for restraining orders against the respondent:**

| Hearing Date → | Date: 6/10/16 | Time: 8:30 | Name and address of court if different from above: |
|---|---|---|---|
| | Dept.: 7X | Room: 242 | |

## ⑤ Temporary Restraining Orders *(Any orders granted are on Form WV-110, served with this notice.)*

a. Temporary Restraining Orders for personal conduct and stay away orders as requested in Form WV-100. *Request for Workplace Violence Restraining Orders,* are *(check only one box below):*

(1) [X] All **GRANTED** until the court hearing.

(2) [ ] All **DENIED** until the court hearing. *(Specify reasons for denial in b, below.)*

(3) [ ] Partly **GRANTED** and partly **DENIED** until the court hearing. *(Specify reasons for denial in b, below.)*

Judicial Council of California,
Revised January 1, 2012, Mandatory Form
Code of Civil Procedure, § 527.8
Approved by DOJ

**Notice of Court Hearing**
**(Workplace Violence Prevention)**

Legal
Solutions
Plus

WV-109, Page 1 of 3
→

*Exhibit C* (handwritten)

103

# EXHIBIT G

104

## DECLARATION OF HERMAN J. WESSON, JR.

I, HERMAN J. WESSON, JR, state and declare as follows:

1. That I am the elected Councilmember for the Tenth District of the City Council of the City of Los Angeles ("City"), and have held my office since 2005;

2. That my work location, physical offices, and my staff are located primarily in City Hall, Room 430, 200 N. Spring Street, Los Angeles, CA 90012, and my district field office is located at 1819 S. Western Avenue, Los Angeles, CA 90006;

3. That in addition to my duties as a council member representing the residents of the Tenth District, I have also served as the President of the City Council since 2011, and as such preside over the Council meetings;

4. That in the course of Council meetings, including those conducted off site, the public is present. Members of the public may comment on the agenda items, and also have the right to make general public comment. Members of the public who wish to give public comment fill out a speaker card, which is given to the Sergeant-at-Arms and then to the City Clerk, and finally to me. City Council meetings are primarily conducted in the Council Chambers of City Hall, but also are held in Van Nuys, at the Van Nuys City Hall. Council committees also meet at City Hall and in Van Nuys;

5. That on May 11, 2016, I presided over a special meeting of the Council's Elections, Inter-Governmental Relations & Neighborhoods Committee in the Van Nuys City Hall. The meeting began at approximately 6:00 p.m. The subject of the meeting was governance reform at the Department of Water and Power;

6. That at approximately 7:30 p.m., I was handed a speaker card submitted by a member of public known to me as Wayne Spindler. Spindler attends many Council meetings and makes frequent comment. In this case the speaker card, a copy of which is attached as Attachment "A", identified the submitter as "Wayne from Encino". On the front of the card in blue ink were depictions of (1) a tree with a human figure hanging from a noose, (2) a character who was clearly depicting a Klu Klux Klan member holding a noose in one hand and a sign in the other saying "Herb=Nigger", and (3) a burning cross. On the back of the card in large block letters was written "Fuck-U Herb";

1

---

DECLARATION OF HERMAN J. WESSON, JR.

Exhibit G



7. That I was stunned at the writing and drawings on the card, and while I found the card's message threatening to me personally raising concerns for my personal safety, I allowed Spindler to provide his public comment. Shortly thereafter, I described the writing and drawings on the card to those in attendance. When I did so, Spindler began to shout out, and he refused to quiet himself causing a disruption. He was removed from the meeting by the uniformed officers present, as he was creating a disruption;

8. That the speaker card submitted by Spindler was clearly targeted towards me as an African-American, and contained depictions of violence recalling the history of the Klu Klux Klan towards African-Americans such as myself;

9. That I took the depictions as a personal and direct threat to me;

10. That the depictions and statements on the card had nothing to do with the DWP agenda item;

11. That based upon Wayne Spindler's written statements and depictions, his specific targeting of me, and his easy access to me as a public figure without assigned security, I am afraid for my safety, and the safety of my office staff and my family when Wayne Spindler is near;

I declare that the foregoing statements are based upon my personal knowledge and that the foregoing is true and correct under penalty of perjury under the laws of the State of California and I could and would so testify if required to do so.

Executed this 19th day of May, 2016, at Los Angeles, California.


Herman J. Wesson, Jr.

2

DECLARATION OF HERMAN J. WESSON, JR.



# EXHIBIT H

162

# L.A. City Hall critic faces charge of possessing an assault weapon

 By Emily Alpert Reyes

MARCH 29, 2017, 6:10 PM



An Encino attorney who was accused last year of making racist threats against Los Angeles City Council President Herb Wesson now faces a criminal charge for illegally possessing an assault weapon, the city attorney's office said Wednesday.

Wayne Spindler, who frequently appears at City Council meetings, was arrested last year after turning in a public comment card that included drawings of a burning cross, a stick figure hanging from a tree, and a sign labeling Wesson with a racial slur.

Wesson, who is African American, described the card as a threatening reminder of the history of racist attacks on the black community. Spindler said that his drawings were satirical, arguing that images such as the hanging person symbolized the Department of Water and Power "lynching" Angelenos with high rates.

Prosecutors in the district attorney's office ultimately declined to file charges against Spindler, saying there wasn't enough evidence to prove his comment card was a threat. But city lawyers obtained a restraining order that barred Spindler from coming near Wesson's home, vehicle or city office.

That restraining order also required Spindler to surrender his firearms. Rob Wilcox, a spokesman for City Atty. Mike Feuer, said in a statement that Spindler had turned in three handguns and an AK 47 assault rifle — a weapon that is "illegal for unregistered possession in the state of California since 1991."

Spindler was charged with a misdemeanor and is scheduled to be arraigned in April, Wilcox said.

Spindler did not immediately respond to a phone call seeking comment Wednesday afternoon. He filed a federal lawsuit against the city in January alleging that his free speech and other constitutional rights had been violated, calling the arrest and restraining order "a bogus attempt as a free speech suppressant."

exhibit H

108

City Hall chic faces charge of possessing an assault weapon - '. Times

In that lawsuit, he also said that his "guns and all ammo were taken and destroyed by the malicious actions" of city officials.

emily.alpert@latimes.com

**Twitter:** @LATimesEmily

Copyright © 2017, Los Angeles Times



# EXHIBIT I

HOME (/INDEX.PHP)     SUPERPLANNER (/INDEX.PHP/SUPERPLANNER)     CWTV (/INDEX.PHP/CWTV)     CONTRIBUTORS (/INDEX.PHP/CONTRIBUTORS)

ARCHIVE (/INDEX.PHP/ARCHIVE)     ADVERTISE (/INDEX.PHP/ADVERTISE)     CONTACT (/INDEX.PHP/CONTACT)

# SLAPP: City Attorney's Bogus LA Times Story, 911 Call and Criminal Charge?

DANIEL GUSS  /  03 APRIL 2017



(/index.php/los-angeles/12948-slapp-city-attorney-s-bogus-la-times-story-911-call-and-criminal-charge)

‹          PREVIOUS ARTICLE
TheaterWatch: ECT's Romeo and Juliet Takes a Different Tack
(/index.php/los-angeles/12947-theaterwatch-ect-s-romeo-and-juliet-takes-
a-different-tack)

NEXT ARTICLE
Rethinking the Trumpster ... The LA Times Editorial Board is Getting Edgy
(/index.php/los-angeles/12949-rethinking-the-trumpster-the-la-times-
editorial-board-is-getting-edgy)          ›

@THE GUSS REPORT-The City of Los Angeles has a history of losing anti-SLAPP (strategic **lawsuit** against public participation) lawsuits when it has illegally tried to silence critics with threats of unjust criminal charges and physical intimidation. It appears that it may be hit with another anti-SLAPP suit in the coming days for its actions last week, and it could cost the taxpayers millions of dollars in civil damages and LA City Attorney Mike Feuer a headache with the California Bar Association.

Outside a Canoga Park town hall meeting last Thursday where speakers included Feuer and California State Assemblyman Matt Dababneh, a pack of nearly 20 LAPD and California Highway Patrol officers descended upon the parking lot and allegedly drew and aimed high-powered semi-automatic guns at a man sitting in his vehicle talking calmly on his phone.

exhibit T                    111

(Note: I was on the other end of that phone call, interviewing the man for what 's supposed to be today's article, and heard the encounter from its f.      moment.)

Law enforcement's guns were allegedly trained on Wayne Spindler, the controversial attorney embroiled in a year-long, two-way legal battle with the City of Los Angeles. He was at the meeting a half hour earlier complaining about difficulty registering guns on a state website which is not presently functional.

After ordering Spindler from his parked vehicle, law enforcement officers instructed him to lie on the pavement where he was cuffed, patted down, and had his vehicle searched while he was interrogated.

Then Spindler was let go.

*"They eventually admitted it was a false alarm,"* Spindler told me by phone after the incident, *"but they didn't apologize. This was an unprovoked threat against my life that I had better drop my civil rights lawsuits against the city ... or else."*

The story started 24 hours earlier when Feuer's primary spokesman, Mike Wilcox, planted a story (http://www.latimes.com/local/lanow/la-me-ln-weapons-charge-20170329-story.html) in the *LA Times* that reporter Emily Alpert Reyes apparently failed to confirm with the court website.

Reyes' article entitled, *LA City Hall Critic Faces Charge of Possessing an Assault Weapon,* says, "Spindler was charged with a misdemeanor and is scheduled to be arraigned in April, Wilcox said."

Note the words: *"was charged"* and *"is scheduled,"* both untrue according to the LA courts website at the time of the article's publishing. This is a snapshot (https://drive.google.com/file/d/0BwXAuqQJKBGwb2pGX2NjbzBHYWs/view) from its website taken on Sunday morning, showing no such charge in the system five days after Reyes' article was published. If the case isn't in the system, it has not been filed, a court employee confirmed for me.

Wilcox made the same claim in written form to other members of the media, which was eventually shared and wound up on the websites of *KTLA, LA Daily News, City News Service* and others who didn't check its accuracy against the court website.

I reached out multiple times to no avail to Wilcox, who has been incommunicado with me since last year when I exposed (http://www.citywatchla.com/index.php/the-la-beat/11481-la-prosecutor-fake-businesses-and-why-it-matters) Deputy City Attorney Hugo Rossitter as running two side businesses in conflict with his city employment, and for his failure to pay business taxes to the cities of Los Angeles and Beverly Hills. I also got no response from Feuer's executive assistant or his chief of staff.

I then emailed Reyes to determine whether Wilcox tipped her off on a case that was not on the court website and that the defendant knew nothing about, and what is the *Times'* policy for verifying what anyone, including a government official, claims?

Reyes refused to answer, deferring my inquiry (at the direction of her editors Shelby Grad and Steve Clow) to Hillary Manning, the *Times'* Communications Director, who repeatedly deflected.

*"We do not have a comment on this, as it relates to the details of our newsgathering,"* Manning wrote.

When advised that Reyes' story was factually wrong, Manning asked what about it was incorrect and I told her that my position, too, then, is to not disclose the details of *my* newsgathering, but that they may wish to confirm its accuracy, which was also suggested to Reyes.

Neither the *Times* nor Reyes apparently did that though. Her article remains published in its original form on the *Times'* website in direct conflict with the LA court website, five days after it was published.

88 11.2

this turmoil all started nearly a year ago when Spindler submitted an LA City Council speaker card with racially antagonistic words and images to City Council president Herb Wesson, who is black, and who felt Spindler's content was threatening. While the city obtained a temporary restraining order (TRO) against Spindler, which he is appealing, the California Bar Association refused to take action against him, citing his content as free speech and that it did not constitute a threat.

The TRO against Spindler required him to turn in all firearms he owned, which he did in May 2016. His AK-47 was unregistered but, he says, it was grandfathered because it was purchased prior to the 1991 law requiring registration. *"As an officer of the court, even though the gun was legally not in the state's registry, I turned it in for voluntary destruction along with my other guns because that is what I was ordered to do."*

Spindler provided me with a dated copy of the receipt (https://drive.google.com/file/d/0BwXAuqQJKBGwdkdlOVpVWEJDOGc/view) for the gun's purchase which, he says, was provided to the LAPD when he turned it in. The date of purchase was January 25, 1989, long before the 1991 law. (I cropped the receipt to not expose Spindler's personal information on it.)

That raises the question, *if possession of the gun is a misdemeanor, as Feuer now claims, why was Spindler not arrested on the spot and charged with a crime when he turned it in in May 2016?*

What has transpired between then and now, since the possession was not illegal?

The answer is Spindler's civil lawsuits against the city, and his appeal of the TRO, that's what.

And why *would anyone* be charged with a misdemeanor when the state recently launched a program allowing people to register guns without repercussions for not doing so earlier?

In our phone interview right before the LAPD and CHP surrounded his vehicle with guns drawn, Spindler told me, *"If they're going to try to prosecute me for that, which I am confident I will win, they had better be prepared to charge everyone else in LA in the same predicament."*

At a recent settlement meeting with attorneys representing the city, Spindler says they encouraged him to hold off serving the city with his second civil suit (against Wesson,) allegedly and ominously telling him they *"would see what we can do about this."*

Spindler claims that Feuer's office planted the fake *LA Times* story on Wednesday and 'threatened his life' on Thursday to induce a *quid pro quo* to drop his civil lawsuits and his TRO appeal in exchange for their dropping what he says is a baseless misdemeanor charge.

He adds that Feuer violated the State Bar's Ethics Rule 5-100, which states that a prosecutor can't threaten criminal charges in order to get an advantage in a civil lawsuit; Rule 5-110, that they can't threaten charges that don't stand up to probable cause standards; and 5-120, that Wilcox's *extrajudicial* statements to the media were done to bias a potential jury pool.

Spindler says he will sue to get the recorded 911 call, if one was actually made, and phone records of everyone who accompanied Feuer and Dababneh to the town hall to establish what threat they claim he posed, and whether, if they felt he *did* pose a threat, the meeting hall doors were locked and the building evacuated from the other side.

That is what you would do ... *if you feel someone posed a threat requiring such a heavy-handed law enforcement response.*

*(Daniel Guss, MBA, is a member of the Los Angeles Press Club, and has contributed to CityWatch, KFI AM-640, Huffington Post, Los Angeles Times, Los Angeles Daily News, Los Angeles Magazine, Movieline Magazine, Emmy Magazine, Los Angeles Business Journal and elsewhere. Follow him on Twitter @TheGussReport. His opinions are his own and do not necessarily reflect the views of CityWatch.) Edited for CityWatch by Linda Abrams.*

# EXHIBIT J

SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES
NO. 7VW01632
THE PEOPLE OF THE STATE OF CALIFORNIA     VS.          PAGE NO.  1
DEFENDANT 01: WAYNE  SPINDLER                           CURRENT DATE 07/12/17
LAW ENFORCEMENT AGENCY EFFECTING ARREST: LAPD - VAN NUYS AREA

BAIL: APPEARANCE   AMOUNT    DATE     RECEIPT OR   SURETY COMPANY   REGISTER
      DATE         OF BAIL   POSTED   BOND NO.                      NUMBER

CASE FILED ON 04/04/17.
 COMPLAINT FILED, DECLARED OR SWORN TO CHARGING DEFENDANT WITH HAVING
COMMITTED, ON OR ABOUT 05/20/16 IN THE COUNTY OF LOS ANGELES, THE FOLLOWING
OFFENSE(S) OF:
   COUNT 01: 30605(A) PC MISD
NEXT SCHEDULED EVENT:
 04/21/17   830 AM  ARRAIGNMENT    DIST VAN NUYS COURTHOUSE DEPT 101


ON 04/21/17 AT  830 AM   IN VAN NUYS COURTHOUSE DEPT 101


CASE CALLED FOR ARRAIGNMENT
PARTIES: BERNARD J. KAMINS (JUDGE)  HARUT YEDALYAN  (CLERK)
         DEBBIE WOLLMAN  (REP)     KENNETH D. TSO  (CA)
DEFENDANT IS PRESENT IN COURT, AND NOT REPRESENTED BY COUNSEL
DEFENDANT WAIVES FURTHER ARRAIGNMENT.
 COURT ORDERS AND FINDINGS:
  -OBEY ALL LAWS AND ORDERS OF THE COURT.
  -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
  ARRAIGNMENT AND PLEA CONTINUED TO 05/08/17
  .
 MINUTE ORDER PREPARED BY AGREEN
WAIVES STATUTORY TIME.
NEXT SCHEDULED EVENT:
 05/08/17   830 AM  ARRAIGNMENT AND PLEA    DIST VAN NUYS COURTHOUSE DEPT 101


ON 05/08/17 AT  830 AM   IN VAN NUYS COURTHOUSE DEPT 101


 NUNC PRO TUNC ORDER PREPARED. IT APPEARING TO THE COURT THAT THE MINUTE ORDER

 IN THE ABOVE ENTITLED ACTION DOES NOT PROPERLY REFLECT THE COURT'S ORDER. SAID
 MINUTE ORDER IS AMENDED NUNC PRO TUNC AS OF THAT DATE.  ALL OTHER ORDERS ARE
 TO REMAIN IN FULL FORCE AND EFFECT. DETAILS LISTED AT END OF THIS MINUTE ORDER.
CASE CALLED FOR ARRAIGNMENT AND PLEA
PARTIES: LELAND B. HARRIS (JUDGE)  HARUT YEDALYAN  (CLERK)
         DEBBIE WOLLMAN  (REP)     EUGENE HALL  (CA)
DEFENDANT IS PRESENT IN COURT, AND NOT REPRESENTED BY COUNSEL
 DEFENDANT APPEARS IN PRO PER
 COURT ORDERS AND FINDINGS:
  -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
 AMENDED COMPLAINT IS FILED BY THE OFFICE OF THE LOS ANGELES
 CITY ATTORNEY.
 .
 DEFENDANT'S NOTICE OF DEMURRER AND DEMURRER TO COMPLAINT PER
 P.C. 1004 IS HEARD, ARGUED AND DENIED AS REFLECTED IN THE NOTES

EXhiBit J

115

CASE NO. 7VW01632
DEF NO. 01

PAGE NO.   2
DATE PRINTED 07/12/17

OF THE OFFICIAL COURT REPORTER.
.
DEFENDANT GIVES NOTICE OF DEMURRER TO AMENDED COMPLAINT.
CASE IS SET FOR ARRAIGNMENT AND DEMURRER ON 05.23.17 IN THIS
DEPARTMENT 101.
.
COURT ORDER THE COURT REPORTER, DEBBIE WOLLMAN, TO PREPARE ONE
ORIGINAL TRANSCRIPT OF TODAY'S PROCEEDINGS.
NEXT SCHEDULED EVENT:
05/23/17   830 AM  ARRAIGNMENT AND PLEA   DIST VAN NUYS COURTHOUSE DEPT 101

CUSTODY STATUS: DEFENDANT REMAINS ON OWN RECOGNIZANCE


ON 05/18/17 AT  830 AM  IN VAN NUYS COURTHOUSE DEPT 101

CASE CALLED FOR ARRAIGNMENT AND PLEA
PARTIES: BERNARD J. KAMINS (JUDGE)  HARUT YEDALYAN  (CLERK)
              DEBBIE WOLLMAN  (REP)      EUGENE HALL  (CA)
DEFENDANT IS PRESENT IN COURT, AND NOT REPRESENTED BY COUNSEL
DEFENDANT APPEARS IN PRO PER
DEFENDANT WAIVES FURTHER ARRAIGNMENT.
 COURT ORDERS AND FINDINGS:
 -OBEY ALL LAWS AND ORDERS OF THE COURT.
 -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
 ADVANCED AND VACATE 05/23/17
 .
 ARRAIGNMENT AND PLEA CONTINUED TO 05/24/17
 .
 MINUTE ORDER PREPARED BY AGREEN
WAIVES STATUTORY TIME.
NEXT SCHEDULED EVENT:
05/24/17   830 AM  ARRAIGNMENT AND PLEA    DIST VAN NUYS COURTHOUSE DEPT 101


ON 05/24/17 AT  830 AM  IN VAN NUYS COURTHOUSE DEPT 101

 NUNC PRO TUNC ORDER PREPARED. IT APPEARING TO THE COURT THAT THE MINUTE ORDER

IN THE ABOVE ENTITLED ACTION DOES NOT PROPERLY REFLECT THE COURT'S ORDER. SAID
MINUTE ORDER IS AMENDED NUNC PRO TUNC AS OF THAT DATE.  ALL OTHER ORDERS ARE
TO REMAIN IN FULL FORCE AND EFFECT. DETAILS LISTED AT END OF THIS MINUTE ORDER.
CASE CALLED FOR ARRAIGNMENT AND PLEA
PARTIES: LELAND B. HARRIS (JUDGE)  HARUT YEDALYAN  (CLERK)
              FRANKIE DALTON  (REP)      EUGENE HALL  (CA)
DEFENDANT IS PRESENT IN COURT, AND NOT REPRESENTED BY COUNSEL
DEFENDANT WAIVES FURTHER ARRAIGNMENT.
DEFENDANT PLEADS NOT GUILTY TO COUNT 01, 30605(A) PC.
 COURT ORDERS AND FINDINGS:
 -OBEY ALL LAWS AND ORDERS OF THE COURT.
 -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
 MOTION IS DENIED
 .
 MATTER IS SET IN DEPARTMENT 113 FOR ALL PURPOSES.

116

CASE NO. 7VW01632                              PAGE NO.   3
DEF NO.  01                                    DATE PRINTED 07/12/17

   LAST DAY FOR TRIAL: 07/10/17.
            .
   MINUTE ORDER IS PREPARED BY AGREEN
NEXT SCHEDULED EVENT:
06/22/17   830 AM   PRETRIAL HEARING    DIST VAN NUYS COURTHOUSE DEPT 113


ON 06/02/17 AT   830 AM   IN VAN NUYS COURTHOUSE DEPT 113

CASE CALLED FOR FURTHER PROCEEDINGS
PARTIES: ERIC P. HARMON (JUDGE)   THERESE ZAVALA  (CLERK)
         ANN MARIE CIZIN       (REP)  NICHOLAS D. LAUBER  (CA)
DEFENDANT IS PRESENT IN COURT, AND NOT REPRESENTED BY COUNSEL
   DEFENDANT APPEARS IN PRO PER
   THE PEREMPTORY CHALLENGE PURSUANT TO CODE OF CIVIL PROCEDURE
   SECTION 170.6 FILED ON JUNE 02, 2017, BY THE DEFENDANT,
   AGAINST JUDGE ERIC HARMON IS REVIEWED BY THE COURT.

            .
   THE COURT FINDS THE CHALLENGE PURSUANT TO 170.6 TO BE TIMELY.
            .
   THIS CASE IS ORDERED RE-ASSIGNED TO THE HONORABLE JUDGE ANDREA
   THOMPSON, DEPARTMENT 105, FOR ALL PURPOSES.
            .
   PRETRIAL HEARING JUNE 22, 2017, AT 8:30 A.M.IN DEPARTMENT 105.
            .
   LAST DAY: JULY 10, 2017
NEXT SCHEDULED EVENT:
06/22/17   830 AM   PRETRIAL HEARING    DIST VAN NUYS COURTHOUSE DEPT 105


ON 06/22/17 AT   830 AM   IN VAN NUYS COURTHOUSE DEPT 105

CASE CALLED FOR PRETRIAL HEARING
PARTIES: ANDREA C. THOMPSON (JUDGE)   U-CHIN JANG  (CLERK)
         JAN KIYOMI CHAJA       (REP)  EUGENE HALL  (CA)
DEFENDANT IS PRESENT IN COURT, AND NOT REPRESENTED BY COUNSEL
   DEFENDANT APPEARS IN PRO PER

   THE MATTER IS TRAILED TO JULY 7, 2017, IN DEPARTMENT 105, FOR
   PRETRIAL HEARING AND MOTION, AS DAY 42 OF 45.
   COURT ORDERS AND FINDINGS:
   -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
NEXT SCHEDULED EVENT:
07/07/17   830 AM   PRETRIAL HEARING    DIST VAN NUYS COURTHOUSE DEPT 105
DAY 42 OF 45

CUSTODY STATUS: DEFENDANT REMAINS ON OWN RECOGNIZANCE


ON 07/05/17 AT   830 AM   IN VAN NUYS COURTHOUSE DEPT 105

CASE CALLED FOR ADVANCEMENT
PARTIES: ANDREA C. THOMPSON (JUDGE)   U-CHIN JANG  (CLERK)
         JAN KIYOMI CHAJA  (REP)      EUGENE HALL  (CA)
DEFENDANT IS PRESENT IN COURT, AND NOT REPRESENTED BY COUNSEL
   DEFENDANT APPEARS IN PRO PER
ON PEOPLE'S MOTION, COURT ORDERS COMPLAINT AMENDED BY INTERLINEATION TO ADD

117

CASE NO. 7VW01632
DEF NO.  01

PAGE NO.   4
DATE PRINTED 07/12/17

VIOLATION 46.30 LAM INF AS COUNT 02.
DEFENDANT ADVISED OF THE FOLLOWING RIGHTS ORALLY:
DEFENDANT WAIVES ARRAIGNMENT, READING OF COMPLAINT, AND STATEMENT OF
  CONSTITUTIONAL AND STATUTORY RIGHTS.
DEFENDANT ADVISED OF AND PERSONALLY AND EXPLICITLY WAIVES THE FOLLOWING RIGHTS:
TRIAL BY COURT AND TRIAL BY JURY
  CONFRONTATION AND CROSS-EXAMINATION OF WITNESSES;
  SUBPOENA OF WITNESSES INTO COURT TO TESTIFY IN YOUR DEFENSE;
  AGAINST SELF-INCRIMINATION;
DEFENDANT ADVISED OF THE FOLLOWING:
 THE NATURE OF THE CHARGES AGAINST HIM, THE ELEMENTS OF THE OFFENSE IN THE
  COMPLAINT, AND POSSIBLE DEFENSES TO SUCH CHARGES;
 THE POSSIBLE CONSEQUENCES OF A PLEA OF GUILTY OR NOLO CONTENDERE, INCLUDING
  THE MAXIMUM PENALTY AND ADMINISTRATIVE SANCTIONS AND THE POSSIBLE LEGAL
  EFFECTS AND MAXIMUM PENALTIES INCIDENT TO SUBSEQUENT CONVICTIONS FOR THE
  SAME OR SIMILAR OFFENSES;
 THE EFFECTS OF PROBATION;
 IF YOU ARE NOT A CITIZEN, YOU ARE HEREBY ADVISED THAT A CONVICTION OF THE

  OFFENSE FOR WHICH YOU HAVE BEEN CHARGED WILL HAVE THE CONSEQUENCES OF
  DEPORTATION, EXCLUSION FROM ADMISSION TO THE UNITED STATES, OR DENIAL OF
  NATURALIZATION PURSUANT TO THE LAWS OF THE UNITED STATES.
COURT FINDS THAT EACH SUCH WAIVER IS KNOWINGLY, UNDERSTANDINGLY, AND EXPLICITLY
  MADE;
THE DEFENDANT WITH THE COURTS APPROVAL, PLEADS NOLO CONTENDERE TO COUNT 02 A
  VIOLATION OF SECTION 46.30 LAM.  THE COURT FINDS THE DEFENDANT GUILTY.
COUNT (02) : DISPOSITION: CONVICTED
  COURT ORDERS AND FINDINGS:
  -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
COURT FINDS THAT THERE IS A FACTUAL BASIS FOR DEFENDANT'S PLEA, AND COURT
  ACCEPTS PLEA.
  THE MATTER IS ADVANCED FROM JULY 7, 2017.
  .
  THE DEFENDANT'S WRITTEN MOTION TO DISQUALIFY THE PROSECUTING
  ATTORNEY, CALENDARED FOR JULY 7, 2017, IS PLACED OFF CALENDAR.
  .
  THE MATTER IS CONTINUED TO JULY 7, 2017, IN DEPARTMENT 105,
  FOR SENTENCING.
NEXT SCHEDULED EVENT:
07/07/17   830 AM   PROBATION AND SENTENCE HEARING    DIST VAN NUYS COURTHOUSE

DEPT 105

CUSTODY STATUS: DEFENDANT REMAINS ON OWN RECOGNIZANCE


ON 07/05/17 AT  900 AM :

  THE MATTER IS CALENDARED FOR SENTENCING ON JULY 7, 2017, IN
  DEPARTMENT 105.
NEXT SCHEDULED EVENT:
  07/07/17   830 AM   PROBATION AND SENTENCE HEARING    DIST VAN NUYS COURTHOUSE
  DEPT 105


ON 07/07/17 AT  830 AM  IN VAN NUYS COURTHOUSE DEPT 105

  NUNC PRO TUNC ORDER PREPARED. IT APPEARING TO THE COURT THAT THE MINUTE ORDER
IN THE ABOVE ENTITLED ACTION DOES NOT PROPERLY REFLECT THE COURT'S ORDER. SAID
MINUTE ORDER IS AMENDED NUNC PRO TUNC AS OF THAT DATE.  ALL OTHER ORDERS ARE
TO REMAIN IN FULL FORCE AND EFFECT. DETAILS LISTED AT END OF THIS MINUTE ORDER.

1/8

CASE NO. 7VW01632
DEF NO.  01

PAGE NO.   5
DATE PRINTED 07/12/17

CASE CALLED FOR PROBATION AND SENTENCE HEARING
PARTIES: ANDREA C. THOMPSON (JUDGE)  U-CHIN JANG  (CLERK)
         JAN KIYOMI CHAJA      (REP)  EUGENE HALL  (CA)
DEFENDANT IS PRESENT IN COURT, AND NOT REPRESENTED BY COUNSEL
   DEFENDANT APPEARS IN PRO PER
   THE COURT ORDERS THE LOS ANGELES POLICE DEPARTMENT TAKE
   POSSESSION OF FIVE, THIRTY-ROUND MAGAZINES (BANANA CLIPS, 7.62 X
   39MM ACCOMMODATING ROUNDS) FOR DESTRUCTION.
   .
   THE MATTER IS CONTINUED TO THE AFTERNOON COURT SESSION.
   COURT ORDERS AND FINDINGS:
   -THE COURT ORDERS THE DEFENDANT TO APPEAR ON THE NEXT COURT DATE.
NEXT SCHEDULED EVENT:
   07/07/17   130 PM  PROBATION AND SENTENCE HEARING   DIST VAN NUYS COURTHOUSE
     DEPT 105

CUSTODY STATUS: DEFENDANT REMAINS ON OWN RECOGNIZANCE


ON 07/07/17 AT  130 PM  IN VAN NUYS COURTHOUSE DEPT 105

CASE CALLED FOR PROBATION AND SENTENCE HEARING
PARTIES: ANDREA C. THOMPSON (JUDGE)  U-CHIN JANG  (CLERK)
         JAN KIYOMI CHAJA  (REP)    EUGENE HALL  (CA)
DEFENDANT IS PRESENT IN COURT, AND NOT REPRESENTED BY COUNSEL
   DEFENDANT APPEARS IN PRO PER
ON PEOPLE'S MOTION, COURT ORDERS COMPLAINT AMENDED BY INTERLINEATION TO ADD
   VIOLATION 415(2) PC INF AS COUNT 03.
DEFENDANT ADVISED OF THE FOLLOWING RIGHTS ORALLY:
DEFENDANT WAIVES ARRAIGNMENT, READING OF COMPLAINT, AND STATEMENT OF
   CONSTITUTIONAL AND STATUTORY RIGHTS.
DEFENDANT ADVISED OF AND PERSONALLY AND EXPLICITLY WAIVES THE FOLLOWING RIGHTS:
TRIAL BY COURT AND TRIAL BY JURY
   CONFRONTATION AND CROSS-EXAMINATION OF WITNESSES;
   SUBPOENA OF WITNESSES INTO COURT TO TESTIFY IN YOUR DEFENSE;
   AGAINST SELF-INCRIMINATION;
DEFENDANT ADVISED OF THE FOLLOWING:
 THE NATURE OF THE CHARGES AGAINST HIM, THE ELEMENTS OF THE OFFENSE IN THE
   COMPLAINT, AND POSSIBLE DEFENSES TO SUCH CHARGES;

THE POSSIBLE CONSEQUENCES OF A PLEA OF GUILTY OR NOLO CONTENDERE, INCLUDING
   THE MAXIMUM PENALTY AND ADMINISTRATIVE SANCTIONS AND THE POSSIBLE LEGAL
   EFFECTS AND MAXIMUM PENALTIES INCIDENT TO SUBSEQUENT CONVICTIONS FOR THE
   SAME OR SIMILAR OFFENSES;
THE EFFECTS OF PROBATION;
IF YOU ARE NOT A CITIZEN, YOU ARE HEREBY ADVISED THAT A CONVICTION OF THE
   OFFENSE FOR WHICH YOU HAVE BEEN CHARGED WILL HAVE THE CONSEQUENCES OF
   DEPORTATION, EXCLUSION FROM ADMISSION TO THE UNITED STATES, OR DENIAL OF
   NATURALIZATION PURSUANT TO THE LAWS OF THE UNITED STATES.
COURT FINDS THAT EACH SUCH WAIVER IS KNOWINGLY, UNDERSTANDINGLY, AND EXPLICITLY
   MADE;
THE DEFENDANT WITH THE COURTS APPROVAL, PLEADS NOLO CONTENDERE TO COUNT 03 A
   VIOLATION OF SECTION 415(2) PC.  THE COURT FINDS THE DEFENDANT GUILTY.
COUNT (03) : DISPOSITION: CONVICTED
COURT FINDS THAT THERE IS A FACTUAL BASIS FOR DEFENDANT'S PLEA, AND COURT

/19

ASE NO. 7VW01632
EF NO.  01

PAGE NO.   6
DATE PRINTED 07/12/17

ACCEPTS PLEA.
THE DEFENDANT PROVIDES PROOF OF SURRENDER OF HIS WEAPONS TO THE
LOS ANGELES POLICE DEPARTMENT.
.
THE DEFENDANT'S PLEA TO COUNT 2 IS WITHDRAWN.
AIVES TIME FOR SENTENCE.
EXT SCHEDULED EVENT:
SENTENCING
DEFENDANT WAIVES ARRAIGNMENT FOR JUDGMENT AND STATES THERE IS NO LEGAL CAUSE
WHY SENTENCE SHOULD NOT BE PRONOUNCED. THE COURT ORDERED THE FOLLOWING
JUDGMENT:
S TO COUNT  (03):
PAY A FINE OF $200.00
OR SERVE 001 DAYS IN LOS ANGELES COUNTY JAIL LESS CREDIT FOR 1 DAYS
DEFENDANT TO PAY FINE TO THE COURT CLERK
THE DEFENDANT WAIVES HIS APPELLATERIGHTS ON THIS CASE ONLY.
.
ANY AND ALL PENDING MOTIONS, INCLUDING ANY CALENDARED DATES, ON

THIS CASE ARE DISMISSED AND VACATED.
.
ANY WEAPONS AND AMMUNITION TURN IN TO LAW ENFORCEMENT ON MAY 20,
2016 AND JULY 7, 2017, ARE ORDERED TO BE DESTROYED.
OUNT (03): DISPOSITION: CONVICTED
EMAINING COUNTS DISMISSED:
COUNT  (01): DISMISSED DUE TO PLEA NEGOTIATION
COUNT  (02): DISMISSED DUE TO PLEA NEGOTIATION
MV ABSTRACT NOT REQUIRED
EXT SCHEDULED EVENT:
PROCEEDINGS TERMINATED

# EXHIBIT K

# Dowd v. City of L.A.

United States District Court for the Central District of California

August 7, 2013, Decided; August 7, 2013, Filed

Case No. CV 09-06731 DDP (SSx)

**Reporter**

2013 U.S. Dist. LEXIS 111435 *; 2013 WL 4039043

MATTHEW DOWD; PETER DEMIAN; EDWARD LA GROSSA; ANTHONY BROWN; NATHAN PINO, WILLIE LEE TURNER; DAVID "ZUMA DOGG" SALTSBURG; THOMAS BURRUM JNR; MARVIN SIMS; JESSE BROWN; LOUIE GARCIA; RENE CASTRO, Plaintiff, v. CITY OF LOS ANGELES, a municipal corporation, Defendants.

**Subsequent History:** Costs and fees proceeding at, Motion granted by Dowd v. City of Los Angeles, 2014 U.S. Dist. LEXIS 91096 (C.D. Cal., May 23, 2014)

**Counsel:** [*1] For Matthew Dowd, an individual, Peter Demian, an individual, Edward LaGrossa, an individual, Anthony Brown, an individual, Nathan Pino, an individual, Willie Lee Turner, an individual, David Saltsburg, an individual also known as Zuma Dogg, Louie Garcia, an individual, Rene Castro, an individual, Plaintiffs: Stephen F Rohde, Rohde and Victoroff, Los Angeles, CA.

For City of Los Angeles, a municipal corporation, Defendant: Laurie Rittenberg, LEAD ATTORNEY, Los Angeles City Attorney's Office, Los Angeles, CA; David W Skinner, Dawn A McIntosh, Deborah J Fox, Margaret W Rosequist, Meyers Nave Riback Silver and Wilson, Los Angeles, CA.

**Judges:** DEAN D. PREGERSON, United States District Judge.

**Opinion by:** DEAN D. PREGERSON

# Opinion

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' AND DEFENDANT'S CROSS MOTIONS FOR SUMMARY JUDGMENT**

[Dkt. Nos. 158 & 168]

Presently before the court are Plaintiffs' and Defendant's Cross Motions for Summary Judgment. Having considered the parties' submissions, heard oral argument, and ordered supplemental briefing, the court adopts the following order.

## I. BACKGROUND

### A. Factual History

The Venice Beach Boardwalk (the "Boardwalk") is a major tourist attraction in the City of Los Angeles. LAMC § 42.15(A)(1)(a). [*2] It is "historically significant as a traditional public forum for its performance and visual artists, as well as other free speech activity." Id. During the summer and on weekends, the Boardwalk is filled with street performers, including "instrumental musicians, singers, jugglers, acrobats, mimes, comics, magicians, prophets, fortune tellers, and other assorted entertainers." City of Los Angeles Dep't of Recreation & Parks, http://www.laparks.org/venice/venice.htm (last visited Nov. 8, 2009). Plaintiffs are thirteen street performers and artists who make their living on the Venice Beach Boardwalk by, among other things, dancing, singing, painting, unicycling, playing music, as well as selling or accepting donations for items related to their performances, such as CDs,

*exhibit K*

122

2013 U.S. Dist. LEXIS 111435, *2

works of art, and T-shirts.

Over the years, the defendant the City of Los Angeles (the "City"), has adopted and amended a number of versions of Los Angeles Municipal Code ("LAMC") § 42.15, in order to address its concern that unregulated vending negatively effects the character, safety, and economic vitality of the Venice Beach Boardwalk and in response to litigation. In 2005, the City suspended the 2004 version of § 42.15, [*3] in response to the legal challenge raised in Venice Food Not Bombs v. City of Los Angeles, No. CV 05-04998 DDP (SS) (CD. Cal. 2005), and later adopted an amended version of the ordinance as part of a settlement agreement in 2006. The settlement agreement was the culmination of intensive meetings and negotiations between the parties and community stakeholders, with the aid of the Court, in an effort to draft an ordinance that would address the City's concerns about unregulated vending while protecting the rights of those who engage in activities protected by the First Amendment on Venice Boardwalk.

The City's adoption of the 2006 version of § 42.15 did not end all controversy concerning the vending ordinance and further litigation ensued. On January 14, 2009, this Court ruled in Hunt v. City of Los Angeles, 601 F. Supp. 2d 1158, 1170-72 (C.D. Cal. 2009), that the 2004 version of LAMC § 42.15(C) was unconstitutionally vague, because the exception to the vending ban for "merchandise constituting, carrying or making a religious political, philosophical, or ideological message or statement which is inextricably intertwined with merchandise," presented "a real risk of arbitrary and discriminatory [*4] enforcement because it fail[ed] to provide sufficient guidance to those who would enforce it." The Court did not reach the merits of the plaintiffs' facial void-for-vagueness challenge to a similar provision in the 2006 version of the ordinance, finding that the plaintiffs lacked standing to raise the claim. Hunt, 601 F. Supp. 2d at 1175.

In the face of such litigation, the City again

amended § 42.15, with the latest draft taking effect on May 19, 2008. In enacting the 2008 version of LAMC § 42.15, the City found that (1) tourists are deterred from visiting the Boardwalk because they are harassed by unregulated vendors, (2) the limited amount of space on the Boardwalk should be assigned in order to avoid frequent altercations, (3) vendors and their equipment impede the ingress and egress of emergency and public safety vehicles, and (4) unregulated vending creates excessive and annoying noise on the Boardwalk that negatively affects nearby workers, visitors, and residents. LAMC § 42.15(A)(1)(b)(i)-(vii). In response to these findings, LAMC § 42.15 (2008) provides that "[e]xcept as specifically allowed in this section, no person shall engage in vending" along the Venice Beach Boardwalk. [*5] Id. § 42.15(A).

The 2008 version of the ordinance divides much of the available space in the heart of the Boardwalk into individual spaces designated as P-Zone spaces and I-Zone spaces. Id. § 42.15(2). In the P-Zone spaces, "persons can perform, engage in traditional expressive speech, and petitioning activities, and vend the following expressive items: newspapers, leaflets, pamphlets, bumper stickers, patches, buttons, or books created by the vendor or recordings of the vendor's own performances . . . ." Id. § 42.15(2)(a). In the I-Zone spaces, "persons may engage in activities permissible in the P-Zone, and also engage in vending of expressive items created by the vendor, or the vending of expressive items that are inextricably intertwined with the vendor's message . . . ." Id. § 42.15(2)(b).

With certain limited exceptions, anyone wishing to use a P-Zone or I-Zone space during Peak Season must apply for an annual permit and enter into a lottery system by which spaces are assigned each day. Program Rules at pp. 2-3. The person to whom the space is assigned has priority to use the space. But, after 12:00 p.m., anyone (with or without a permit) may use any unoccupied space, so long as [*6] she engages only in activities approved for the P-Zones and relinquishes the space to the permit-holder if she returns.

123

2013 U.S. Dist. LEXIS 111435, *6

Outside of the P- and I-Zones, anyone may engage in any activity permitted in the P-Zones and vend expressive items "inextricably intertwined with the vendor's message," so long as she does not "set up a display table, easel, stand, equipment, or other furniture, use a pushcart or other vehicle . . . ." Id. § 42.15(D)(1)(a). On the West side of the Boardwalk, outside of the P- and I-Zones, anyone can engage in any permitted P-Zone activity as long as it is "not vending and does not substantially impede or obstruct pedestrian or vehicular traffic, subject to reasonable size and height restrictions on any table, easel, or other furniture . . . ." Id. § 42.15(D)(1)(b).

The ordinance and Program Rules also include noise regulations. LAMC § 42.15(F)(1) provides that noise levels must not exceed seventy-five decibels when measured at a distance of twenty-five feet away or ninety-six decibels when measured from one foot away between nine o'clock in the morning and sunset. Furthermore, LAMC § 42.15(F)(4) bans the use of amplified sound anywhere on the Boardwalk except in specially [*7] designated P-Zone spaces between 17th Avenue and Horizon Avenue and between Breeze Avenue and Park Avenue. The Program Rules clarify that amplified sound "is permitted only in the designated spaces in the P-Zones in the locations specified in Section 42.15 between 9:00 a.m. and sunset, and is prohibited after sunset and before 9:00 a.m." Program Rules at p. 4.

Following the City's adoption of the 2008 version of § 42.15, the Ninth Circuit decided Berger v. City of Seattle, 569 F.3d 1029 (9th Cir. 2009) (en banc), holding that a designated-performance-space and permitting system established by the City of Seattle for the Seattle Center was facially unconstitutional under the First Amendment. In so holding, the court noted that the Supreme Court "has repeatedly concluded that single-speaker permitting requirements are not a constitutionally valid means of advancing [the government's] interests because, typically (1) they sweep too broadly, (2) they only marginally advance the government's asserted interests, and (3) the government's interests can be

achieved by less intrusive means." Id. at 1038 (internal citations omitted). While acknowledging that such Supreme Court decisions involved [*8] permitting requirements for door-to-door solicitation, the court held that "it stands to reason that such [single-speaker permitting] requirements would be at least as constitutionally suspect when applied to speech in a public park, where a speaker's First Amendment protections reach their zenith, than when applied to speech on a citizen's doorstep where substantial privacy interests exist." Id. at 1039. As a result, the court stated that it was "not surprising that we and almost every other circuit to have considered the issue have refused to uphold registration requirements that apply to individual speakers or small groups in a public forum." Id.

Shortly after the Ninth Circuit published its decision in Berger, 569 F.3d 1029, Plaintiffs filed this lawsuit raising facial and as-applied challenges to the 2006 and 2008 versions of LAMC §42.15 and its implementing Public Expression Permit Program Rules ("Program Rules") (revised April 2, 2008), arguing that they violate the First and Fourteenth Amendments. The facial challenges to the 2008 ordinance at issue here appear to be threefold: First, Plaintiffs argue that the permitting and designated performance space system is not a reasonable [*9] time, place and manner restriction and grants unbridled discretion to licensing authorities. Second, Plaintiffs assert that the ordinance's use of the phrase "inextricably intertwined" renders it unconstitutionally vague. Third, Plaintiffs claim that the amplified sound ban is not a reasonable time, place, and manner restriction.

In order to voice their concerns over the ordinance and its enforcement, Plaintiffs Dowd and Saltsburg began attending Los Angeles City Council meetings and speaking during public comment sessions. Plaintiffs Dowd and Saltsburg raise facial and as-applied challenges to the City Council's Rules of Decorum.

724

2013 U.S. Dist. LEXIS 111435, *9

## B. Procedural History

On October 8, 2009, the City filed a motion to dismiss the facial challenges to LAMC § 42.15 (2008) on the grounds that the ordinance is constitutional on its face. The court denied the motion to dismiss with respect Plaintiffs' facial challenge to the permitting system and the amplified sound ban, and granted it with respect to Plaintiffs' facial challenge to the vending ban, holding that they did not have standing to pursue such a claim. On October 16, 2009, Plaintiffs filed a motion for preliminary injunction. The court granted the injunction [*10] as to the amplified sound ban and the permitting and lottery system, and denied it as to the rules of decorum, the limitation of boardwalk activities at sunset, the height prohibition, and the rotation requirement.

The parties have now filed cross-motions for summary judgment on the constitutionality of the 2008 Ordinance, the amplified sound ban, the limitation of boardwalk activities after sunset, the height limitation, and the rules of decorum.

## II. LEGAL STANDARD

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). All reasonable inferences from the evidence must be drawn in favor of the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). [*11] If the moving party does not bear the burden of proof at trial, it is entitled to summary judgment if it can demonstrate that "there is an absence of evidence to support the

nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. There is no genuine issue of fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

It is not the court's task "to scour the record in search [*12] of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996). Counsel has an obligation to lay out their support clearly. Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). The court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." Id.

## III. DISCUSSION

### A. 2006 Ordinance

The statute of limitations for suits under 42 U.S.C. § 1983 is governed by state law applying to tort actions for the recovery of damages for personal injuries. Silva v. Crain, 169 F.3d 608, 610 (9th Cir. 1999). In California, the statute of limitations for such personal injuries is two years. Cal. Civ. Proc. Code § 335.1. "Generally, the statute of limitations begins to run when a potential plaintiff knows or has reason to know of the asserted injury." Action

125

Apartment Ass'n, Inc. v. Santa Monica Rent Control Bd., 509 F.3d 1020, 1026-27 (9th Cir. 2007), quoting De Anza Properties X, Ltd. v. County of Santa Cruz, 936 F.2d 1084, 1086 (9th Cir. 1991). For facial challenges, the two year statute of limitations [*13] runs from the date that the challenged statute or ordinance went into effect, regardless of when a plaintiff learns of the enactment. Action Apartment Ass'n, Inc., 509 F.3d at 1027 (9th Cir. 2007)(internal citation and quotation marks omitted) ("Given the general rule that the statute of limitations begins to run when a potential plaintiff knows or has reason to know of the asserted injury, it stands to reason that any facial injury to any right should be apparent upon passage and enactment of a statute.")

The 2006 Ordinance became effective on March 25, 2006. (City Mot., Exh. 301.) Plaintiffs filed this action on September 16, 2009. Thus, their facial challenge to the 2006 Ordinance was filed more than a year after the statute of limitations period had expired and such a challenge is time-barred.

The as-applied claims are likewise time-barred. Any acts that took place prior to September 16, 2007, and that give rise to an as-applied challenge would be time-barred. Because the 2006 Ordinance was suspended in July 2007 (FAC ¶ 50), any act of enforcement of the 2006 Ordinance would have taken place prior to July 2007, and would necessarily be time barred.

For these reasons, the court GRANTS [*14] summary judgment in favor of Defendant on all claims relating to the 2006 ordinance.

## B. Permit and Lottery System

"A permitting requirement is a prior restraint on speech and therefore bears a 'heavy presumption' against its constitutionality." Berger, 569 F.3d at 1037 (internal citation omitted). "The presumptive invalidity and offensiveness" of such systems "stem from the significant burden they place on free speech. Both the procedural hurdle of filling out and submitting a written application, and the

temporal hurdle of waiting for the permit to be granted may discourage potential speakers." Id. at 1037-38 (internal citation and quotation marks omitted). Even where the government has a significant interest, the Supreme Court has concluded that "single-speaker permitting requirements are not a constitutionally valid means of advancing those interests because, typically, (1) they sweep too broadly . . . (2) they only marginally advance the government's asserted interests, . . . and (3) the government's interests can be achieved by less intrusive means." Id. at 1038. "Although the Supreme Court has not addressed the validity of single-speaker permitting requirements for speech in a [*15] public forum, it stands to reason that such requirements would be at least as constitutionally suspect when applied to speech in a public park, where a speaker's First Amendment protections reach their zenith." Id. at 1039. The "venerable tradition of the park as public forum has . . . a very practical side to it as well: parks provide a free forum for those who cannot afford newspaper advertisements, television infomercials, or billboards." Grossman v. City of Portland, 33 F.3d 1200, 1205 (9th Cir. 1994).

Nonetheless, "local governments can exercise their substantial interest in regulating competing uses of traditional public fora by imposing permitting requirements for certain uses." Santa Monica Food Not Bombs v. Santa Monica, 450 F.3d 1022, 1038 (9th Cir. 2006). A local government may issue reasonable regulations governing the time, place, or manner of speech. Berger, 569 F.3d at 1036. "To be upheld as a constitutional time, place or manner restriction, a permit requirement applying to First Amendment [*16] activity in a public park must (1) be content neutral, (2) be narrowly tailored to serve a significant government interest, and (3) leave open ample alternative channels of expression." Grossman, 33 F.3d at 1205. "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 804, 120 S. Ct. 1878, 146 L. Ed. 2d 865 (2000). See also Berger, 569 F.3d at 1048;

Kuba v. 1-A Agr. Ass'n, 387 F.3d 850, 858-63 (9th Cir. 2004).

This court granted a preliminary injunction with respect to the permit and lottery system, finding that in light of the Ninth Circuit's decision in Berger v. City of Seattle, 569 F.3d 1029 (2009), "the permit requirement is likely to violate the First Amendment." (2010 Order at 26.) Berger concerned a permitting system employed by the 80-acre Seattle Civic Center which, among other things, required street performers to obtain permits before performing anywhere at the Center and to wear a badge while performing, and limited street performances to sixteen designated locations. Id. at 1035. The court in Berger rejected the argument that the permitting system promoted the government's interests [*17] in deterring wrongful conduct by threatening the loss of a permit and by identifying rulebreakers so as to notify them of alleged violations. Id. at 1044. The court held that such goals could be accomplished just as effectively by requiring a person observed violating the rules to identify herself and an after-the-fact penalty, such as the loss of the right to perform or a fine. Id. at 1043.

The Berger court did not strike down the sixteen designated performance locations, noting that "the delineation of performance areas, particularly in the most sought-after locales, might pass constitutional muster on a more developed factual record." Id. at 1045. The court held that the City submitted undisputed evidence that before the location restriction, there were weekly complaints from park tenant about street performers blocking entranceways and egresses, and the location rule did promote the City's interest in reducing these problems. Id. at 1049. It found an issue of fact as to whether the location restriction left "ample alternative channels for communication." Id.

The permitting and lottery system in this case differs in several respects from the system struck down in Berger. First, street [*18] performers may still perform anywhere else on the Boardwalk,

although they are limited in terms of what items they can use (i.e., they cannot use pushcarts or tables elsewhere). Second, the lottery system assigns spaces to a particular person (or large performance group) for a particular day. However, after 12:00 p.m. each day any person, with or without a permit, may use an unoccupied P-Zone space and any person with an I-Zone permit may use an unoccupied I-Zone space, so long as she relinquishes the space should the lottery winner return. Third, insofar as an applicant seeks an I-Zone permit, she is required to disclose (1) her name and mailing address, (2) a description of the goods or merchandise for which she seeks a permit, and (3) a declaration that the goods or merchandise are expressive items inextricably intertwined with the applicant's message.

This court determined that the permitting and lottery system was likely unconstitutional because "[t]here is no explanation as to why this system manages conflicting claims to limited space any more effectively than a simple first-come-first-served rule." (2010 Order at 26.) The court now considers whether the City has met its burden [*19] of showing that the permit system is narrowly tailored to promote its interest.

**1. Content-Neutrality**

"A regulation is content-based if either the underlying purpose of the regulation is to suppress particular ideas or, if the regulation, by its very terms, singles out particular content for differential treatment." Reed v. Town of Gilbert, AZ, 587 F.3d 966, 974 (9th Cir. 2009)(quoting Berger, 569 F.3d at 1051).

Plaintiffs argue that the Ordinance is content-based because in the P-Zone spaces, persons can perform, engage in traditional expressive speech, and petition, but can vend only certain expressive items: "newspapers, leaflets, pamphlets, bumper stickers, patches, buttons, or books created by the vendor or recordings of the vendor's own performances." LAMC § 42.15(2)(a). In the I-Zone spaces "persons may engage in activities permissible in the P-Zone,

*124*

and also engage in vending of expressive items created by the vendor, or the vending of expressive items that are inextricably intertwined with the vendor's message." Id. § 41.15(2)(b). Plaintiffs argue that these require an officer to examine the content of the speech in order to determine whether it is permissible, because an officer [*20] must consider what matter qualifies as "newspaper," "leaflet" or "pamphlet"; whether an item has been "created, written or composed by the vendor"; whether an item is "inherently communicative"; whether an item has "nominal utility apart from its communication"; and other aspects of the speech. (Dowd Mot. at 13-14.)

Plaintiffs argue that such determinations are content-based by analogy to Forsyth County v. Nationalist Movement, 505 U.S. 123, 112 S. Ct. 2395, 120 L. Ed. 2d 101 (1992). There, the county of Forsyth, Georgia, passed an ordinance that allowed the county to adjust the fee for demonstration permit "in order to meet the expense incident to the administration of the Ordinance and to the maintenance of public order in the matter licensed." Id. at 127. The Court determined that the ordinance was content based because "the fee assessed will depend on the administrator's measure of the amount of hostility likely to be created by the speech based on its content. Those wishing to express views unpopular with bottle throwers, for example, may have to pay more for their permit." Id. at 134.

Here, none of the characteristics an officer must consider is based in the subject matter of the message. Determining whether a piece [*21] of literature is a "pamphlet" or a t-shirt, for instance, involves a consideration of form rather than content; the message conveyed is immaterial. While an officer must discern whether an object is inherently communicative, the inquiry is only whether the object is inherently communicating any message, not whether the object is communicating a message on a specific topic. Unlike Foti v. City of Menlo Park, 146 F.3d 629, 633-34, where a city prohibited the posting of signs on public property

with the exception of signs containing certain content (real estate open houses, safety and traffic notices, etc.), here the Ordinance does not target or privilege any particular message. Thus the Ordinance is not content based in the traditional sense of privileging or discriminating against certain topics. While it is by no means obvious whether certain objects are inherently communicative, even the close cases would depend not on the topic of the message but on the nature of the object.

The court finds that the 2008 Ordinance is not content based.

**2. Narrow Tailoring**

The City has met its burden in demonstrating that the 2008 Ordinance responds to a significant government interest. The 2008 Ordinance [*22] contains the following findings:

> The amount of space on the Boardwalk that is available for performing and visual artists and for political advocacy is limited due to the size of the Boardwalk and the large crowds of visitors that the Boardwalk attracts. Due to the limited amount of space, unregulated vending along the Boardwalk prevents many persons from engaging in performance, art, advocacy or other expressive activities. Prior to the City's Board of Recreation and Parks Commission establishing a program for assignment of spaces, unregulated vending resulted in conflicting claims for the available space. There were numerous altercations over the locations and amounts of space that any one person or organization could use. Frequently, the altercations became violent, requiring law enforcement response to preserve the public peace. Persons wishing to secure spaces often arrived prior to dawn and created loud noises in setting up their displays, thereby disturbing the public peace and requiring a law enforcement response. Unregulated, the Boardwalk became a place where only the strongest and earliest arrivals could secure space to exercise their

2013 U.S. Dist. LEXIS 111435, *22

rights of free expression without threat [*23] of intimidation. It is, therefore, necessary to regulate the use of the limited space on the Boardwalk to prevent conflicting claims for the space and to allocate the limited space available fairly to all who desire to use it for lawful purposes.

LAMC (2008) § 42.15(A)(1)(b)(ii). The court accepts these findings as evidence of a significant government interest. "As a general matter, courts should not be in the business of second-guessing fact-bound empirical assessments of city planners." City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 451, 122 S. Ct. 1728, 152 L. Ed. 2d 670 (2002)(J. Kennedy concurring). See also Alameda Books, Inc. v. City of Los Angeles, 631 F.3d 1031, 1042-43 (9th Cir. 2011). Plaintiffs have presented no evidence creating an issue of fact in this respect.

The City must also present evidence that the Ordinance was narrowly tailored to advance this interest. On its face, the Ordinance was crafted to remedy the problems identified in the findings. Unlike the ordinance in Berger, the 2008 Ordinance was a space allocation system which assigned performers to particular spots to effectively distribute the limited space of the Boardwalk. The permits combined with the lottery system provided a mechanism [*24] for officers to resolve disputes about space allocation in a neutral manner. The lottery system was also designed to discourage pre-dawn arrival at the Boardwalk in order to secure a space, and to expand the pool of potential performers to include speakers who might not assert themselves in a first-come-first-serve situation. The ordinance thus appears to be carefully crafted to resolve the problems identified in the findings. "[T]he regulation responds precisely to the substantive problems which legitimately concern the Government." Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 297, 104 S. Ct. 3065, 82 L. Ed. 2d 221 (1984)(internal citations and quotation marks omitted).

The City presents some evidence that the permit system managed space more effectively than the first-come-first-serve system. The City cites a declaration from Victor Jauregui, Senior Recreation Director II within the City of Los Angeles Department of Recreation and Parks, stating that "[t]he space allocation system with the lottery eliminated many of the prior disturbances and problems over spaces. It also allowed those who could not arrive at the crack of dawn or who were not the most aggressive to have a chance to be assigned a space at [*25] the Boardwalk." (Jauregui Decl. ¶ 8.) Jauregui also stated that with space assignment through the permit and lottery, "City staff had a neutral way to determine who was entitled to the space by looking at the lottery results." (Id. ¶ 9.)

Plaintiffs present evidence that a performer who did not obtain a permit through the lottery would not have a permit for a seven days or had to wait until 12:00 p.m. to obtain a space. (Dowd Decl. ¶ 10.) Performers did not always obtain spots. (See e.g. LaGrossa Decl. ¶ 10, stating that he obtained spots 60% of the time.) Plaintiff Demian asserts that his income was reduced because he could not use his amplifier in all spots and did not always get a spot where amplification was permitted. (Demian Decl. ¶ 33.)

Plaintiffs also present declarations to the effect that the Ordinance increased tensions among them. See e.g. Demian Decl. ¶ 14 ("Because of us being cramped together like that [in the large performance spaces], there would be a lot of anger sometimes"), LaGrossa Decl. ¶ 9 ("[T]hey put us like crabs in a barrel, and so naturally there's going to be fights."), Brown Decl. ¶ 11, noting that there were still disputes with the permit system, but now [*26] they are between "people trying to get spaces to sell things."). [1]

---

[1] The City objects to these statements as opinion rather than fact and therefore inappropriate for declarations. (City's Objections to Plaintiffs' Declarations.) See Fed. R. Civ. P. 56(c) ("An affidavit or declaration used to support or oppose a motion must be made on

*129*

2013 U.S. Dist. LEXIS 111435, *26

Plaintiffs' evidence shows that there was some tension on the Boardwalk among performers, but this does not create an issue of fact as to whether altercations decreased; as the City points out, there could be fewer altercations and noise disturbances alongside some tensions and altercations among performers. In addition, the City is not required to achieve its substantial interest  [*27] with the least speech-restrictive alternative. Clark, 468 U.S. at 299. Plaintiffs' evidence is not persuasive in demonstrating that the Ordinance was speech restrictive; it shows instead that Plaintiffs had objections to certain aspects of the Ordinance. That does not necessarily amount to a restriction on speech.

### 3. Alternative Channels of Expression

As the court pointed out in its 2010 Order, another important difference between this Ordinance and the one in Berger is that in Berger, the park required a permit for performers who wished to perform anywhere in the park. Here, the permit is required only for those performers who wish to set up their equipment and remain in a one-mile stretch of the Boardwalk. Performers are free to express themselves without using a table or other equipment within that one-mile area. They may occupy spaces that are not occupied after noon each day, provided they relinquish the space if the person to whom it was assigned appears. Additionally, they may set themselves up on the Boardwalk outside that one-mile area without obtaining a permit. [2]

---

personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.") and L.R. 7-7 ("Declarations shall contain only factual, evidentiary matter and shall conform as far as possible to the requirements of F.R.Civ.P. 56(c)(4).") The court finds that the declarations are based on the performers' first-hand knowledge of the interactions among performers on the Boardwalk and is therefore admissible.

[2] In itself, the fact that performers could set up tables for speech outside the one-mile area would not provide  [*28] a sufficient alternative channel of communication. Although one mile is a limited slice of the Boardwalk, it is nonetheless a significant area, especially for a person who wished to express a message to as broad

The Ordinance thus provides alternative channels of expression.

### 4. Vagueness challenge

The court previously found that Plaintiffs do not have standing to challenge the vending ban as void for vagueness because of its exception for expressive items that are 'inextricably intertwined' with the speaker's message. (2010 Order at 11.) The court found that "Plaintiffs engage in activities that do not fall within the ambit of the anti-vending regulations, as they are street performers who engage in traditional expressive speech, vend expressive items they have created, and sell recordings of their own performances. In fact, none of the Plaintiffs claims to have been chilled from performing or vending any items based on the anti-vending regulations." (2010 Order at 11-12.) The court therefore dismissed Plaintiffs' facial void-for-vagueness challenge to the vending ban and its exception for expressive items "inextricably intertwined" with the speaker's message.  [*29] Id. at 13. The court nonetheless indicated that "insofar as the Plaintiffs argue that the permitting scheme grants unbridled discretion to licensing officials because of its incorporation of the 'inextricably intertwined' standard, that claim survives the City's motion to dismiss." (Id. at 13 n.2.)

Plaintiffs assert that "[o]n the more fully developed record, Plaintiffs have standing to challenge the vending ban as void for vagueness. Plaintiffs engage in activities that fall within the ambit of the anti-vending regulations despite the fact that they are also street performers who engage in traditional expressive speech. Plaintiffs do claim to have been chilled from performing or vending any items based on the police harassment and enforcement of the anti-vending regulations." (Dowd Mot. at 24.) They also assert that they are challenging the vagueness of other terms in § 42.15, including "inherently communicative," "nominal utility apart from its communication," "some expressive

---

an audience as possible.

130

purpose," and "dominant" non-expressive purpose. (Id.)

Despite these assertions, Plaintiffs fail to distinguish these claims from the claims dismissed by this court in the 2010 Order or to point to those portions [*30] of the "more fully developed record" that purportedly give them standing to challenge the vending ban despite the previous dismissal of this claim. Noting that "Plaintiffs' Declarations amply demonstrate a 'serious interest in subjecting themselves to' the challenged measure, and that the City is 'seriously intent on enforcing the challenged measure' against them" without pointing to factual evidence in the record is insufficient to establish a genuine issue of material fact. (Dowd Reply at 4.) Nor is it sufficient for Plaintiffs to state that "[g]iven the limitations of space, all of those facts [in the Statement of Uncontroverted Facts and Conclusions of Law] cannot be repeated here and the Court is encouraged to review the Declarations and the Statement in detail." (Dowd Mot. at 2.) It is not the court's task "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1278 (9th Cir. 1996). Counsel has an obligation to lay out the support clearly. Carmen v. San Francisco Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). The court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set [*31] forth in the opposition papers with adequate references so that it could conveniently be found." Id.

The court finds that Plaintiffs' vagueness challenge was previously dismissed and that Plaintiffs have failed to present evidence sufficient to cause the court to take up the issue again.

## C. Amplified Sound Ban

The use of a sound amplification device is protected by the First Amendment. Saia v. New York, 334 U.S. 558, 561, 68 S. Ct. 1148, 92 L. Ed. 1574 (1948). As discussed above, "the City has the burden of justifying the restriction on speech." Klein v. City of San Clemente, 584 F.3d 1196, 1201 (9th Cir. 2009). In order for a regulation of

amplified sound to comport with the First Amendment, it must (1) be "'justified without reference to the content of the regulated speech,'" (2) be "'narrowly tailored to serve a significant government interest,'" and (3) "'leave open ample alternative channels for communication of the information.'" Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989) (quoting Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293, 104 S. Ct. 3065, 82 L. Ed. 2d 221 (1984)).

LAMC § 42.15(F)(4) and the Program Rules ban the use of amplified sound anywhere on the Boardwalk except in specially designated P-Zone spaces between 17th [*32] Avenue and Horizon Avenue and between Breeze Avenue and Park Avenue. (2008 Ordinance, §§ 42.15(D)(2)(c) and (F).) Fifty-six out of the 105 P-Zone spaces were in the area in which amplified sound was permitted. The ordinance also allowed the City to issue special events permits for amplified sound. (2008 Ordinance, § 42.15(F)(6).)

The City now asserts that the amplified sound ban is intended not only to protect residential areas from excess noise, but also to balance the expressive needs of various Boardwalk users. (2008 Ord. 42.15(A)(1)(b). It points out that there are other noise regulations applicable to the Boardwalk as a whole and that the 2008 Ordinance addressed the use of amplified sound as "one of numerous issues involving vendors and performances" on the western side of the Boardwalk. (City Reply at 21.)

The court finds that although the city has an interest in balancing the expressive needs of various Boardwalk users and in regulating the noise levels on the Boardwalk, this ordinance is not narrowly tailored because it targets only one aspect of the problem, namely, the sound emanating from the west side of the Boardwalk. It does not address sound emanating from the east side [*33] or from visitors.

The amplified sound ban thus places the burden of achieving the government's purpose upon one

group. "[A]lthough the chosen restriction need not be the least restrictive or least intrusive means available to achieve the government's legitimate interests, the existence of obvious, less burdensome alternatives is a relevant consideration in determining whether the 'fit' between ends and means is reasonable." Berger v. City of Seattle, 569 F.3d at 1041. Performers in the eight most northern blocks of the Boardwalk are banned from using any amplification. This ban intrudes on those performers' attempts to make themselves heard. See e.g. Demian Decl. ¶ 9 (stating that the amplified sound ban made it too difficult to perform acoustically because it is impossible to "project" enough to be heard). The obvious less restrictive alternative to the absolute amplified sound ban is a decibel limit that would apply to all users of the Boardwalk, on both sides. The Boardwalk already has a decibel limit of 75bDA at 25 feet and 96 dBA at one foot. LAMC § 42.15(F). If the overall sound level is the problem the Ordinance is meant to address, the obvious less restrictive alternative is [*34] for the City to decrease the maximum decibel limit on both sides of the Boardwalk, rather than barring all amplification by performers on the west side.

The court finds that the amplified sound ban is not narrowly tailored and therefore facially unconstitutional. The court GRANTS summary judgment in favor of Plaintiffs on this issue.

### 3. Height Limitation

The 2008 Ordinance includes a height restriction: "No person shall place or allow any item (except an umbrella or other sun shade) exceeding four feet above ground in any designated space . . . ." (Section 42.15 (2008) G(2)(b). See also Program Rules, Public Expression Program Regulations, p.6.) Although regulating equipment, this section of the Ordinance arguably constrains communicative conduct and therefore is subject to a challenge under the First Amendment. Vlasak v. Superior Court of California ex rel. County of Los Angeles, 329 F.3d 683, 687 (9th Cir. 2003). Again, the City

bears the burden of demonstrating that the Ordinance "advances a substantial governmental interest and that it is narrowly tailored to prevent no more than the exact source of the 'evil' it seeks to remedy." Edwards v. City of Coeur d'Alene, 262 F.3d 856, 863 (9th Cir. 2001)(quoting [*35] Frisby v. Schultz, 487 U.S. 474, 485, 108 S. Ct. 2495, 101 L. Ed. 2d 420 (1988)).

The 2008 Ordinance includes the following findings:

> (iv) The vendors and their equipment may impede the ingress and egress of emergency and public safety vehicles by creating physical obstacles to emergency response and administration of aid to those in need of immediate medical attention and to victims of criminal activity. It is therefore necessary to regulate vendors and their use of equipment to avoid interference with emergency response vehicles that provide assistance to individuals with medical needs and victims of criminal activity.
>
> ...
>
> (vi) Unregulated vending causes visual clutter/blight along the Boardwalk, impedes the views of the beach and the Pacific Ocean, and threatens the City's ability to attract tourists and preserve businesses along the Boardwalk. It is therefore necessary to regulate the number of vendors, the size of their equipment, and displays, and the location of vending activity. Sec. 42.15 A.1.(b).

As discussed above, the City has the burden to demonstrate that the Ordinance is narrowly tailored to promote a significant interest. The City presents evidence that it has a substantial interest, as stated in the Ordinance's [*36] findings, in facilitating emergency access and reducing visual clutter. See Honolulu Weekly, Inc. v. Harris, 298 F.3d 1037, 1045 (9th Cir. 2002) ("both the Supreme Court and this Court have found that aesthetics can be a substantial governmental interest."); Members of

2013 U.S. Dist. LEXIS 111435, *36

City Council of City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 805, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984)("It is well settled that the state may legitimately exercise its police powers to advance esthetic values.").

Plaintiffs argue that the height restriction is not narrowly tailored to achieve those interests because it imposes a significant burden on performers, who often use microphone stands, musical instruments, and other props such as ladders, which are higher than four feet. They also argue that it is irrational insofar as it makes an exception for umbrellas.

In Vlasak, cited by the City, the Ninth Circuit upheld Los Angeles Municipal Code section § 55.07, which prohibits the "carrying or possession of certain 'demonstration equipment'-rectangular wooden pieces more than 1/4 inch thick and 2 inches wide, or non-rectangular pieces thicker than 3/4 inch." Vlasak, 329 F.3d at 686. The court found that, unlike a broad ban on all signs [*37] attached to wooden or plastic handles, this ordinance was "narrowly tailored to meet the substantial interest in public safety," that "[t]he dimension restrictions . . . are not substantially broader than necessary to achieve the government interest," and that the ordinance did not "deprive[] demonstrators of alternative means of communication." Id. at 690. The court found that the ordinance was narrowly tailored because it advanced the public safety interest by limiting the size of handles that could be used as weapons while still allowing demonstrators to communicate their message in the form they chose (placards).

Here, the City does not explain why a four feet restriction, as opposed to a three feet or a six feet restriction, advances its interest. Nonetheless, "particularly where conduct and not merely speech is involved, . . . the over-breadth of a statute must not only be real, but substantial as well, judged in relation to its plainly legitimate sweep." Broadrick v. Oklahoma, 413 U.S. 601, 615, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973). Here, the regulation, while limiting some speech, is not substantially

overbroad; Plaintiffs have some limitations on their performances - they cannot use microphones of a certain [*38] height, and performers accustomed to performing from ladders are unable to do so - but the limitations leave ample channels of communication while advancing the City's interests. The limitations placed on Plaintiffs' performances are not so substantial as to lead the court to micromanage the City's regulation of public safety and aesthetics.

The court GRANTS summary judgment in favor of Defendants on this issue.

**4. Rotation Requirement**

The 2008 Ordinance allocates 5 of the 105 spaces in the P-Zone to large act/performance groups that draw an audience of 25 or more persons on average. (2008 Program Rules at 2.) The Program Rules state:

> the space(s) may be rotated once every hour beginning at 11:00 a.m., if more than one performer or group wants the same space. Example: if two group/performers want space D, they would alternate performances on an hourly basis beginning at 11:00 a.m.

Id. at 6.

The 2008 Ordinance includes findings, discussed above, that the Boardwalk is a limited space, and that altercations took place to obtain available space. LAMC Section 42.15 (1)(b)(ii). To accommodate groups that would attract large numbers of people, the Ordinance set aside a certain number of spaces [*39] into which performers could rotate. Plaintiffs point to a litany of problems [3] with the rotation requirement, including the fact that there is no cap on the number of performers who can be in the rotation; the

---

[3] Plaintiffs do not cite to any evidence in their papers. Once again, it is not the court's task "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996).

133

2013 U.S. Dist. LEXIS 111435, *39

ordinance privileges "popular" speech attracting 30 or more people over less popular speech; performers must predict how large their audience will be; police have too much discretion to determine whether the act attracted a large enough audience; and it is vague, leading to arbitrary enforcement by the police.

The court finds that Plaintiffs have not created an issue of fact as to the narrow tailoring of the rotation requirement. As discussed with respect to the height requirement, the court finds that the rotation requirement does not burden substantially more speech than necessary.

The court GRANTS summary judgment to Defendants on this issue.

## 5. Sunset Requirement

The Program Rules restrict all activity in designated spaces to the period between 9 a.m. and sunset. [*40] (2008 Program Rules at 6.) The City has presented evidence that the purpose of the requirement is to "ensure [the Boardwalk] is clean and safe for the crowds of people that will visit the following day." (Decl. Jauregui ¶ 10.) Plaintiffs allege that this is not a reasonable time, place, and manner restriction because sunset times change each day, the marine layer prevents visual observation of the sunset, tourists leave the park after - but not before - sunset, and other parks close one hour after sunset. (FAC ¶ 43.) Plaintiffs assert that it would be more reasonable for the park to close one hour after sunset. (Id.) It is not clear how these allegations, unsupported by evidence, amount to evidence that the requirement burdens more significantly speech than necessary and is not narrowly tailored. [4] The court finds that there is no

issue of fact and GRANTS summary judgment in favor of the City.

## D. Rules of Decorum

Plaintiffs seek a declaratory judgment that certain of the Los Angeles City Council Rules of Decorum violate the First Amendment and Article 1 § 2 of the California Constitution. (Compl., Prayer for Relief, ¶¶ 2,3.) They also seek a declaratory judgment that "the challenged sections of the Council Rules are 'unconstitutional as-applied,' as well as an order expunging all violations and citations of those rules "in any and all files maintained by the City." (Id., Prayer for Relief, ¶¶ 4, 5.) They also seek a preliminary injunction against the Rules of Decorum. (Id., Prayer for Relief, ¶ 1.)

### 1. Facial Challenge

Under Ninth Circuit law, city council meetings, "once opened, have been regarded as public forums, albeit limited ones." White v. City of Norwalk, 900 F.2d 1421, 1425 (9th Cir. 1990). "A council can regulate not only the time, place, and manner of speech in a limited public [*42] forum, but also the content of speech — as long as content-based regulations are viewpoint neutral and enforced that way." Norse v. City of Santa Cruz, 629 F.3d 966, 975 (9th Cir. 2010). However, rules of decorum are constitutional if they "only permit[] a presiding officer to eject an attendee for actually disturbing or impeding a meeting." Acosta v. City of Costa Mesa, 718 F.3d 800, 811 (2013)(quoting Norse, 629 F.3d at 976).

In Norwalk, the Ninth Circuit considered a facial challenge to council rules nearly identical to those at issue in this case. The relevant portion of the rule was the following:

> Each person who addresses the Council shall not make personal, impertinent, slanderous or profane remarks to any member of the Council,

---

[4] Again, Plaintiffs do not refer in their papers to any evidence on this point in their moving papers or opposition. It appears that the evidence they have on this point is presented in response to the City's Uncontroverted Fact number 19, which states the purpose of this section of the Ordinance [*41] as being to make the Boardwalk clean and safe for the following day and to reduce noise in the adjacent residential neighborhoods. Plaintiffs present over four pages of purported evidence, but it is non-responsive, as it deals primarily

with the continuing presence of conflicts among performers.

134

staff or general public. Any person who makes such remarks, or who utters loud, threatening, personal or abusive language, or engages in any other disorderly conduct which disrupts, disturbs or otherwise impedes the orderly conduct of any Council meeting shall, at the discretion of the presiding officer or a majority of the Council, be barred from further audience before the Council during that meeting.

Norwalk, 900 F.2d at 1424. The Ninth Circuit did not [*43] consider the constitutionality of the rule on its face and held that because the rule was "readily susceptible" to be interpreted as requiring "that removal can only be ordered when someone making a proscribed remark is acting in a way that actually disturbs or impedes the meeting," it did not violate the First Amendment. Id.

Here, the Rule in question is similar to the rule in Norwalk: [5]

> Persons addressing the Council shall not make personal, impertinent, unduly repetitive, slanderous or profane remarks to the Council, any member of the Council, staff or general public, nor utter loud, threatening, personal or abusive language, nor engage in any other disorderly conduct that disrupts, disturbs or otherwise impedes the orderly conduct of any Council meeting.

(FAC ¶ 64; City Mot. Exh. 306, Rules of the Los Angeles City Council As Amended (July 2009), Ch. 1 Rule No. 12(a).)

There are at least three possible interpretations of the Rule. First, reading the sentence as three disjunctive [*44] clauses separated by "nor," it could be taken to state that certain kinds of speech are not allowed (personal, impertinent, repetitive, slanderous, threatening, etc.) and additionally that "disorderly conduct" that is disruptive is not

allowed. Read this way, there is no "actual disruption" required for there to be a breach of the rule. A second interpretation is that the final clause ("that disrupts, disturbs or otherwise impedes the orderly conduct of any Council meeting") could be taken to modify all three sets of speech and behavior, [6] thus imposing an "actual disturbance" requirement on all types of speech and conduct listed. Third, the final clause -"nor engage in any other disorderly conduct that disrupts, disturbs or otherwise impedes the orderly conduct of any Council meeting" -could be taken to indicate that the first two types of speech or conduct (profanities, slander, abusive language, etc.) are a type of conduct that inherently "disrupts, disturbs, or otherwise impedes the meeting," and that other, similarly disruptive conduct is also prohibited. [7]

Only the second construction, which imposes an actual disruption requirement on all prohibited speech, allows the Rule to survive constitutional scrutiny because is otherwise viewpoint discrimination. As Plaintiffs point out, by their nature, "personal, impertinent and slanderous remarks will be critical. No one could be deemed impertinent while praising the City Council." (Plaintiff's Mot. at 32.) "The council members should [know] that the government may never suppress viewpoints [*46] it doesn't like." Norse, 629 F.3d at 979 (Kozinski, J. concurring). Nonetheless, because the Ninth Circuit interpreted a similar statute and found that it resisted a facial

---

[5] The two are distinguishable in that the Norwalk rule uses "which" where the L.A. rule uses "that," a point which could be significant if a strict grammatical interpretation were performed. See notes 2 and 3 below.

[6] This is an ungrammatical reading of the Rule. "That" introduces "a clause defining or restricting the antecedent, and thus [*45] completing its sense." Oxford English Dictionary online, "that, pron.2." Sept. 2012. Oxford Univ. Press. <http://www.oed.com/view/Entry/200178?rskey=U6kljt&result=3&i sAdvan ced=false>. (Nov. 29, 2012.) Here, as a grammatical matter it is clear that "that" is restricting the meaning of "disorderly conduct," not of the clauses preceding the sentence's final "nor." Nonetheless, given the widespread confusion concerning the use of "that" and "which," the court will not base a determination of whether the rule is "readily susceptible" to a certain interpretation on that interpretation's grammatical precision.

[7] As discussed below, the video evidence suggests that City Council members interpret the rule in this way.

challenge, the court here likewise holds that the Rule is constitutional insofar as it is interpreted by the Council as requiring an "actual disruption" separate from the bare violation of the Rule.

The court notes, however, that this is an uncomfortable result. Without the "actual disruption" requirement, the Rule would be unconstitutional viewpoint discrimination. Acosta, 718 F.3d at 812 (holding that a city council rule of decorum prohibiting "any personal, impertinent, profane, insolent, or slanderous remarks" without requiring an actual disruption is unconstitutional). With the "actual disruption" requirement, any speech covered by the first two parts of the rule would also qualify under the broader (and more likely constitutional) final category of "disorderly conduct that disrupts, disturbs or otherwise impedes the orderly conduct of any Council meeting." The restrictions on personal, impertinent, and slanderous remarks therefore serve no purpose in the Rule; they are remnants of unconstitutional restrictions [*47] saved from invalidity only by the qualification of "actual disruption" that arguably applies to them. Those restrictions on speech are thus at best superfluous. At worst, they chill constitutionally protected political speech. The rule contains a list of prohibited (and unconstitutionally restrictive) types of speech that is then, much less explicitly, qualified by the actual disruption requirement and thereby rendered constitutional. Although the Rule may help the Council meetings run more smoothly, it verges on violating the core right of citizens to criticize their democratically elected officials. And, as discussed below, because of its phrasing, it is easy to apply the Rule in an unconstitutional manner.

Nonetheless, Ninth Circuit precedent compels upholding the Rule insofar as it is interpreted to include an "actual disruption" requirement. [8] For

the reasons discussed above, this requirement must be applied scrupulously in order to avoid violating the First Amendment.

## 2. As-applied Challenge

"Norwalk permits the City to eject anyone for violation of the City's rules—rules that were only held to be facially valid to the extent that they require a person actually to disturb a meeting before being ejected." Norse v. City of Santa Cruz, 629 F.3d at 976. The court now considers whether Plaintiffs Dowd and Saltsburg actually disturbed the City Council meeting prior to being ejected.

### a. Actual Disruption Standard

The Ninth Circuit has not defined "actual disruption" with precision. Actual disruption need not resemble a breach of the peace or fighting words. Norwalk, 900 F.2d at 1425. "A speaker may disrupt a Council meeting by speaking too long, by being unduly repetitious, or by extended discussion of irrelevancies. The meeting is disrupted because the Council is prevented from accomplishing its business in a reasonably efficient manner." Id. at 1426.

Although the standard for disruption [*49] is relatively low, a disruption must in fact have occurred. "Actual disruption means actual disruption. It does not mean constructive disruption, technical disruption, virtual disruption, nunc pro tunc disruption, or imaginary disruption. The City cannot define disruption so as to include non-disruption to invoke the aid of Norwalk." Norse, 629 F.3d at 976 (9th Cir. 2010). "The Supreme Court long ago explained that 'in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression.'" Id. at 979 (Kozinski, J. concurring.), quoting Tinker v. De Moines Ind. Cmty. Sch. Dist., 393 U.S. 503, 508, 89 S. Ct. 733,

[8] This said, the City would do well to consider revising the Rules of Decorum to make it clear that an actual disruption is required before a speaker can be ejected. As discussed below, the court finds, based on the [*48] video evidence, that the Rules of Decorum are unconstitutional as applied. Revising the Rules of Decorum to indicate that an actual disruption is required would provide clear guidance to the City Council to help it conduct its business within the bounds of the First Amendment.

21 L. Ed. 2d 731 (1969).

In some cases, the line between actual and potential disruption is difficult to draw. In Kindt v. Santa Monica Rent Control Bd., 67 F.3d 266 (9th Cir. 1995), the Ninth Circuit held that it was permissible to remove a man who had previously disrupted proceedings of the same meeting when his "cohort" and frequent partner in disruption made an obscene gesture "which threatened to start the disruption all over again." Id. at 271. However, in Norse, the Ninth Circuit held that there had not clearly been a disruption when a man "gave [*50] the Council a silent Nazi salute" and was then ejected and arrested, rejecting the City's definition of "disturbance" as "any violation of its decorum rules." Norse, 629 F.3d at 976.

At a minimum, the disturbance must be something more than the bare violation of a rule. In Acosta, the Ninth Circuit favorably considered two jury instructions indicating that actual disruption is measured by an effect on the audience and that profanity without more is not an actual disruption. 718 F.3d at 810 n.5 ("Whether a given instance of alleged misconduct substantially impairs the effective conduct of a meeting depends on the actual impact of that conduct on the course of the meeting." . . . "A speaker may not be removed from a meeting solely because of the use of profanity unless the use of profanity actually disturbs or impedes the meeting.").

The power to determine when a disruption has occurred has been placed in the hands of the moderator. Norwalk, 900 F.2d at 1426 ("The role of a moderator involves a great deal of discretion. Undoubtedly, abuses can occur, as when a moderator rules speech out of order simply because he disagrees with it, or because it employs words he does not like.") The disruption [*51] cannot be the reaction of a Councilmember who is attacked. Norse, 629 F.3d at 979 (CJ. Kozinski concurring) ("Though defendants point to Norse's reaction to Councilman Fitzmaurice as the 'disruption' that warranted carting him off to jail, Norse's calm

assertion of his constitutional rights was not the least bit disruptive. The First Amendment would be meaningless if Councilman Fitzmaurice's petty pique justified Norse's arrest and removal.")

**b. As-applied Challenge**

The Ninth Circuit has identified two types of as-applied challenges. The first "paradigmatic type" is "one that tests a statute's constitutionality in one particular fact situation while refusing to adjudicate the constitutionality of the law in other fact situations." Hoye v. City of Oakland, 653 F.3d 835, 854 (9th Cir. 2011)(citation and internal quotation marks omitted). The second type is "based on the idea that the law itself is neutral and constitutional in all fact situations, but that it has been enforced selectively in a viewpoint discriminatory way. Such a challenge . . . is dependent on the factual evidence provided as to how the statutory scheme has in fact operated vis-à-vis the plaintiffs." Id. (citation and [*52] internal quotation marks omitted).

Plaintiffs have not presented evidence of the second type of as-applied challenge. Deposition evidence of Council members or other types of policy evidence would be required for the court to extrapolate from the video, transcript, and declaration evidence and find that there is a policy, rather than isolated instances, of unconstitutional application.

The court therefore considers the specific instances in which Plaintiffs contend that the Rules of Decorum were unconstitutional as applied. [9]

**c. Incidents**

The first three incidents took place on March 4, 2008, August 13, 2008, and June 12, 2009, prior to the amendment of the Rules on July 29, 2009. (FAC ¶ 64.) Plaintiffs assert that their challenge applies to the Rules prior to their amendment and to the amended Rules. The FAC is ambiguous on this

---

[9] The court requested supplemental briefing identifying these incidents.

point. However, nowhere in their briefing do Plaintiffs present the pre-2009 Rules, which may or may not contain the same provisions Plaintiffs are challenging. The court therefore declines to consider the first three incidents.

Plaintiffs have identified approximately ten [10] additional incidents [*53] involving Plaintiffs David Saltsburg ("Zuma Dogg" or "Dogg") and Matt Dowd when they attended City Council meetings. (Joint Statements RE Incidents 4 - 13.) The court has reviewed the video recordings and transcripts of the incidents provided by the parties. The evidence often demonstrates significant tolerance of citizen speech on the part of the members of the City Council. Dowd and Dogg were frequent speakers at City Council meetings and were ejected from only a handful of them. However, the court finds that each identified incident involves an unconstitutional application of the Rules of Decorum. The fact that these incidents represented a fraction of Dowd and Dogg's appearances at City Council meetings does not mitigate the constitutional violations. Additionally, although the court does not have enough evidence to determine that the City has a policy of applying the Rules in an unconstitutional fashion, it appears from the video evidence that the City Council and the representative of the City Attorney do not always require a disruption beyond the breach of the Rules of Decorum. Additionally, they appear to interpret the use of profanity as an actual disruption per se.

For instance, in Incident No. 4., on Sept. 2, 2009, Plaintiff Dowd addresses the City Council and says "First of all, your president is pathetic and hopeless and is not doing a very good job and you need to get together and lose her because, because see when Eric is not here - sit down [Councilman] LaBonge, just sit down." (Joint Statement RE Incident No. 4 at 1.) Council members then discuss the incident with City Attorney Dion O'Connell who advises them as follows: "The speaker should

not engage in personal attacks on the councilmembers. He can speak about the performance of the City services and the councilmembers but not engage in personal attacks." (Id.) Dowd begins speaking again.

> DOWD: See when it's just me it's I, Matthew Dowd and when I'm talking to you that's the part that's not allowed but when I'm talking about you that's the third person and you did it to me yesterday so I'm filing on the decorum. I got to sue for the 42.15 you are still using the words inextricably intertwined but there's no guidelines for what that fucking means. I am tired. . . .

> PERRY: Thank you very much, that is the end of your time now. [11]

> LABONGE: He [*55] should be removed.

> PERRY: Okay, thank you.

> LABONGE: He should be removed from the meeting.

> PERRY: Mr. Officer if you can please escort Mr. Dowd to the door. Thank you very much.

> . . .

> O'CONNELL:It is within the Council's discretion to ban him from attending, or from speaking, he can attend the meetings but he can't speak for a certain amount of time. In the past it has been 3 days, then since the new Council rules, Council can ban him for up to 30 days.

> PERRY: Would someone like to make a motion.

> ZINE: I make a motion for 30 days.

The council then voted 11 to 1 to ban him for 30 days.

---

[10] Incidents [*54] 8 and 9 appear to be substantially overlapping.

[11] The video appears to indicate that Dowd had 15 seconds remaining on his clock.

The City argues that "Dowd's actions disrupted the meeting by shifting the focus to the speaker's improper language and conduct rather than the issues and business before the Council. His personal attacks directed toward individual Councilmembers did not further the governmental process or enlighten either the Council or the public regarding items of City business, they simply delayed the City Council meeting and impeded the City Council's ability to efficiently complete its business." (Defendant's Position on Incident No. 4 at 1.) [*56] The court disagrees. Calling the Council president "pathetic and hopeless" and saying she is "not doing a very good job and you need to get together and lose her" is political speech at the heart of the First Amendment. As Councilwoman Perry says during the incident, "Whether I like what he has to say or not, which I actually don't like, . . . he still has the right to say it." (Joint Statement RE Incident No. 4 at 2.) While the frustration of Councilmembers is understandable, so is the frustration of Dowd at experiencing an interruption that "broke[] [his] whole thread." (Id.)

The City does not point to, nor does the court discern in the video, any disruption beyond Dowd's speech. It appears based on this video, taken with the other incidents, that it was Dowd's use of a profanity ("there's no guidelines for what that fucking means") that was the basis for dismissing him from the meeting and for the weighty punishment of barring him from speaking for 30 days.[12] But '[a] speaker may not be removed from a meeting solely because of the use of profanity unless the use of profanity actually disturbs or impedes the meeting." Acosta, 718 F.3d at 810 n.5. The court finds that no actual disturbance

[*57] took place here. This is also the case in Incidents 5, 7, 8, 9, 10, 11, 12, and 13. In all of those instances, the court finds that there is no actual disturbance beyond breaching the Rules by the use of profanity.

If profanity takes a speaker off topic, it could be grounds to silence the speaker because it would impede the progress of the meeting. However, the profanity in the video evidence of these incidents is in the service of making a point that is related to the issue at hand, if not taking the discussion in the direction that the Council intends. For instance, in Incident No. 12, February 14, 2012, Zuma Dogg used a profanity as an intensifier in the context of a critique of the [*58] City Attorney. (Joint Statement RE Incident No. 12 at 2 ("[T]hen we'll see what the jury has to say so Carmen Trutanich can spend millions and millions and millions and millions of dollars [and] outside counsel can drag it out and I only want a fraction. As Matt Dowd would say that is fucked up.").)

Additionally, even where profanities are not involved, in some instances, the City's determination that certain comments are not on topic results in a limitation of political speech. For instance, in Incident No. 6 from October 15, 2010, Dowd was again removed from a meeting, this time because he was not on topic. The subject was the funding of the Pacoima Christmas Parade. Pacoima is in City Council District 7, of which Richard Alarcon was the representative. Before Dowd began to comment, Dogg stated, "My public comment is that I want council to discuss the legality of this when you've got a criminal taking the money." Dowd then came to the podium. Dowd and Councilman Zine had an interchange about the relevance of Dogg's and Dowd's comments to the agenda item:

> ZINE: The subject matter is the Christmas Parade. That's the debate right now.
>
> DOWD: Okay, and I'm talking about Richard Alarcon's [*59] performance in his council district. What's wrong with that?

---

[12] Taken together, the evidence strongly suggests that the City Council believed that profanity was a sufficient basis on which to eject a speaker. For instance, in Incident No. 11, February 14, 2012, Dogg is allowed without interruption to sing a rendition of a Whitney Houston song to express his love for Councilmember Parks, but is ejected when he says, "As Matt Dowd would say that is fucked up." (Joint Statement RE Incident No. 12 at 2.) The song is not considered a disruption, but the profanity is.

ZINE: That is not the issue. That is not the issue.

DOWD: It's in his district and he's getting money out of the general fund . . .

ZINE: The issue is the Christmas Parade in Pacoima . . .

DOWD: Get the City Attorney, please, get your head on the hook . . .

ZINE: The Christmas Parade is the subject . . .

DOWD: Exactly, and I'm against it because Richard Alarcon shouldn't be a councilman right here and if he stays you're going to have to put up with it . . .

ZINE: Mr. Dowd, Mr. Dowd, you're finished for the day

DOWD: . . . public comment

ZINE: Mr. Dowd, you're finished for the day. You're finished for the day, Mr. Dowd. Sergeant at Arms, remove him from chambers. He's finished for the day.

(Joint Statement RE Incident No. 6 at 10.) The court finds the discussion of a councilman's alleged criminal activities is relevant to a discussion of funding that the City intends to give to that councilman's District. Indeed, this incident is exemplary of why it is unconstitutional to restrict speakers from making personal attacks in City Council meetings; it chills speech critical of elected officials, which is speech at the heart of the First Amendment.

In [*60] one of the largest cities in the world, it is to be expected that some inhabitants will sometimes use language that does not conform to conventions of civility and decorum, including offensive language and swear-words. As an elected official, a City Council member will be the subject of personal attacks in such language. It is asking much of City Council members, who have given themselves to public service, to tolerate profanities

and personal attacks, but that is what is required by the First Amendment. While the City Council has a right to keep its meetings on topic and moving forward, it cannot sacrifice political speech to a formula of civility. Dowd and Dogg "may be a gadfly to those with views contrary to [their] own, but First Amendment jurisprudence is clear that the way to oppose offensive speech is by more speech, not censorship, enforced silence or eviction from legitimately occupied public space." Gathright v. City of Portland, Or., 439 F.3d 573, 578 (9th Cir. 2006). The city that silences a critic will injure itself as much as it injures the critic, for the gadfly's task is to stir into life the massive beast of the city, to "rouse each and every one of you, to persuade [*61] and reproach you all day long." (Plato, Five Dialogues, Hackett, 2d Ed., Trans. G.M.A. Grube, 35 (Apology).)

The court GRANTS summary judgment to Plaintiffs on the as-applied challenge to the Rules of Decorum. The court declines to issue a preliminary injunction but finds that the provisions of the Rules of Decorum at issue here are constitutional only when there is an actual disruption beyond a per se breach of the Rules.

### 3. California Constitution

The California Constitution provides, "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." Cal. Const. art. I, § 2. "The California Constitution, and California cases construing it, accords greater protection to the expression of free speech than does the United States Constitution." Gonzales v. Superior Court, 180 Cal. App. 3d 1116, 1122, 226 Cal. Rptr. 164 (Ct. App. 1986). Because the California Constitution is more protective of free speech than the U.S. Constitution, the court finds that as applied the Rules of Decorum violate Article I § 2 as well. [13]

---

[13] Due to insufficient briefing, the court declines to address

140

2013 U.S. Dist. LEXIS 111435, *61

**E. Damages Claims**

The City has presented evidence indicating that Plaintiffs did not suffer economic loss due to the 2008 Ordinance. (See, e.g., City Exhs. 28, 49, 68, 317, 325, 327-32, 335-44, 355-56, 360, 362.) Plaintiffs have presented evidence in the form of their declarations indicating that they suffered economic loss and potentially compensable emotional distress. (See, e.g., Saltsburg Decl. ¶ 74.) Emotional distress damages need not be based on objective evidence. Zhang v. American Gem Seafoods, Inc., 339 F.3d 1020, 1040 (9th Cir. 2003), citing Passantino v. Johnson & Johnson Consumer Prods., Inc., 212 F.3d 493, 513 (9th Cir. 2000). The court finds that there is an issue of fact as to the compensatory damages suffered by Plaintiffs and DENIES summary judgment on the issue of damages.

**IV. CONCLUSION**

For the reasons stated above, the court GRANTS summary judgment in favor of Defendants on the 2006 Ordinance. The court GRANTS summary judgment in favor of Defendants on the Permit and Lottery system, the height restriction, the rotation requirement, and the sunset requirement. The court GRANTS [*63] summary judgment in favor of Plaintiffs on the amplified sound ban. The court GRANTS summary judgment in favor of Defendants on the facial constitutionality of the Rules of Decorum under the United States Constitution, but GRANTS summary judgment in favor of Plaintiffs on their as-applied challenge to the Rules of Decorum under the United States Constitution and the California constitution. The court declines to issue a preliminary injunction but finds that the provisions of the Rules of Decorum at issue here are constitutional only when there is an actual disruption beyond a per se breach of the Rules. The court DENIES summary judgment on the issue of damages.

IT IS SO ORDERED.

Dated: August 7, 2013

/s/ Dean D. Pregerson

DEAN D. PREGERSON

United States District Judge

---

End of Document

---

[*62] whether the Rules of Decorum are facially unconstitutional under the California constitution.

# EXHIBIT L

142

Case 2:12-cv-07261-FM   SH   Document 23   Filed 12/06/12   ..ge 1 of 14   Page ID #:201

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

# MEMORANDUM

| | |
|---|---|
| Case No.   CV 12–7261 DSF (SHx) | Date   12/6/12 |

Title   Michael Hunt v. City of Los Angeles, et al.

Present: The Honorable   DALE S. FISCHER, United States District Judge

| Debra Plato | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:**   (In Chambers) Order GRANTING IN PART and DENYING IN PART Defendants' Motion to Dismiss Plaintiff's Complaint (Docket No. 12) and DENYING AS MOOT Plaintiff's Objection and Motion to Strike Defendants' Reply to Plaintiff's Opposition to Motion to Dismiss (Docket No. 20)

On August 23, 2012, Plaintiff Michael Hunt filed a Complaint alleging violations under 42 U.S.C. § 1983 of his First, Fifth, and Fourth Amendment Rights and his rights under Article 1, Section 2 of the California Constitution. On October 26, 2012, Defendants[1] City of Los Angeles (City) and Barry Sanders (Sanders), President of the Board of Recreation and Parks Commissioners, filed a motion to dismiss the First Amendment facial challenges in Hunt's Complaint. Defendants do not seek to dismiss Hunt's First Claim for Relief challenging California Penal Code § 403. (Defs.' Opp'n to Pl.'s Mot. to Strike 2.)[2] Defendants also do not seek to dismiss Hunt's as-applied

---

[1] Hunt initially named the Los Angeles Board of Recreation and Parks Commissioners as a Defendant but has now voluntarily dismissed that entity.

[2] Hunt filed an objection and motion to strike a portion of Defendants' Reply to his Opposition to the Motion to Dismiss regarding his challenge to Penal Code § 403 on the basis that Defendants failed to address the claim in their Motion to Dismiss. Defendants concede that they are not seeking to dismiss Hunt's § 403 claim and "are currently meeting and conferring with Plaintiff's counsel regarding a voluntary dismissal of this claim." (Defs.' Opp'n to Pl.'s Mot. to Strike 2.) As Defendants concede that they are not challenging Hunt's § 403 claim, the Court will not consider Defendants' challenge in their reply to Hunt's § 403 claim. As a result,

exhibit L

143

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

challenges.[3]  (Defs.' Reply 1.)

The Court deems this matter appropriate for decision without oral argument.  See Fed. R. Civ. P. 78; Local Rule 7–15.

## I.   INTRODUCTION

Hunt alleges that on September 21, 2011 he was wrongfully arrested and expelled from a public meeting of the Los Angeles Board of Recreation and Parks Commissioners (Board).[4]  (Compl. ¶ 11.)  The purpose of the September 21, 2011 meeting (Public Meeting) was to receive public comments on the proposed re-enactment of Los Angeles Municipal Code § 42.15, regarding restrictions on vending and other activities on the Venice Beach Boardwalk.  (Id.)  Hunt contends that he had a direct and vital interest in such ordinance having successfully challenged a previous version of the ordinance in the case of Hunt v. City of L.A., 638 F.3d 703 (9th Cir. 2011).[5]

Hunt alleges that he silently entered the hearing room wearing a T-shirt that bore the "political message" "Fuck White Niggar [sic] too."[6]  (Id. ¶¶ 11–12.)  Defendants

──────────

Hunt's objection and motion to strike are DENIED as moot.

[3] Defendants explain that "[i]n their moving papers, Defendants moved to dismiss the facial challenges, but did not address Plaintiff's as-applied challenges.  (Defendants will likely move for summary judgment on Plaintiff's as-applied challenges.)"

[4] Defendants contend that there was first a general meeting and then a special meeting.  (Defs.' Mot. to Dismiss 3.)  Defendants assert that the agenda item regarding a possible amendment to the Venice Beach Boardwalk Ordinance, which Hunt claimed he had a "direct and vital interest in," was to be heard at the second, special meeting.  (Id.)

[5] Hunt v. City of L.A. involved Hunt's challenge to Los Angeles ordinances aimed at preventing vending on the Venice Beach Boardwalk.  638 F.3d at 706.

[6] In order to list the contents of the message on his shirt, Hunt quotes the citation he was given for violating California Penal Code § 403.  (Compl. ¶ 12.)  The citation read:

> 403 PC Disturb Lawful Public Assbly
> Violation wore offensive clothing
> T-Shirt "Fuck White Niggar [sic] too" in
> Violation of City of LA Public Commission
> Hearing Decorum.

(Id.)

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### MEMORANDUM

claim that Hunt was also wearing a Ku Klux Klan hood at the meeting. (Defs.' Mot. to Dismiss 3; Defs.' Req. for Judicial Notice (RJN) Ex. 3; Docket No. 13.)[7] In his Opposition, Hunt describes his headgear as "unusual," but he does not provide any further description and does not mention any headgear in his Complaint. (Pl.'s Opp'n 11; Docket No. 17.)

   Hunt alleges that he "peaceably and silently entered the hearing room" and "remained silent" and "made no noise." (Compl. ¶ 11.) He claims that, "without warning . . . Sanders, as Presiding Officer of the Public Meeting, immediately interrupted the proceedings . . . accused Plaintiff of disturbing the Public Meeting and, without giving Plaintiff notice and/or an opportunity to be heard, and without review by the entire Board, ordered Plaintiff to leave." (Id.) Hunt alleges that two uniformed police officers immediately confronted him, took hold of him and expelled him from the Public Meeting. (Id.)[8] Hunt claims that he was prevented from returning to the Public Meeting and was not allowed to speak and address the Board as he had intended. (Id.)

   After his removal from the Public Meeting, Hunt was issued a citation for violation of California Penal Code § 403.[9] (Id. ¶ 12.) As required by the citation, Hunt appeared in court on November 14, 2011, but no charges were filed. (Id. ¶ 13.)

---

[7] The Court declines to take judicial notice of Defendants' RJN Exhibit 3, September 21, 2011 Minutes of the Board of Recreation and Park Commissioners of the City of Los Angeles (Minutes) at this time as the Minutes are not properly authenticated. The Minutes note that: "Mr. Hunt was requested before and during the meeting to remove his t-shirt which had offensive language and Ku Klux Klan hood, which were both offensive and disruptive to the meeting." (Defs.' RJN Ex. 3.)

[8] Defendants request that the Court take judicial notice of a transcript of the Public Meeting. (Defs.' RJN Ex. 5.) Hunt objects to Defendants' request for judicial notice as "unreliable and incomplete because they contain no time code or other indication of the passage of time, particularly the crucial moments at page 4 . . . after Sanders ordered Hunt removed from the meeting" and because "[n]either Sanders nor any other participant whose statements are transcribed were based on personal knowledge." (Pl.'s Opp'n 10.) The Court declines to take judicial notice of the transcript at this time as consideration of a more complete version of the transcript, along with any relevant declarations, is more appropriate for a summary judgment motion. The Court also declines to take judicial notice of Defendants' proffered audio recordings of the September 21, 2011 meetings for the same reason. (See Defs.' RJN Exs. 4, 7.)

[9] California Penal Code § 403 provides in pertinent part: "Every person who, without authority of law, willfully disturbs or breaks up any assembly or meeting that is not unlawful in its character . . . is guilty of a misdemeanor."

145

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**MEMORANDUM**

Hunt was cited for violation of Article VI of the Rules of Recreation and Park Commissioners of the City of Los Angeles (Rules).[10]  Article VI states:

1) Rules of Decorum.  During a meeting of the Board, there is the need for civility and expedition in the carrying out of public business in order to ensure that the public has a full opportunity to be heard and that the Board has an opportunity for its deliberative process.  While any meeting of the Board is in session, the following rules of decorum shall be observed . . . .  Persons addressing the Board shall not make any personal, impertinent, unduly repetitive, slanderous or profane remarks to the Board, any member of the Board, staff or general public, nor utter loud, threatening, personal or abusive language, nor engage in any other disorderly conduct that disrupts, disturbs or otherwise impedes the orderly conduct of any Board meeting.  No person in the audience at a Board meeting shall engage in disorderly or boisterous conduct, including the utterance of loud, threatening or abusive language, whistling, stamping of feet or other acts which disturb, disrupt or otherwise impede the orderly conduct of any Board meeting.  Signs, placards, banners or similar items shall not be permitted at any time in the Board Hearing Room.  Unless addressing the Board or entering or leaving the Board, all persons in the audience shall remain sitting in the seats provided or standing in the area provided.

(Defs.' RJN Ex. 1; Compl. ¶ 16)  The remaining three Rules read:

2) Enforcement of Decorum of Public Comment Speakers.  The Presiding Officer may request that a person speaking at the podium during a public comment period who is violating the rules of decorum, comply immediately.  If, after receiving a warning from the Presiding Officer, a person persists in violating the rules of decorum during that meeting or during any of the next two meetings immediately following the meeting at which the warning was given, the Presiding Officer shall order him or her to leave the Board meeting.  Any person so ordered removed shall be excluded from further attendance at the

---

[10] The Court takes judicial notice of Defendants' Exhibit 1 in their Request for Judicial Notice pursuant to Federal Rule of Evidence 201.  Exhibit 1 is a public record, the authenticity of which is capable of accurate and ready determination by sources whose accuracy cannot reasonably be questioned.  Defendants have requested the Court take judicial notice of this Exhibit and Hunt fails to contest its authenticity or accuracy.  Hunt has also attached the Rules to his Complaint as Exhibit A.

Case 2:12-cv-07261-FM   SH   Document 23   Filed 12/06/12   ..ge 5 of 14   Page ID #:205

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

meeting from which he or she has been removed, unless permission to attend is granted upon motion adopted by a majority vote of the Board. If that person does not remove himself or herself, the Presiding Officer may order the sergeant-at-arms of the Board to remove that person from the Board Meeting. The Board appoints any officer from the Office of Public Safety or Park Ranger in attendance at a Board meeting as the sergeant-at-arms for the purposes of providing security and enforcing these Rules.

3) Enforcement of Decorum of Audience Members. A member of the audience who is violating the rules of decorum shall comply immediately when so ordered by either the Presiding Officer or the sergeant-at-arms. If the audience member does not comply immediately, the sergeant-at-arms has the authority to remove him or her, without the need of a warning or order from the Presiding Officer. These enforcement provisions are in addition to the authority held by the sergeant-at-arms to maintain order pursuant to his or her lawful authority as a peace officer.

4) Penalties. Any person who has been ordered removed from a meeting may be charged with a violation of Penal Code Section 403, and/or other appropriate Penal Code or Los Angeles Municipal Code sections. The Board by majority vote may prohibit a person removed on the basis of disruptive conduct from addressing the Board for up to 30 days. The length of time of the prohibition shall be based on the number and severity of prior incidents of disruptive conduct.

(Defs.' RJN Ex. 1; Compl. ¶¶ 17–18.)

Hunt alleges that the Rules, as interpreted and applied by Defendants are: (1) impermissible prior restraints on free expression and the right of assembly; (2) content-based restrictions on protected expression; and (3) vague and ambiguous and allow for unbridled, discretionary enforcement based on subjective analysis by Defendants. (Compl. ¶ 18.) Specifically, Hunt challenges the Rules' absolute ban on "[s]igns, placards, banners, or similar items" as an unwarranted prior restraint and overbroad prohibition on peaceful and protected speech. (Id. ¶ 21.)

Hunt also challenges the terms "disorderly," "boisterous," "loud," "threatening," "abusive language," "other acts," "which disturb, disrupt or otherwise impedes the orderly conduct of any Board meeting" as impermissibly vague and ambiguous and lacking in any guidelines to determine which specific acts, conduct, or language fall into these undefined categories. (Id. ¶ 20.) Hunt alleges that the Rules are overbroad on their face and as-applied. (Id.)

147

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### MEMORANDUM

Hunt claims that Rule 3, regarding "Enforcement of Decorum of Audience Members," violates his due process rights and the right of assembly by failing to afford him any notice and opportunity to be heard to challenge his removal and by failing to provide any process to challenge the decision of the Presiding Officer or sergeant-at-arms before the violation of his constitutional rights. (Id. ¶ 22.)

Finally, Hunt challenges the constitutionality of Defendants' use of California Penal Code § 403 "by charging Plaintiff with a violation thereof when in fact Plaintiff did not actually disturb or break up the Public Meeting." (Id. ¶ 27.) Hunt's first claim for relief alleges violations of his First, Fifth, and Fourteenth Amendment rights as well as his rights under Article 1, Section 2 of the California constitution regarding his allegedly unconstitutional arrest and expulsion from the Public Meeting. (Id. ¶¶ 26–32.) Hunt's second claim for relief alleges violation of the same rights as a result of the enforcement of the Rules. (Id. ¶¶ 33–40.)

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows an attack on the pleadings for failure to state a claim upon which relief can be granted. "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, 551 U.S. 89, 94 (2007). However, allegations contradicted by matters properly subject to judicial notice or by exhibit need not be accepted as true, Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001). The Court also need not "accord an assumption of truthfulness to legal conclusions that are not supported by factual allegations in the Complaint or that are contradicted by documents referred to in the Complaint." Colony Cove Properties, LLC v. City of Carson, 640 F.3d 948, 957 (9th Cir. 2011) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003)).

A complaint must "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A complaint does not suffice if it tenders naked assertion[s] devoid of further factual enhancement." Iqbal, 556 U.S. at 678 (alteration in original; internal quotation marks omitted). This means that the complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. Ruling on a motion to dismiss will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] – that the pleader is entitled to relief." Iqbal, 556 U.S. at 679 (alteration

148

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

in original; internal quotation marks and citation omitted).

"Normally, when a viable case may be pled, a district court should freely grant leave to amend." Cafasso v. Gen. Dynamics C4 Sys., 637 F.3d 1047, 1058 (9th Cir. 2011).

## III.   DISCUSSION

As noted above, Defendants seek to dismiss only Hunt's First Amendment facial challenges to the Rules and his claim under Article 1, Section 2 of the California Constitution. Accordingly, the Court does not address Hunt's as-applied challenges or his claim seeking to invalidate California Penal Code section 403.

A.      Facial Challenge to the Rules of Decorum[11]

Hunt alleges that the Rules are facially overbroad and vague. (Compl. ¶ 20.)

1.      Overbreadth

"For a statute to be facially invalid on overbreadth grounds, it must be *substantially* overbroad." Acosta v. City of Costa Mesa, 694 F.3d 960, 970 (9th Cir. 2012) (citing Members of City Council of City of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 800–01 (1984)). "There must be 'a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court.'" Id. (quoting Taxpayers for Vincent, 466 U.S. at 801). "A statute will not be held invalid simply because we can 'conceive of a single impermissible application.'" Id. (quoting Broadrick v. Okla., 413 U.S. 601, 630 (1973)). Additionally, "in a limited public forum such as a city council meeting, a city's rules of decorum will not be facially overbroad 'where they only permit a presiding officer to eject an attendee for actually

---

[11] Defendants claim that Hunt's First Amendment facial challenges are barred by the statute of limitations for § 1983 claims. As Hunt correctly points out, in Maldonado v. Harris, 370 F.3d 945, 955 (9th Cir. 2004), the Ninth Circuit "express[ed] serious doubts that a facial challenge under the First Amendment can ever be barred by a statute of limitations." While the Maldonado court did not rule on the issue of the proper statute of limitations for a § 1983 claim, the court did recognize that "a significant number of district courts have held that facial challenges under the First Amendment are not subject to the statutes of limitation applicable to § 1983 actions." Id. at 955 n.6. Given the Ninth Circuit's serious doubts in Maldonado and the lack of intervening case law regarding the statute of limitations, the Court declines at this time to find that Hunt's First Amendment facial challenges are time-barred.

149

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

disturbing or impeding a meeting.'" Id. at 971 (quoting Norse v. City of Santa Cruz, 629 F.3d 966, 976 (9th Cir. 2010) (en banc)). "A city, however, cannot define actual disturbance in any way it chooses; the statute must not unnecessarily restrict protected speech." Id.

"The first step in an overbreadth analysis is to construe the challenged statute." Id. When analyzing a facial challenge, the Court "must consider the City's authoritative constructions of the ordinance, including its own implementation and interpretation of it." Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 946 (9th Cir. 2011).

In this facial analysis, White v. City of Norwalk, 900 F.2d 1421 (9th Cir. 1990) is dispositive.[12] In Norwalk, the plaintiff brought a facial challenge to a city ordinance that proscribed "personal, impertinent, slanderous or profane remarks." Id. at 1424. The Norwalk court declined to find that the city ordinance was substantially and fatally overbroad. Id. at 1426. The Acosta court explained the reasoning in Norwalk:

> The City of Norwalk, however, offered a narrow construction of the ordinance that only permitted removal when someone who made a proscribed remark was acting in a way that actually disturbed the meeting. We adopted this construction, because language after the offending phrase indicated that the prohibited conduct must be conduct which "disrupts, disturbs or otherwise impedes the orderly conduct of any Council meeting."

> In adopting the City of Norwalk's narrow construction, we held that the city

---

[12] The Norwalk Municipal Code section at issue in Norwalk provided:

> (b) Rules of Decorum. While any meeting of the City Council is in session, the following rules of order and decorum shall be observed: . . .

> 3. Persons Addressing the Council . . . . Each person who addresses the Council shall not make personal, impertinent, slanderous or profane remarks to any member of the Council, staff or general public. Any person who makes such remarks, or who utters loud, threatening, personal or abusive language, or engages in any other disorderly conduct which disrupts, disturbs or otherwise impedes the orderly conduct of any Council meeting shall, at the discretion of the presiding officer or a majority of the Council, be barred from further audience before the Council during that meeting.

900 F.2d at 1424.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

> council meetings, once open to public participation, are limited public forums.
> A council can regulate not only the time, place, and manner of speech in a
> limited public forum, but also the content of the speech with reasonable and
> viewpoint neutral regulations.

694 F.3d at 971 (citations omitted). As in <u>Norwalk</u>, the City here offers a narrow and constitutionally permissible construction of the statute. Specifically, the City points to requirements of the Rules that mandate that an actual disturbance must occur prior to an attendee being eligible for ejection. First, the City explains that the Rules require: "Persons addressing the Board shall not make any personal, impertinent, unduly repetitive, slanderous or profane remarks to the Board, any member of the Board, staff or general public, nor utter loud, threatening, personal or abusive language, *nor engage in any other disorderly conduct that disrupts, disturbs or otherwise impedes the orderly conduct of any Board meeting.*" (<u>Id.</u>) Second, the provision of the Rules dealing with audience members states that "[n]o person in the audience at a board meeting shall engage in disorderly or boisterous conduct, including the utterance of loud, threatening or abusive language, whistling, stamping of the feet or other acts which disturb, disrupt or otherwise impede the orderly conduct of any Board meeting." Like the court in <u>Norwalk</u>, this Court, faced with very similar language, "cannot say that the ordinance on its face is substantially and facially overbroad." <u>Norwalk</u>, 900 F.2d at 1426 (citing <u>Broadrick</u>, 413 U.S. at 615)). The Court concludes that the Rules are "readily susceptible to the City's interpretation" and thus "adopt[s] the City's narrower construction." <u>Id.</u> at 1424. This narrower construction of the Rules, which requires actual disruption, is plainly constitutional.

Hunt's arguments in favor of his facial overbreadth challenge confuse the distinction between facial and as-applied challenges. Hunt argues that "[t]here is no evidence that the City has in the past construed the Rules to require 'actual disruption.'" (Pl.'s Opp'n 13.) However, Hunt has brought forth no evidence whatsoever, nor has he alleged any instances in which the City has previously construed the Rules in a manner inconsistent with its proffered interpretation of the Rules. As the City points out, "Plaintiff's particular factual situation or speech activity is irrelevant for purposes of the facial analysis." (Defs.' Reply 7.) Hunt's particular factual situation will be relevant to his as-applied challenge but is not relevant here.

2.    Vagueness

Hunt also alleges that the Rules are unconstitutionally vague. "An ordinance is unconstitutionally vague 'if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits,' or 'if it authorizes or even

15)

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

encourages arbitrary and discriminatory enforcement.'" <u>Gospel Missions of Am. v. City of L.A.</u>, 419 F.3d 1042, 1047 (9th Cir. 2005) (quoting <u>Hill v. Colo.</u>, 530 U.S. 703, 732 (2000)). "There must be a greater degree of specificity and clarity when First Amendment freedoms are at stake." <u>Id.</u> (citation omitted). "However, 'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" <u>Id.</u> (quoting <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 110 (1972). "As a result, uncertainty at a statute's margins will not warrant facial invalidation if it is clear what the statute proscribes in the vast majority of its intended applications." <u>Id.</u> (citations and quotation marks omitted).

In this case, the Rules are not unconstitutionally vague. Hunt's one sentence vagueness argument is that "[t]he Rules violate the First Amendment by employing such undefined, content-based terms as 'impertinent,' 'slanderous,' and 'abusive,'" which invite (and in this case did invite i.e. SANDERS: 'offensive' expression) subjective personal yet official judgments based on the content of the speaker's message." (Pl.'s Opp'n 14.) This argument is insufficient to support a finding that the Rules are unconstitutionally vague. Hunt fails to provide factual allegations, examples, explanations, or even conjecture to show how these words could possibly be impermissibly vague. Simply stating the bare legal conclusion that the Rules are unconstitutionally vague falls well short of the pleading requirements of <u>Twombly</u> and <u>Iqbal</u>. When these legal and factual deficiencies are considered alongside the Ninth Circuit's rejection of facial First Amendment challenges to the <u>Norwalk</u> Rules of Decorum, it is clear that this facial vagueness claim must be dismissed.[13]

Hunt's First Amendment facial overbreadth and vagueness challenges to the Rules of Decorum fail. These claims are dismissed with leave to amend.

      B.      Facial Challenge to the Prohibition on Signs, Placards, and Banners in the Boardroom

Hunt brings a facial overbreadth and vagueness challenge to the portion of the Rules stating that "[s]igns, placards, banners or similar items shall not be permitted at any

---

[13] Hunt also alleges that the Rules facially violate the First Amendment prior restraint doctrine. Under that doctrine, "a law cannot condition the free exercise of First Amendment rights on the unbridled discretion of government officials" and "[r]egulations must contain narrow, objective, and definitive standards." <u>World Wide Rush, LLC v. City of L.A.</u>, 606 F.3d 676, 687 (9th Cir. 2010) (citations and quotation marks omitted). For the reasons explained in the vagueness analysis, the Court finds that the Rules on their face are not an unconstitutional prior restraint. Put simply, the Rules do not provide Board officials or the City "unbridled discretion," and they contain "narrow, objective, and definitive standards."

152

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

time in the Board Hearing Room." (Compl. ¶ 21.) As noted above, the Board Hearing Room is a limited public forum. "[T]he government's power is at its least when speech takes place in a public forum, is greater when it is regulating speech in a limited public forum, and is at its greatest when regulating speech in a non-public forum." Johnson v. Poway Unified School Dist., 658 F.3d 954, 961 (9th Cir. 2011) (citing Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 44–46 (1983)). "[L]imitations on speech at [meetings in a limited public forum] must be reasonable and viewpoint neutral, but that is all they need to be." Kindt v. Santa Monic Rent Control Bd., 67 F.3d 266, 271 (9th Cir. 1995).

1.      Overbreadth

On its face, the prohibition of signs, placards, banners, or similar items is a viewpoint neutral restriction. In examining the content neutrality of a restriction, the Court does not "make a searching inquiry of a hidden motive" but will "look at the literal command of the restraint." Kaahumanu v. Haw., 682 F.3d 789, 808 (9th Cir. 2012) (citation and quotation marks omitted). The literal command of the Rules is viewpoint neutral as it bans all signs, placards, banners, or similar items regardless of what message, if any, they might carry.

In addition to the requirement of viewpoint neutrality, the Rules must also be "reasonable in light of the purpose of the forum" in order to avoid running afoul of the First Amendment. Wright v. Incline Vill. Gen. Improvement Dist., 665 F.3d 1128, 1138 (9th Cir. 2011). It is well-settled that a city board has a "legitimate interest in conducting efficient, orderly meetings" and that "reasonable time, place, and manner restrictions that preserve" this interest are permissible under the First Amendment. Kindt, 67 F.3d at 271 (citing City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n, 429 U.S. 167, 175 n.8 (1976)). The Board's restriction on signs, placards, banners, and similar items is a reasonable restriction, enacted to protect the Board's legitimate interest in running efficient and orderly meetings. Further, as the Defendants note in their reply, "a person is free to attend the Board meeting and speak during the public comment portion as long as the signage is left outside of the Board Room. The Rules do not prohibit picketing outside of the Board Room nor do they prohibit providing written materials or statements to the Board. Therefore, ample alternative forms of communication are available." (Defs.' Reply 9.) As the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government," Perry Educ. Ass'n, 460 U.S. at 46, and the "government may limit the use of properties under its control to the uses to which the properties are lawfully dedicated," Wright, 665 F.3d at 1138, it is clear that the viewpoint neutral and reasonable restrictions contained in the Rules on signs, placards, and banners in the limited public forum is not

153

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

constitutionally invalid.

Additionally, Hunt's claim that <u>United States v. Grace</u>, 461 U.S. 171 (1983) controls this case misses the mark. <u>Grace</u> considered a prohibition on "the distribution of leaflets on the Supreme Court grounds, which includes the sidewalk." <u>Id.</u> at 173. <u>Grace</u> considered only the "right to use the public sidewalks surrounding the Court building for the communicative activities [appellees] sought to carry out, and [the Court] address[ed] only whether the proscriptions of [the statute prohibiting such protests were] constitutional as applied to the public sidewalks." <u>Id.</u> at 175–76. The key distinction between the instant case and <u>Grace</u> is that <u>Grace</u> involved only a public forum — the sidewalk — whereas the Board Meeting in this case took place in a limited public forum. The distinction is crucial. As explained above, the fact that the Rules apply to a limited public forum means that the Rules' restriction on signs, banners, placards, and similar items does not run afoul of the First Amendment. <u>Grace</u> does not control.

Hunt also claims that this restriction "contains no explicit limits on an official's discretion in deciding what will be prohibited." (Pl.'s Opp'n 16.) This argument fails — there is *no* discretion to limit. As Defendants explain, the restriction's "flat, plain terms do not grant the presiding officer any discretion on enforcement," and "[a]ny Board meeting attendee, regardless of the message contained on his sign, placard or banner, is prohibited from bringing such items into the Board Hearing Room." (Defs.' Mot. to Dismiss 13.) This prior restraint variant on Hunt's facial challenge also fails.

The Rules' restriction on signs, banners, placards, and similar items is not an unconstitutional prior restraint on its face nor is it unconstitutionally overbroad. Hunt's claim is dismissed with leave to amend.

    2.    Vagueness

Finally, Hunt claims that the Rules' "signs, placards, banners, or similar items" ban is unconstitutionally vague. Hunt asks whether "a 'sign' include[s] a T-shirt bearing constitutionally protected speech" and whether the term "similar items" might cover "a USA flag pin, a baseball hat reading 'Vote for Sanders,' a yellow ribbon honoring veterans, a black arm band protesting the War in Afghanistan, etc?" (Pl.'s Opp'n 16.) The City has not directly addressed Hunt's vagueness claims. The City has not provided an interpretation of the Rules with respect to the scope and coverage of the ban on "signs, placards, banners, or similar items." As such, the Court cannot determine whether the Rules' ban is unconstitutionally vague on its face at this time. The City's motion on this issue is denied.

    C.    California State Law Claim

154

EXHIBIT M

155

*Recording on views at 1 a.03983463-34-F-78c5-865d-972e1e5e25d*
*spe cards at tablet "HeBB"*

Called by Committee Chair

SPECIAL MEETING - RULES, ELECTIONS, INTERGOVERNMENTAL RELATIONS, AND
NEIGHBORHOODS COMMITTEE

Wednesday, May 11, 2016

VAN NUYS CITY HALL - 6:00 PM

COUNCIL CHAMBER
14410 Sylvan Street, 2nd Floor
Van Nuys, CA 91401

MEMBERS:   COUNCILMEMBER HERB J. WESSON, JR., CHAIR
COUNCILMEMBER JOSE HUIZAR
COUNCILMEMBER MARQUEECE HARRIS-DAWSON

(Richard Williams - Legislative Assistant - (213) 978-1071 or email richard.williams@lacity.org)

Click here for agenda packets

---

Note: For information regarding the Committee and its operations, please contact the Committee
Legislative Assistant at the phone number and/or email address listed above. The Legislative Assistant
may answer questions and provide materials and notice of matters scheduled before the City Council.
Sign Language Interpreters, Communication Access Real-Time Transcription (CART), Assistive
Listening Devices, or other auxiliary aids and/or services may be provided upon request. To ensure
availability, you are advised to make your request at least 72 hours prior to the meeting/event you wish
to attend. Due to difficulties in securing Sign Language Interpreters, five or more business days notice is
strongly recommended. For additional information, please contact the Legislative Assistant listed above.

ITEM NO.   (1)
16-0093

Joint City Administrative Officer and Chief Legislative Analyst report relative to
governance reform of the Los Angeles Department of Water and Power (DWP),
and proposals for Los Angeles City Charter and Administrative Code Amendments
for inclusion in a 2016 ballot measure. (For more information:
http://dwpreform.lacity.org/.)

Remarks by Deputy Mayor Barbara Romero

Remarks by the Valley Alliance of Neighborhood Councils

Presentation by the DWP Advocacy Committee and the DWP MOU
Oversight Committee

Public Comment and Question and Answer Session with the Public

Fiscal Impact Statement Submitted: No.
Community Impact Statement: Yes.

*exhibit M*
*( Attachment*

*156*

For:              Bel-Air Beverly Crest Neighborhood Council
                     Eagle Rock Neighborhood Council
                     Historic Highland Park Neighborhood Council
                     Los Feliz Neighborhood Council

For if Amended:   Lake Balboa Neighborhood Council
General Comments: Studio City Neighborhood Council

If you challenge this Committee's action(s) in court, you may be limited to raising only those issues you or someone else raised at the public hearing described in this notice, or in written correspondence delivered to the City Clerk at or prior to, the public hearing. Any written correspondence delivered to the City Clerk before the City Council's final action on a matter will become a part of the administrative record.

Materials related to an item on this agenda submitted to the committee after distribution of the agenda packet are available for public inspection in the City Clerk's Office at 200 North Spring Street, Room 395, City Hall, Los Angeles, CA 90012 during normal business hours.

157

**EXHIBIT N**

158

2DCA-04

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT, DIVISION <u>Pre-Division</u>

<u>OFFICE OF THE CITY ATTORNEY</u>,

_Plaintiff and <u>Respondent</u>_,

v.

<u>WAYNE SPINDLER</u>,

_Defendant and Appellant_.

Appeal No. <u>B276413</u>

Super. Ct. No. <u>BS 162097</u>

**APPLICATION FOR EXTENSION OF TIME**

1. To file <u>Respondent's Brief</u>     to     <u>Sep 13, 2017</u>     Total days: ( 30 )
   (Document Name)                            (Date)

2. I need more time for the following reason(s) _(specify)_:
   I have other deadlines that as a practical matter preclude the filing and preparation of Respondent's Opening Brief by the present due date of August 14, 2017 without impairing its quality.

For attorneys filing application on behalf of client, I certify that I have delivered a copy of this application to my client (Cal. Rules of Court, rule 8.60).

I declare under penalty of perjury that the foregoing is true and correct. Executed at     <u>Los Angeles</u>,
California, on _____ <u>Jul 18, 2017</u>.

<u>HUGO S. ROSSITTER</u>
(TYPE OR PRINT NAME)

Bar No.: <u>079335</u>

(SIGNATURE)

Phone No.: <u>213-978-7153</u>

| Record Size: | | Vol./Pgs. | | Vol./Pgs. | | Date Filed |
|---|---|---|---|---|---|---|
| | Appendix/CT: | 54 pg. | RT: | 7 pg. | | 02/28/2017 |
| | Augmentation     CT: | 17 pg. | RT: | | | 06/23/2017 |
| Briefs Filed: | | | | | | Date Filed |
| | | | | AOB | | 07/14/2017 |
| | | | | RB | | |
| Number of Previous Extension Requests | | | Number | Date | Total Number of Days | |
| | | | 0     To | _____ | ( ) | |
| Were any previous extension grants marked "no further"?     (Yes or No) | | | | | | |

EXTENSION OF TIME IS:

☐ Granted to _____
☐ Denied

Date:

_____
(SIGNATURE OF PRESIDING JUSTICE)

2DCA-04 (Rev. 3/2017)          **APPLICATION FOR EXTENSION OF TIME**

exhibit N

159

2DCA-15

**PROOF OF SERVICE (Court of Appeal)**
**Mail, Electronic Service or Personal Service**

Case Name:

Court of Appeal Case Number: B276413

Superior Court Case Number: BS 162097

1. At the time of service I was at least 18 years of age and **not a party to this legal action.**

2. My  ☐ residence  ☒ business  address is *(specify):*

My electronic service address is: sylvia.martinez@lacity.org

3. I mailed, electronically served or personally delivered a copy of the
   as indicated below *(complete either a, b or c):*

   a. ☒ **Mail.** I mailed a copy of the document identified above as follows:

   b. ☐ **Electronic service.** I electronically served a copy of the document identified above as follows:

   c. ☐ **Personal delivery.** I personally delivered a copy of the document identified above as follows:

   Date mailed, electronically served or personally served: Jul 18, 2017

   (1) Name of Person served: WAYNE SPINDLER

   On behalf of *(name or names of parties represented, if person served is an attorney):*

   **Office of the City Attorney**

   (a) Address:   P.O. BOX 16501, ENCINO, CA 91416-6501

   (b) E-Mail Address:

   (2) Name of Person served:

   On behalf of *(name or names of parties represented, if person served is an attorney):*

   (a) Address:

   (b) E-Mail Address:

   (3) Name of Person served:

   On behalf of *(name or names of parties represented, if person served is an attorney):*

   (a) Address:

   (b) E-Mail Address:

4. I am a resident of or employed in the county where the mailing occurred. The document was served from
   *(city and state):* Los Angeles, California

   ☐ Additional persons served are listed on the attached page *(See page 3).*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: Jul 18, 2017

Sylvia Martinez
(TYPE OR PRINT NAME OF PERSON COMPLETING THIS FORM)                    (SIGNATURE OF PERSON COMPLETING THIS FORM)

(Rev. 7/2013)                         **PROOF OF SERVICE**                         Page 1 of 2
                                        **(Court of Appeal)**

160

**EXHIBIT O**

*161*

CORY RECEIVED
7/12/17
DEPT 105   3:50PM



Re: 7 #W 01632

# LA City Hall critic to destroy guns, pleads guilty to disturbing the peace

By: City News Service

RECEIVED
JUL 1 2 2017
CA/VN Pre-Trial

POSTED: Tuesday, July 11, 2017 - 7:19 p.m.
UPDATED: A DAY AGO



Wayne Spindler is shown at a Los Angeles City Council meeting. (*Photo courtesy LA Cityview Channel 35*)

LOS ANGELES >> A frequent City Hall critic who was arrested after submitting a public-meeting

comment card containing Ku Klux Klan imagery and a racial slur pleaded guilty to a misdemeanor

disturbing-the-peace charge and agreed to destroy a variety of weapons and ammunition, the City

Attorney's Office confirmed Tuesday.   exhibit (10)   162

Wayne Spindler, a 47-year-old lawyer who lives in Encino, reached the plea deal Friday, agreeing to destroy three handguns, some ammunition, an assault rifle and five ammunition magazine clips. Charges of illegally possessing an assault rifle and illegal possession of the magazine clip were dropped, according to city prosecutors.

Spindler had been facing up to a year in jail if he had been convicted of the misdemeanor weapons-related charges. He was sentenced to a $200 fine and one day in county jail, but both were waived due to the eight hours he spent in police custody after being arrested, according to the City Attorney's Office.

• RELATED STORY: <u>LA City Hall gadfly won't face charges for racist comments directed at councilman</u>

Spindler, who could not be immediately reached for comment, is a regular speaker during public comment periods at City Council and Police Commission meetings. He frequently uses vulgar or racist language, sometimes wears a KKK mask or speaks through a puppet, and has been kicked out of numerous meetings after council members accused him of being disruptive while in the audience.

Advertisement



New Law Affects Seniors 65+
Seniors can keep benefit that new law is phasing out...
Read More
dailyfinancereport.org

Spindler was arrested in May 2016 after submitting the comment card with the racial slur and KKK imagery during a committee meeting chaired by Council President Herb Wesson.

Wesson, who is black, said he took the card as a threat and Spindler was arrested two days later on a felony charge of making a criminal threat, although the District Attorney's Office decided in December not to press any charges.

163

• RELATED STORY: <u>LA City Council proposes trespassing citations amid complaints about 'gadflies'</u>

Wesson obtained a temporary restraining order against Spindler, requiring the attorney to surrender all firearms in his possession to the Los Angeles Police Department. Among the four weapons Spindler turned in was a Norinco 56S-1 Category 1 Assault Rifle, which is a variant of the Russian AK-47, a weapon illegal for unregistered possession in the state of California since 1991, according to the City Attorney's Office.

Rob Wilcox, a spokesman for City Attorney Mike Feuer, said none of the weapons Spindler turned in were registered to him, and added, "As more evidence was discovered we found it unlikely that we could prevail on the possession charge."

Wilcox did not elaborate on why the gun charges were dropped.

In January, Spindler filed a federal lawsuit against the city, claiming his civil rights had been violated when he was arrested.

The restraining order Wesson received against Spindler is still active, although it allows him to continue to speak at public meetings even if Wesson is present.



KNOW YOUR
NEIGHBORHOOD
Sign up for our local email newsletters.

SIGN ME UP NOW

**You Might Like**

164



Editorial cartoon of the day

Recommended by

Marketplace



© 2017 Digital First Media

v. 0.968

Contact Us                    Privacy Policy                    Copyright

View Desktop Site

165

**EXHIBIT P**

16 &



MONDAY, JULY 17, 2017 **B3**

# City Hall critic strikes a deal

**Man accused of racial taunt had faced gun charges but pleads no contest to infraction.**

BY RICHARD WINTON

An attorney engaged in a controversy with Los Angeles City Hall has pleaded no contest to disturbing the peace, according to court records and city prosecutors.

Wayne Spindler, an Encino attorney, entered the plea to the infraction July 7 after the Los Angeles city attorney's office agreed to dismiss charges of misdemeanor possession of an assault weapon and possession of a high-capacity magazine, an infraction, city prosecutors and court records say.

The gun-related charges stemmed from a restraining order limiting Spindler's contact with Los Angeles City Council President Herb Wesson.

Spindler was arrested in May 2016 a few days after he handed in a public comment card during a city committee meeting in Van Nuys. The card included drawings of a burning cross and a stick fig-



ALLEN J. SCHABEN Los Angeles Times

...ed by swordfishing nets.

## ...imals

...ready in place."

Oceana alleges that Ross did not determine that the proposed limits were inconsistent with the fishery management plan — a potential violation of the Magnuson-Stevens Fishery Conservation and Management Act, which dictates the process for considering regulations recommended by fishery...

...card also included a racial slur and the name of Wesson, who is African American. Wesson said he regarded the card as threatening, according to court records.

A judge issued a restraining order preventing Spindler from coming near Wesson's home, office or vehicle, although he was allowed to speak at public meetings, records show. Spindler turned in multiple weapons to L.A. police for safekeeping to comply with the order's no firearms requirement, records show.

The Los Angeles County district attorney declined to file a charge against Spindler in connection with

Spindler in connection with the committee meeting, citing insufficient evidence and 1st Amendment concerns.

City Atty. Mike Feuer's office in April filed the charge of possessing an assault weapon.

About two weeks ago, city prosecutors and Spindler struck a plea deal allowing him to plead no contest to disturbing the peace, which was unrelated to the City Council meeting.

The court ordered that the firearms Spindler relinquished — several pistols, a rifle and five rifle magazines — be destroyed, Los Angeles city attorney spokesman Rob Wilcox said.

Wilcox said his office agreed to the plea deal because it was "unlikely that we could prevail" on firearms charges. "It was a generic infraction that is commonly used as an alternative charge as part of plea agreements," he said in a statement.

Spindler said in an interview that the city attorney's office has sought to persecute him since last year's city meeting. He accused the office of incorrectly stating its case against him.

In January, Spindler filed a federal lawsuit accusing the city of violating his free speech and other constitutional rights. It is pending.

According to court documents, Spindler said his drawings on the comment card were satirical and protected political speech, and the person depicted hanging from a tree symbolized the city's Department of Water and Power "lynching" residents with high water rates. He also said in court documents that the racial slur had been used by others at council meetings to refer to Wesson as a "sellout" to his

exhibit A

167